UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | NO. 4:22-cr-00612-3 |
| | § | |
| JOHN RYBARCZYK | § | |

_____

**REPLY BRIEF IN SUPPORT OF RYBARCZYK'S MOTIONS TO DISMISS**

TO THE HONORABLE ANDREW HANEN, UNITED STATES DISTRICT JUDGE:

Mr. Rybarczyk respectfully submits this reply in response to the primary arguments raised by the Government in response to his Motions to Dismiss (Dkt. 267).

### A. *The Government is wrong: securities fraud by "omission" does require a "duty" to disclose.*

Rybarczyk moved to dismiss the Superseding Indictment ("SI"), in part, on the grounds that where the fraud alleged is fraud by "omission"—in this case a failure to disclose stock sales—there must be some corresponding duty to disclose those stock sales. Dkt. 267 at 22-34. The SI, however, fails to allege such a duty. The Government responds that no such duty is required, and in any event, such a duty arose when Rybarczyk "chose to speak on the subject of [his] stock sales. *See* Dkt. 297 at 10. The Government is wrong, and as a result, all allegations based on "material omissions," *i.e.*, a failure to disclose stock sales, must be dismissed. *See United States v. Elizabeth Holmes*, 18-CR-258-EJD, 2020 WL 666563, *14 (N.D. Ca. Feb. 11, 2020) ("[t]he ability to use an omission to form the basis of a scheme to defraud is narrow … an indictment *must allege facts giving rise to a duty to disclose*") (citations omitted) (emphasis added).

1

*First*, Rybarczyk cited multiple recent 5th Circuit decisions which held that under the federal fraud statutes, fraud by omission is actionable "*only* where the defendant is under a duty to disclose." *See* Dkt. 267 at 23; *see, e.g., United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016). In its Opposition, the Government did not even note the existence of those cases, let alone distinguish them. But the Government should not be surprised that the federal fraud statutes—and particularly fraud by omission allegations, where a defendant is being prosecuted for what he did *not* say—are cabined by a required "duty," which acts as an important safeguard to prevent the overuse of federal statutes to target conduct that, while perhaps unsavory, is not illegal.

In fact, just last month, in *Percoco v. United States*, 21-1158, 598 U.S. ____ (May 11, 2023), the Supreme Court reiterated the long-held view that to be guilty of a particular species of mail and wire fraud—in *Percoco* it was "honest-services" wire or mail fraud punishable under Title 18, U.S.C., Section 1346—a defendant must have a "fiduciary duty" to the entity being defrauded. The *Percoco* court also rejected the government's attempts to expand "fiduciary" responsibilities to non-governmental employees in most situations. *Id*. at 7. As the Supreme Court recognized in *Percoco*, the imposition of a strict duty requirement was needed to prevent the expansion of vague criminal laws by zealous prosecutors who may seek to sweep in every imaginable conduct under the federal fraud laws. *Id*. at 7 (further explaining that "*Skilling* was careful to avoid giving Section 1346 an indeterminate breadth that would sweep in any conception of 'intangible rights of honest services' recognized by some courts prior to *McNally*.").

The Supreme Court's reasoning in *Percoco* is directly on point here. Without an affirmative duty to disclose, literally every stock trader who touts a stock on Twitter—but fails to

disclose specific sales—could be swept up in a Government dragnet. Thus, a duty requirement for omissions serves two important functions. *First*, it puts important limits on Government overreach, and *second*, it puts people on notice as to what the federal fraud laws actually require: people have a duty to disclose material information *only* when that person has a fiduciary or trusting relationship with another person, which is what people typically expect. Tweeting general platitudes about certain stocks or trading positions to the public, without more, does not (and should not) create a duty to disclose all of one's stock trades or financial positions.

**Second**, the cases the Government *does* cite for the proposition that no "duty to disclose" is required in a fraud by omission case are either out of Circuit or unhelpful to their argument. *See* Dkt. 297 at 9-10. For example, in *United States v. Mathews,* 31 Fed. App'x 838, 2002 WL 261421, at *9 (5th Cir. 2002), the court did *not* hold that no duty was required for omissions. The court held that the fraud statutes "do not require a duty to disclose *imposed by statute or regulation*." Rybarczyk does *not* argue that he had no duty to disclose stock sales because no "statute or regulation" required him to disclose—although he does cite to relevant SEC regulations to buttress his arguments. Rather, Rybarczyk contends that there is no disclosure duty because, like *Percoco* who owed no fiduciary duty to the New York State Government, Rybarczyk is a Twitter influencer who has no connection to any of the purported victims other than those who have affirmatively chosen to view his statements on social media.

**Third**, the Government argues that even if a duty is required under the law, a "duty to disclose arose when Defendants chose to speak on the subject of their stock trades." Dkt. 297 at 10. From that, the Government contends that this is not a "case of 'mere omissions,'" but rather of "affirmative misrepresentations." But this argument misses the point. Rybarczyk's duty argument applies *only* to omissions and *not* to affirmative misrepresentations. *See* Dkt. 267 at 23

3

("to the extent that the Indictment relies on the alleged non-disclosure of sales or intent to sell, as described in Exhibit A, those allegations and corresponding counts must be dismissed"). Rybarczyk is <u>not</u> asking for the dismissal of the entire Superseding Indictment on "duty" grounds; however, granting his motion here will result in the dismissal of the majority of the counts and allegations.

The Government cites cases that, once again, do not support their argument. The Government relies on *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000), a case that expressly found that "fraud statutes are violated by … omissions of material information that the defendant has a duty to disclose." *Id*. at 118. Moreover, the Government leaves out a critical part of the *Autuori* decision concerning when a defendant must disclose information to correct any "half truths" or make statements "not misleading." Importantly, *Autuori* instructs that statements must be considered "in light of the circumstances under which they were made." *Id*. Here, Rybarczyk's statements were made on Twitter and Discord, forums where no one would reasonably expect *anyone*—let alone a Twitter influencer named "Ultra Calls"—to disclose all their trades or their "intent to trade," as the Government now believes. Certainly, no one would believe that "Ultra Calls" had a duty to do so, or that the federal fraud laws would intervene if he did not Tweet out his trading positions.

Finally, the Government's duty argument—that a "duty to disclose arose when Defendants chose to speak on the subject of their stock trades"—makes little sense when considered in the context of the actual Tweets cited in the Superseding Indictment. Many of those Tweets do not discuss Rybarczyk's stock trades at all. *See, e.g.,* Dkt. 267-1 Ex. A ¶ 45 ("$GTT 24RSI +++ major multi billion $$$ catalyst"); ¶86 ("$ABVC Still goes $6+"); ¶91 ("sorry all about $ABVC[.] Taking time to make sure next is a big winner. I'll make sure it's

4

available to discord and Twitter same time too….."); ¶97 ("$CEI That's a triple now @LadeBackk @MrZackMorris loving the action. Thanks for mentioning this idea. On the way to the $2 dolla bill next."). The Tweets are simply market commentary reflecting on the trajectories of various tickers. To the extent that Rybarczyk had a duty to disclose when he tweeted about his own trades—to be clear, he did not—he certainly did not have a duty to disclose when he tweeted market commentary or stock price projections.

*Fourth*, the Government completely fails to address the defense arguments concerning "traditional scalping" as well as the numerous examples of similar activity—Coinbase, Galaxy Digital, and Bed Bath and Beyond—that remain uncharged by the Government. *See* Dkt. 267 at 23-34. Certainly, the Government does not have to respond to every defense argument, but to assert that the defense arguments need no reply and that this Court—without citation—should "simply ignore these points," Dkt. 297 at 10, makes clear that the Government does not tackle these important arguments because it has no answers for them.

For all these reasons, the Government is using the federal fraud laws to radically reshape disclosure duties in the United States. If this case were to stand, random Twitter or Discord users—even those with few followers—must disclose their trades concurrently with their online musings or else risk arrest. This Court should put a stop to that. Without a specific duty, social media users need not disclose.

### B. The Government has failed to allege that each statement or omission in the indictment was material.

In his motion to dismiss, Rybarczyk pointed to numerous statements alleged in the SI and explained how those particular statements could not have been material. *See* Dkt. 267 at 36-37. The Government fails to grapple with those specific statements, and instead contends that because the SI contains generic indicia of materiality, *see* Dkt. 297 at 12-13, the Government has

sufficiently alleged materiality as to the entire SI. But that is not the law. Rather, to plead materiality under Section 1348(2), the Government must allege sufficient facts to show that *each* of the SI's alleged misstatements was material. *See, e.g., Holmes*, 2020 WL 666563 *13 fn. 8 ("each misstatement must be 'material' to form the basis of the wire fraud charges") (*citing United States v. Woods*, 335 F.3d 993, 1000 (9th Cir. 2003) (for misstatements, materiality must be shown as to *each* alleged misstatement)); *see also* SI ¶¶ 117, 121 (for each fraud count, the Government alleges that Rybarczyk obtained money or property "by means of *materially* false and fraudulent, pretenses, representations, promises, and *material* omissions ....").

The Government's Opposition glosses over this requirement, and instead argues that materiality can be presumed because Defendants "designed their social media statements to induce their followers to participate as unwitting victims in the pump-and-dump scheme." Dkt. 297 at 12. But this argument misses the point. If the Government wants to allege that there were material false representations and promises made—as the charges chosen by the Government seem to indicate—it must also allege that those particular statements (and not just the broader scheme) were material. The Government fails to do that for the majority of the stock tickers alleged in the Superseding Indictment—ABVC (Count 13), GTT (Count 7), NAKD (Count 16), and EZFL (Count 17)—that were traded by Rybarczyk. Accordingly, those counts, at minimum, must be dismissed.

***Second***, the Government is incorrect that the "benefit of the bargain" defense to wire fraud does not apply here. *See* Dkt. 297 at 14-15. The Government does not dispute that the shares purchased by "victims" were on the open market, and that the defendants did not manipulate the price of the security through deceptive trading such as wash or match trading. At best, the Government alleges that the price of the securities rose because of defendants' own

6

open market purchases, which, of course, is not a criminal act. Thus, "victims" who purchased shares on the open market received the full "benefit of the bargain"— stock recommendations by the defendants (who also owned those same shares), and the shares themselves at the open market price. There certainly was no agreement or "bargain" entered into by Rybarczyk or anyone else to accurately provide to everyone on Twitter all of his purchases or sales of stock going forward on a real-time basis.

To circumvent this glaring defect, the Government contends that the defendants "misrepresented to their followers the nature and quality of the stocks they were touting …," and therefore, the "deceit affected the victim's economic calculus or the benefits and burdens of the agreement." Dkt. 297 at 14. But that is not accurate. As alleged in the SI, the core of the case is not that Rybarczyk falsely tweeted about the "nature and quality of the stocks," but rather that he tweeted, allegedly falsely, about his *own* trading positions, holdings and opinions of where the stock price would be in the future. *See* SI ¶¶. 82-91; 44-52. But missing from the SI is any allegation that there was *any* bargain between Rybarczyk and his Twitter followers—explicit or implicit—let alone a bargain whereby Rybarczyk would accurately disclose his own trading positions to his Twitter followers. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994) (mail fraud conviction of Government employee who concealed ownership interest in property Government agreed to purchase was overturned); *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016) (scheme to defraud refers "only to those schemes in which a defendant lies about the nature of the bargain itself.").

That is what distinguishes this case from traditional pump-and-dump schemes, where fraudsters issue false press releases or merger reports about the company itself. This also distinguishes this case from traditional "scalping" cases, where investment advisors fail to

disclose their stock sales or purchases to their customers in stocks that they were recommending, in violation on an implicit "bargain" reached with consumers that any advice received (and paid for) would be for the customer's benefit. For this reason too, the SI's alleged deceit or trickery by the defendants did not go to the "bargain" (or lack thereof) between the defendants and any victims, and therefore, it cannot sustain federal fraud charges.

### C.  *Section 1348 does not define what conduct is prohibited, and therefore, the statute is void for vagueness.*

*First*, in arguing that Section 1348 is not void-for-vagueness, the Government contends that ordinary people would understand what is prohibited by the statute because it clearly "prohibits schemes to defraud involving securities." *See* Dkt. 297 at 16. But that is not actually what the statute says. Section 1348(1), as an example, prohibits schemes "to defraud *any* person … in connection with … *any* security." As Rybarczyk argued in his Motion, it is nearly impossible to tell what conduct is prohibited by the statute because the "scheme" does not even have to involve the purchase or sale of a security, and the scheme does not require that the defendant scheme to obtain "money or property." [1] *See* Dkt. 267 at 45-46. Rather, *any* scheme directed against *any* person with *any* tangential connection to *any* security is punishable under the statute. If that is not vague, nothing is vague.

---

[1] The recent Supreme Court ruling of *Ciminelli v. United States*, 21-1170, 598 U.S. ____ (May 2023), which ruled that the wire fraud statute applied only to traditional property rights, appears to read the term "money or property" into sub-section 1 of the securities fraud statute. As Justice Thomas convincingly explains in his decision that was joined by every other justice, the wire fraud statute, on which Section 1348 was patterned, is limited to schemes to defraud to obtain "money or property," a term itself used in the wire fraud statute. This is so because the words "to defraud" specifically means "to wronging one in his property rights." *Ciminelli*, 598 U.S. ____(2023) at 4-5. Thus, "defraud" could imply an intent to obtain property, although the statute itself omits the word "property." This is just another example of how vague the statute truly is.

*Second*, the Government argues that Section 1348's "scienter requirement" saves it from a vagueness challenge.  Dkt. 297 at 17. Not so. The mail and wire fraud statutes—similar in kind to Section 1348—also have a specific intent to defraud requirement. But that has not stopped the Supreme Court from *twice* narrowing honest services mail and wire fraud on vagueness grounds because ordinary persons would not be on notice as to what conduct would be prohibited by those statutes, despite the "scienter requirement." *See, e.g., Skilling v. United States*, 561 U.S. 358, 408 (2010) (narrowing honest services fraud statute to encompass only the "core" of pre-*McNally* honest services doctrine—bribes and kickbacks—due to "the due process concerns underlying the vagueness doctrine"); *McNally v. United States,* 483 U.S. 350, 360 (1987) (narrowing wire fraud statute on vagueness concerns, as a failure to do so would leave the statute's "outer boundaries ambiguous."); *see also Percoco*, 598 U.S. ___ (2023) (Gorsuch, J. concurrence) (explaining history of vagueness concerns with honest services wire and mail fraud, and arguing that Congress must re-draft the statute). When a statute is so overbroad and unspecific as to what it prohibits—like Section 1348—Supreme Court precedent dictates that the statute's coverage must be narrowed (or re-drafted), regardless of whether the statute also can be read to encompass a specific intent requirement.

*Third*, the cases that the Government cites—primarily recent "spoofing" cases—are of little assistance in countering an "as applied" challenge to Section 1348 under the facts alleged here. *See* Dkt. 297 at 17 *citing United States v. Smith*, 555 F. Supp. 3d 563, 577–79 (N.D. Ill. 2021); *United States v. Bases*, 18-CR-48, 2020 WL 2557342, at *11–13 (N.D. Ill. May 20, 2020); *United States v. Coscia*, 100 F. Supp. 3d 653, 659–61 (N.D. Ill. 2015), *aff'd*, 866 F.3d 782 (7th Cir. 2017). Of course, Section 1348 is not unconstitutionally vague "as applied" to spoofing because spoofing is specifically defined and prohibited by a separate statute. *See* 7 U.S.C.

Section 6c(a)(5)(C). Publicly touting a stock to Twitter followers on social media while allegedly failing to disclose specific sales is not. In contrast to the spoofing cases—which primarily hail from the 7th Circuit—courts in this district have not hesitated to strike down on "as-applied" grounds statutes as unconstitutionally vague where the statute fails to adequately define the prohibited activity. *See, e.g., United States v. Radley*, 659 F.Supp.2d 803 (S.D. Tex. Sept. 17, 2009) (ruling that commodities statute prohibiting "manipulation" was unconstitutionally vague because it did not give fair notice as to what conduct was manipulative as the statute contained no definition of "manipulation"). [2]

  **Fourth**, in asserting that Rybarczyk was on notice that his conduct was prohibited, the Government contends that "saying one thing publicly about a stock and trading another way privately" has long been "prohibited under numerous laws proscribing fraud." *See* Dkt. 297 at 18-19. That is not accurate. *United States v. Wenger*, 427 F.3d 840, 854 (10th Cir. 2005), *SEC v. Huttoe*, 1998 WL 34078092, at *7 (D.D.C. Sept. 14, 1998), and *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1265-66 (9th Cir. 1979) were all cases brought under the traditional securities fraud statutes—*i.e.* Rule 10b(5)—which carries with far more stringent duty and materiality requirements. *See, e.g.*, *Huttoe*, at *4; *Zweig*, at 1266. Here, by contrast, the Government has

---

[2] One way for the Court to deal with the apparent vagueness issue of Section 1348 is to narrowly define the statute to apply solely to conduct encompassed within the realm of traditional securities fraud, where there must be a "duty" to disclose, where conduct must be in connection to the purchase or sale of a security, and where the "materiality" standard applies only to reasonable investors. *Cf. McDonnell v. United*, 579 U.S. 550, 576 (2016) (adopting narrow definition of the term "official act" because the government's interpretation of the term "official act" was not defined with "sufficient definiteness" so that ordinary people could "understand what conduct is prohibited."); *see also Skilling v. United States*, 561 U.S. 358, 400 (2010) and *McNally v. United States*, 483 U.S. 350, 359-60 (1987) (both cases narrow "honest services" wire and mail fraud to only punish conduct long-since prohibited by federal law).

argued that in this case, the defendants did not have to have a duty to disclose their stock sales, and the materiality bar may be far lower. *See* Dkt. 297 at 9-16.

And in *United States v. Gallagher*, No. 22-CR-122 (S.D.N.Y. July 6, 2022), which is the one securities fraud case even remotely comparable, the defendant did *not* plead guilty to "saying one thing publicly about a stock and trading another way privately." Rather, he pled guilty to an affirmative misrepresentation concerning a single ticker for which he profited less than $22,000. In fact, the Government dropped all the charges related to failing to disclose stock sales, and also dropped the Section 1348 charges as well. *See* 22-CR-122, Dkt. 22 at 16 [defense sentencing memo explaining that Gallagher pled guilty to false posts about SCIE].

**Finally**, the Government is mistaken that the "rule of lenity" does not apply here. Even the government's own citations—*Bases*, 2020 WL 2557342, at \*12—make that clear. In *Bases*, the court ruled only, with respect to Section 1348, that the rule of lenity did not apply "*as applied* to Defendants' conduct," which in that case was "spoofing." Here, by contrast, the statute *is* vague *as applied* to Defendants' conduct (social media touting), Dkt. 267 at 50, and therefore the rule of lenity *does* apply. That the rule of lenity should apply is further buttressed by the legislative history cited by the Government, which conclusively proves that Section 1348 is so vague as to be unenforceable. *See* Dkt. 297 at 19 (Section 1348 "should not be read to require proof of technical elements from the securities laws, and **is intended to provide needed enforcement flexibility in the context of publicly traded companies** to protect shareholders and prospective shareholders against all the types scheme and frauds which inventive criminals may devise in the future.").

**D.  The Government's attempt to write the First Amendment out of the United States Constitution must be rejected.**

In his Motion to Dismiss, Rybarczyk argued that the Government is seeking to criminalize protected speech, not because the Government does not have an ability to police fraud, but rather because the specific examples of the speech chosen by the Government—banal statements such as "CEI looking good" or "$BBI Bullish!!!!!"—are neither fraudulent on their face, and nor could such nonsensical tweets possibly trigger any disclosure obligations. Therefore, any government-imposed restrictions on statements such as those (or mandated disclosures) would necessarily encroach on and chill constitutionally-protected expression. *See* Dkt. 267 at 51-57.

The Government shrugs off this entire argument, writing in response that the "First Amendment does not shield fraud," and that the "fraud alleged in this case is unprotected speech to which the First Amendment's defenses do not apply." *See* Dkt. 297 at 20-21 If only things were that simple. Labelling a statement as "fraud," or declaring that this case is about "fraud," as the Government attempts to do here, does not then unilaterally exempt it from First Amendment strict scrutiny. *See Illinois ex rel. Madigan v. Telemarketing Associates*, 538 U.S. 600, 601 (2003) (the Government may not avoid First Amendment scrutiny by "simply labeling an action one for 'fraud.'); *see also Percoco* at 4 (Gorsuch, J. concurrence) (explaining that because the honest services fraud statute is too vague, it could result "result in the conviction of anyone whose 'clout exceeds some ill-defined threshold' and thus sweep in 'effective lobbyists' *exercising their First Amendment right to petition the Government*."). Rather, the burden is on the Government to adequately allege that the statements in the Superseding Indictment constitute actual fraud prohibited by statutes duly passed by Congress before this Court can conclude, even for pleading purposes, that First Amendment protections do not apply.  *Illinois ex rel. Madigan*,

538 U.S. at 618 (Court reviewed complaint and annexed affidavits in determining whether fraud had been adequately alleged).

If there is no judicial screen, and the Government is allowed to proceed simply because they choose to use the words "fraud" and "fraudulent" *ad nauseum* in a charging instrument, that would severely prejudice the defendants. Not only would the defense be put in the unenviable position of having to litigate the issues at trial and explain to the jury the scope of First Amendment protections, but the Government would also be permitted to put constitutionally protected evidence in front of the jury to prove allegations of fraud. That simply cannot be. As *Illinois ex rel. Madigan* instructs, this Court must first make its own determination as to whether the specific misrepresentations and omissions suffice to plead fraud. This is particularly true here where the Government is not so much seeking to curtail speech but rather seeking to force an individual to speak by tweeting out at undefined times his stock sales and/or intent to sell stock.[3]

In addition to an "as applied" challenge to Section 1348, Rybarczyk also put forth a "facial" challenge to Section 1348. *See* Dkt. 267 at 55-57. The government's response to this facial challenge—that the statute cannot be overbroad because it "requires fraudulent intent" (Dkt. 297 at 21)— makes little sense when juxtaposed against the actual language of Section 1348. In that regard, the Government cites to *United States v. Alvarez*, 567 U.S. 709, 723 (2012)—a recent Supreme Court decision that struck down the "Stolen Valor" statute because it infringed on constitutionally-protected speech—for the proposition that "[w]here false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting

---

[3] In further support of his reply, Rybarczyk incorporates by reference certain arguments made by co-defendant Constantinescu in his reply brief filed on July 19, 2023. *See* Dkt. 312 at 6-7.

the First Amendment." Dkt. 297 at 21. But the *Alvarez* decision also noted, in explaining why the statute was overbroad, that the Stolen Valor statute "by its plain terms applies to a false statement made at any time, in any place, to any person," and that the "sweeping, quite unprecedented reach of the statute puts it in conflict with the First Amendment." *Alvarez,* at 722. The Court further determined that the statute prohibited speech "entirely without regard to whether the lie was made for the purpose of material gain." *Id*. at 723.

Here, Section 1348(1) is even broader than the Stolen Valor Act. Section 1348(1) prohibits defrauding "*any* person" in "connection with … *any* security." As with *Alvarez*, 1348(1) applies "to a false statement made at any time, in any place, to any person," and, it is in connection with *any* security—even if there is no purchase or sale of that security. Moreover, Section 1348(1) does so without "regard to whether" the fraud "was made for the purpose of material gain." Indeed, unlike with the mail and wire frauds, there is no explicit requirement that the fraud under Section 1348(1) be intended to obtain "money or property." Just like in *Alvarez*, the broad reach of the statute, combined with the government's reading of it that purports to criminalize *omissions* regardless of whether there was a duty to disclose, heavily infringes on the First Amendment, and therefore, Section 1348(1), at the very least, is facially overbroad. *See Alvarez*, 567 U.S. at 723 (finding the Stolen Valor Act facially overbroad because "absent any evidence that the speech was used to gain a material advantage, it would give Government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom.").

Finally, the government's unsupported assertion that "there is no sincere concern that substantial amounts of legitimate speech will be chilled by the statute" is frivolous. Dkt. 297 at

14

21-22. Rybarczyk's opening brief cited a number of amorphous tweets that the Government seeks to prohibit. *See* Dkt. 267-1 Ex. A. In addition, the SI seeks to criminalize constitutionally protected activities such as touting stocks and banding together with others to purchase stocks. Dkt. 267 at 52-53. And the examples that the Government does use to explain why they are not stifling speech— *see, e.g.*, SI contained "[p]rivate communications coordinating the scheme, including Defendant Rybarczyk's own" (Dkt. 297 at 21)— employ circular reasoning, where the evidence offered to support the government's claim that certain communications were about fraud is actually just a repetition of the claim itself (asserting that the subject communications were part of a "scheme"). *See* Dkt. 297 at 22. Once again, the Government does not just get to state that fraud has been committed; the Government must properly allege it in the Superseding Indictment.

But perhaps most tellingly, the Government does not, because it cannot, explain to the defendants exactly what they must do, if they exercise their First Amendment right to publicly discuss stocks in open forums, to comply with federal fraud laws. As set forth in Rybarczyk's opening brief:

> Instead, what the Indictment here is *actually* attempting to criminalize is not the failure to disclose an intent to sell—the Defendants did that—but rather an alleged failure to inform other Twitter users of *exactly when*, in real-time, they would be selling their shares. But such a rule is unworkable for multiple reasons, including because the specific timing of a trade is largely dependent upon market forces outside a trader's control. As an example, if a trader tweets out a positive statement about a stock, and the price then rises thereby allowing the trader to sell, the timing of that sale is dependent entirely on the post-Tweet price movement of the stock. Likewise, if a trader tweets a positive statement about a stock, and then the stock price does nothing or even declines in value, the trader may hold his shares or sell a portion to lock-in any earlier profits and prevent future losses. Under the Government's proposed rule, a trader would have to keep updating his Twitter followers—to whom he has no fiduciary or other type of duty—every step of the way simply because of an earlier positive tweet, telling them precisely how he will react to certain price movements and exactly when he will sell his stock. If a trader does not do that, he risks being charged with criminal fraud.

*See* Dkt. 267 at 53-54. In addition, how must a trader disclose his intent to sell? Must he tweet it out? Does he need to file an intent to sell with the SEC? What if he just emails a statement to select friends, is that sufficient? The Government does not respond to these arguments—made not only by Rybarczyk but by others as well—because it has no answers to them. This failure to provide standards or guidance to the tweeting public simply proves what the defendants have been saying all along—Section 1348 and this case here infringes on individuals' First Amendment rights because it compels constant speech while providing no guidance on what, when or where to disclose. As such, the Government's case infringes on constitutionally protected speech. *See Turner v. F.C.C.*, 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message subject to the same rigorous scrutiny" referring to "the most exacting scrutiny").

### D. The Government fails to allege that the Tweets and Discord messages were "*in connection with the purchase or sale of a security,*" as required under Section 1348(2).

Rybarczyk argued in his brief that his Twitter and Discord statements were not sent "in connection with the purchase or sale of a security" because such statements were not made in a document on which an investor "would presumably rely." Dkt. 267 at 57-58. The Government cites nothing to indicate that Tweets or direct messages by individuals completely unaffiliated with the various companies are documents on which an investor would presumably rely, nor could the Government do so. After all, Rybarczyk (and the co-defendants) did not work for any of the companies that they tweeted about nor did they purport to be licensed financial advisors. Instead, the Government simply states that it is a question of fact for the jury. It is not. The Government must allege some evidence showing that investors are justified in relying on random Tweets and messages by individuals such as "Ultra Calls" in order to sufficiently allege the

charged crime. Because the Government fails to do so here, all charges under Section 1348(2) must be dismissed.

### E. Counts 16 and 17 do not sufficiently allege Securities Fraud Under Section 1348.

The Government concedes that it has provided the defense with absolutely no details in the Indictment about the conduct alleged to have occurred with respect to NAKD (Count 16) and EZFL (Count 17) but contends that it does not have to. *See* Dkt. 297 at 23-24.  For the reasons stated in Rybarczyk's opening brief, this argument is wrong. In addition, the Government should be forced to allege further details regarding NAKD and EZFL because it is unclear whether the Government has actually charged Rybarczyk with any crime at all with respect to those stocks.

Specifically, and as one example, if the Court accepts Rybarczyk's argument that a defendant such as Rybarczyk could not commit fraud by omission by failing to disclose stock trades, and the Government's theory is that NAKD and EZFL are omissions-based charges, then Rybarczyk has not been charged with any federal crime. Accordingly, for this reason too the Government should be forced to expand the allegations concerning EZFL and NAKD so that this Court can determine if a federal crime has been properly alleged. Until they do so, the counts should be dismissed.

### CONCLUSION

For the reasons set forth in Rybarczyk's opening brief (Dkt. 267) and for the further reasons set forth herein, the Superseding Indictment (Dkt. 134) should be dismissed in its entirety.

Respectfully submitted,

**HILDER & ASSOCIATES, P.C.**

/s/ *Stephanie K. McGuire*
      Stephanie K. McGuire
Texas Bar No. 11100520
Philip H. Hilder
Texas Bar No. 09620050
Q. Tate Williams
Texas Bar No.: 24013760
819 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
philip@hilderlaw.com
tate@hilderlaw.com
stephanie@hilderlaw.com

Eric Samuel Rosen
Freedman Normand Friedland LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Tel: (617) 977-4163
erosen@fnf.law

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2023, a true and correct copy of the above and foregoing reply brief was served on all counsel of record via ECF, certified mail, return receipt requested, facsimile, electronically, or hand delivery.

/s/ *Stephanie K. McGuire*
Stephanie K. McGuire