68

percent less in his or her 401(k) or IRA after a lifetime of savings.[5] In dollar terms, the average IRA investor would have $20,000 less at retirement as a result of this tax.[6] FTTs paid by pension funds would reduce their returns and worsen existing problems with underfunded pensions.[7]

2. An FTT would harm the owners, workers, and customers of businesses. FTTs increase the cost of capital for any company whose securities are subject to the FTT. As a result, owners of those companies—including Main Street investors who hold those securities directly or indirectly in mutual funds and exchange-traded funds (ETFs)—would be harmed through lower returns to capital.[8] Workers would be harmed through lower returns to labor.[9] Customers would be harmed through an increase in the cost of consumer goods.[10]

3. An FTT would harm all American taxpayers. In addition to the increased costs of consumer goods, everyday Americans would be harmed by other indirect effects of FTTs. The level and growth of GDP would be reduced under an FTT, resulting in a lower standard of living.[11] Moreover, indirect tax effects would pernicious and counterproductive. Lower income and payroll taxes would result from the increased cost of capital to businesses, and the incentive to hold off on the sale of financial assets to avoid capital gains taxation would exacerbate the lock-in effect of these taxes.[12]

———

### RESPONSES TO WRITTEN QUESTIONS OF SENATOR DAINES FROM MICHAEL S. PIWOWAR

**Q.1.** Many of my colleagues across the aisle have recently spoken in favor of implementing a Financial Transaction Tax (FTT). They argue that doing so is necessary in order to reduce market volatility and make sure that Wall Street is paying its fair share. However, given that data from the Federal Reserve shows that 53 percent of U.S. families owned some form of publicly traded stock in 2019 and that 80–100 million Americans have a 401k, what impact would the imposition of a FTT have on pensioners and retail investors?

**A.1.** An FTT imposed in the United States would harm everyday Americans in a number of ways:

1. An FTT would harm everyday Americans saving and investing for retirement. Main Street investors would pay the tax directly when they trade, and pay it again as financial intermediaries pass on the taxes they face as a cost of doing business.[1] According to

---

[5] Id.

[6] Id.

[7] See, e.g., Angel (2019); and "The Hidden Costs of a Financial Transaction Tax: Estimated Impact on Pension Funds", Kirsten Wegner, *Modern Markets Initiative* (2018), available at *https://www.modernmarketsinitiative.org/ftt.*

[8] See, e.g., "The Impact of a Financial Transactions Tax", Colin Miller and Anna Tyger, Tax Foundation Fiscal Fact No. 690 (2020), available at *https://files.taxfoundation.org/20200122152248/The-Impact-of-a-Financial-Transactions-Tax.pdf*; and Angel (2019).

[9] Id.

[10] Id.

[11] Id.

[12] Id.

[1] See, e.g., "Financial Transaction Taxes: A Tax on Investors, Taxpayers, and Consumers", James J. Angel, Center for Capital Markets Competitiveness (2019), available at *https://*

69

one study, under the version of the tax proposed by Senator Bernie Sanders (D-VT), a typical retirement investor will end up with 8.5 percent less in his or her 401(k) or IRA after a lifetime of savings.[2] In dollar terms, the average IRA investor would have $20,000 less at retirement as a result of this tax.[3] FTTs paid by pension funds would reduce their returns and worsen existing problems with underfunded pensions.[4]

2. An FTT would harm the owners, workers, and customers of businesses. FTTs increase the cost of capital for any company whose securities are subject to the FTT. As a result, owners of those companies—including Main Street investors who hold those securities directly or indirectly in mutual funds and exchange-traded funds (ETFs)—would be harmed through lower returns to capital.[5] Workers would be harmed through lower returns to labor.[6] Customers would be harmed through an increase in the cost of consumer goods.[7]

3. An FTT would harm all American taxpayers. In addition to the increased costs of consumer goods, everyday Americans would be harmed by other indirect effects of FTTs. The level and growth of GDP would be reduced under an FTT, resulting in a lower standard of living.[8] Moreover, indirect tax effects would pernicious and counterproductive. Lower income and payroll taxes would result from the increased cost of capital to businesses, and the incentive to hold off on the sale of financial assets to avoid capital gains taxation would exacerbate the lock-in effect of these taxes.[9]

**Q.2.** If the U.S. were to institute an FTT, would you expect many films would moving their trading operations to an international exchange with a more hospitable tax environment?

**A.2.** Jurisdictions that do not impose an FTT win at the expense of jurisdictions that do. For example, when the Sweden imposed an FTT in the 1980s, a significant amount of trading volume simply move to the London stock market.[10] Keep in mind that this occurred 40 years ago when it was much more difficult and costly to divert trading activity across borders. A similar tax imposed in the United States today would result in immediate, devastating, quite possibly irreversible results.

**Q.3.** Is it your belief that Congress should actively use the tax code to limit the practice of short selling? And is there any evidence to suggest that imposing an FTT would reduce the prevalence of short selling?

---

*www.centerforcapitalmarkets.com/resource/financial-transaction-taxes-a-tax-on-investors-taxpayers-and-consumers/.*

[2] Id.

[3] Id.

[4] See, e.g., Angel (2019); and "The Hidden Costs of a Financial Transaction Tax: Estimated Impact on Pension Funds", Kirsten Wegner, *Modern Markets Initiative* (2018), available at *https://www.modernmarketsinitiative.org/ftt.*

[5] See, e.g., "The Impact of a Financial Transactions Tax", Colin Miller and Anna Tyger, Tax Foundation Fiscal Fact No. 690 (2020), available at *https://files.taxfoundation.org/20200122152248/The-Impact-of-a-Financial-Transactions-Tax.pdf*; and Angel (2019).

[6] Id.

[7] Id.

[8] Id.

[9] Id.

[10] See, e.g., Umlauf (1993).

70

**A.3.** Imposing a financial transaction tax (FTT) in the United Sates would result in many negative effects, including unnecessarily hurting the global competitiveness of U.S. capital markets.

In 2009, when I was a senior economist at the President's Council of Economic Advisers, I was asked to conduct research and prepare a memo for President Obama's top economic policy advisors on the potential effects of a financial transaction tax. My research showed that, without exception, every time an FTT was introduced in another jurisdiction, it resulted in disastrous consequences. In addition to finding that jurisdictions that do not impose an FTT win at the expense of jurisdictions that do (as I mentioned in my answer to your previous question, my research also found:

1. FTTs hurt market quality. Several empirical studies showed that the imposition of FTTs results in higher volatility, lower liquidity, and lower trading volume.[11] As a result, FTTs have negative effects on price discovery and lead to a reduction in the information efficiency of markets.[12]

2. FTTs never raise the expected revenue. Because trading volume declines (and moves to other jurisdictions) when FTTs are imposed, actual FTT revenues never come close to the projections made by proponents. As a result, the main "benefit" of an FTT is never worth the costs.

I was gratified to receive very positive feedback on my research and memo. More importantly—and quite correctly—the Obama administration never pursued a policy of trying to impose an FTT in the United States.

———

### RESPONSES TO WRITTEN QUESTIONS OF SENATOR DAINES FROM ANDREW N. VOLLMER

**Q.1.** Many of my colleagues across the aisle have recently spoken in favor of implementing a Financial Transaction Tax (FTT). They argue that doing so is necessary in order to reduce market volatility and make sure that Wall Street is paying its fair share. However, given that data from the Federal Reserve shows that 53 percent of U.S. families owned some form of publicly traded stock in 2019 and that 80–100 million Americans have a 401k, what impact would the imposition of a FTT have on pensioners and retail investors?

**A.1.** The idea of an FTT is hotly debated. Supporters argue that an FTT would raise revenue for the government, reduce trading in securities, especially by high frequency traders, fall more on the wealthy than on middle- and low-income people, and therefore reduce the gap between the wealthy and less wealthy.[1] Opponents argue that an FTT would be harmful.[2] Extensive academic lit-

---

[11] See, e.g., "Securities Transaction Taxes and Financial Markets", Karl Habermeier and Andrei Kirilenko, IMF Working Paper 01-51 (2001) available at *http://www.imf.org/external/pubs/ft/wp/2001/wp0151.pdf*; and "Transaction Taxes and the Behavior of the Swedish Stock Market", Steven R. Umlauf, *Journal of Financial Economics*, Vol. 33, No. 2 (1993).

[12] Id.

[1] Naomi Jagoda, "Financial Trade Tax Gains Traction with 2020 Democrats", *The Hill*, February 25, 2020.

[2] SIFMA, "A Financial Transaction Tax Is a Retirement Tax Which Harms Working Americans", the U.S. Capital Markets and Individual Investors, 2019.

erature on FTTs exists.[3] Scholars for the Mercatus Center have contributed to this literature.[4]

The cost of an FTT would fall on both professional investors and individual investors. An FTT would reduce the net returns of retail investors and retirees who have mutual funds or retirement funds because retirement plans and mutual funds buy and sell securities, which are transactions that would be subject to the tax. Writers dispute the amount of the cost to individuals with retirement accounts or mutual funds.[5]

Financial economists do not agree on all the effects of an FTT. They do tend to agree that a tax would reduce the volume of securities trading and would not produce as much revenue as expected.[6] Some analysts claim that an FTT could cause riskier investments or more price volatility.[7] It might be fair to say that the tax would alter securities trading behavior in unexpected and unintended ways.

Supporters of an FTT believe that it will discourage high-frequency trading (HFT).[8] Neither Congress nor the staff of the SEC have concluded that HFT should be discouraged. As late as 2018, Congress had not determined that HFT causes undue harms that needed to be regulated and instead was keeping its policy options open while collecting further evidence. In legislation, Congress instructed the SEC staff to prepare a report assessing the benefits and risks of algorithmic trading to equity and debt markets and recommending necessary changes to Federal regulation.[9] (For practical purposes, algorithmic trading is another term for HFT.)

The SEC staff delivered the requested report in early August 2020 but did not recommend any additional regulation to curtail HFT activities.[10] In fact, the staff did not conclude that harms from HFT outweigh the benefits and, if anything, dwelled more on the benefits. Algorithmic trading in the equities markets, the staff

[3]See, for example, Jean-Edouard Colliard and Peter Hoffmann, "Financial Transaction Taxes, Market Composition, and Liquidity", *Journal of Finance* 72, no. 6 (2017): 2685-2716. Further studies are cited in Leonard E. Burman et al., "Financial Transaction Taxes in Theory and Practice", *National Tax Journal* 69, no. 1 (2016): 171-216; and George H.K. Wang and Jot Yau, "Would a Financial Transaction Tax Affect Financial Market Activity?" (Policy Analysis No. 702, Cato Institute, Washington, DC, July 9, 2012).

[4]Phillip Swagel and Cynthia Boruchowicz, "Policies To Address Income Inequality and Increase Economic Opportunities for Low-Income Families" (Mercatus Research, Mercatus Center at George Mason University, Arlington, VA, May 2017), 26-27; Holly A. Bell, "Using the Market to Manage Proprietary Algorithmic Trading", in *Reframing Financial Regulation: Enhancing Stability and Protecting Consumers*, ed. Hester Peirce and Benjamin Klutsey (Arlington, VA: Mercatus Center at George Mason University, 2016), 262-65; George H.K. Wang, "Securities Transaction Taxes and Market Quality of Equity and Futures Markets: Issues and Evidence" (Mercatus Research, Mercatus Center at George Mason University, Arlington, VA, March 2014).

[5]Michael Edesess, "Vanguard Opposes a Tax on Wall Street Its Founder John Bogle Favored—and the Reason May Surprise You", *MarketWatch*, September 3, 2020. According to Edesess, "The real burden of an FTT will fall on the professional traders." SIFMA, "A Financial Transaction Tax Is a Retirement Tax"; Burton G. Malkiel and George U. Sauter, "A Transaction Tax Would Hurt All Investors", *Wall Street Journal*, December 8, 2009. According to Sauter, "'Wall Street' would not foot the bill for the presumed $150 billion tax. In fact, the tax would simply be added to the cost of doing business, burdening all investors, including 401(k) plans, IRAs and mutual funds."

[6]Colin Miller and Anna Tyger, "The Impact of a Financial Transactions Tax" (Fiscal Fact No. 690, Tax Foundation, Washington, DC, January 2020), 1.

[7]Miller and Tyger, "The Impact of a Financial Transactions Tax 1".

[8]Aaron Klein, "What Is a Financial Transaction Tax?" Voter Vitals, Brookings Policy, March 27, 2020.

[9]Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No. 115-174 §502, 132 Stat. 1296, 1361-62 (2018).

[10]Staff of the Securities and Exchange Commission, Staff Report on Algorithmic Trading in U.S. Capital Markets, August 5, 2020.

72

wrote, "has improved many measures of market quality and liquidity provision during normal market conditions, though studies have also shown that some types of algorithmic trading may exacerbate periods of unusual market stress or volatility."[11] In addition, the SEC staff discerned that algorithms help market participants reduce risks from the increasing complexity of many interconnected markets.[12]

The staff also surveyed the academic literature and concluded that, "Overall, most academic studies find that algorithmic trading and HFTs have improved market quality and helped reduce transaction costs. There is ample evidence suggesting that, under normal market conditions, algorithmic trading and HFTs improve liquidity and price efficiency and reduce short term volatility."[13]

The staff noted that evidence of the effect of high-speed trading in periods of stress was mixed. At least "some academic studies . . . find that algorithmic trading and high-frequency trading continue to reduce volatility during periods of heightened volatility."[14]

**Q.2.** If the U.S. were to institute an FTT, would you expect many firms would move their trading operations to an international exchange with a more hospitable tax environment?

**A.2.** Capital flows freely across international boundaries and seeks the most efficient markets. Adding costs with a new securities tax in the United States inevitably will drive some amount of securities trading to lower-cost jurisdictions. According to economist Aaron Klein, "Several countries attempted large FTTs in the past and experienced significant capital migration."[15]

**Q.3.** Is it your belief that Congress should actively use the tax code to limit the practice of short selling? And is there any evidence to suggest that imposing an FTT would reduce the prevalence of short selling?

**A.3.** Short selling is socially valuable. Short sellers help to discover accurate prices and to identify companies that are overvalued or engaged in questionable conduct. Academic studies do not support the claims that short selling causes distress in the securities markets.[16] Tax and regulatory policy should treat short selling and

[11] Staff of the Securities and Exchange Commission, Staff Report on Algorithmic Trading in U.S. Capital Markets, 4.

[12] Staff of the Securities and Exchange Commission, 4.

[13] Staff of the Securities and Exchange Commission, 70 (footnote omitted). According to the report, most studies "find that algorithmic trading and high-frequency trading improve price efficiency and decrease the time it takes for prices to incorporate new information." Staff of the Securities and Exchange Commission, Staff Report on Algorithmic Trading in U.S. Capital Markets, 77.

[14] Staff of the Securities and Exchange Commission, Staff Report on Algorithmic Trading in U.S. Capital Markets, 79.

[15] Klein, "What Is a Financial Transaction Tax?"; Bell, "Using the Market".

[16] For example, see Peter Molk and Frank Partnoy, "The Long-Term Effects of Short Selling and Negative Activism", *University of Illinois Law Review* (forthcoming). See also Ekkehart Boehmer and Juan Wu, "Short Selling and the Price Discovery Process", *Review of Financial Studies* 26, no. 2 (2013): 287-322. The authors state that stock prices are more accurate when short sellers are more active. See also Alessandro Beber and Marco Pagano, "Short-Selling Bans Around the World: Evidence From the 2007-09 Crisis", *Journal of Finance* 68, no. 1 (2013): 343-81. According to Beber and Pagano, bans (a) were detrimental for liquidity, especially for stocks with small market capitalization, high volatility, and no listed options; (b) slowed down price discovery, especially in bear market phases; and (c) failed to support stock prices, except possibly for U.S. financial stocks). See also Pedro A.C. Saffi and Kari Sigurdsson, "Price Efficiency and Short Selling", *Review of Financial Studies* 24, no. 3 (2011): 821-52. Saffi and Sigurdsson report that relaxing short-sales constraints are not associated with an increase in either price instability or the occurrence of extreme negative returns). Finally, see Securities and Exchange

73

short covering no better and no worse than long buying and selling. Tax, disclosure, and other obligations should be comparable and not more onerous for short transactions.

If an FTT is applied neutrally and equally to all securities sales and purchases, it would reduce short selling and covering to the same extent as long buying and selling. I am not aware of evidence that an FTT would reduce short sales more than it would reduce other securities transactions. As mentioned earlier, most commentators agree that an FTT would reduce the number of securities transactions.

The main objective of the Federal tax system should be to raise revenue to fund Congress's expenditures at the least cost to economic activity. Using tax provisions to encourage or discourage particular types of conduct or to benefit or penalize particular groups or activities leads to complexity in the law, difficulties in complying with the law, concealed differential treatment, and unforeseen and unpredictable consequences.

---

Commission, Office of Economic Analysis, "Economic Analysis of the Short Sale Price Restrictions under the Regulation SHO Pilot", February 6, 2007. This report provides analysis of price restrictions on short sales.

74

ADDITIONAL MATERIAL SUPPLIED FOR THE RECORD

This document is being provided for the exclusive use of LARRY TABB at BLOOMBERG INTELLIGENCE BOSTON. Not for redistribution.

**Bloomberg Intelligence**

## Price Improvement: Core of Retail Execution Quality

BI Market Structure, Global Dashboard

 Larry R Tabb
Team: Market Structure
BI Director: Market Structure Research

Price Improvement 3x Order-Flow Payments Weakens Conflict Case

(Bloomberg Intelligence) -- The 6.6% monthly increase in price improvement that market makers provided in January by internalizing retail equity order flow put $401 million back in investors pockets and counters perceived conflicts of interest ahead of a key Senate committee hearing. While the nine wholesalers we track on BI MKTS <GO> compensate brokers for directing trades, they're executing investor orders at better than market prices, which the sides hope will weaken calls to rein in order-flow payments. (03/09/21)

1. Top 4 Improved Retail Execution by $340 Million

The four biggest wholesalers accounted for 85% of the $401 million of price improvement on retail investors' trades they executed in January, up from a $376 million total in December, based on our review of SEC 605 filings. Price improvement was relative to the market makers' size, with Citadel Securities and Virtu Financial leading the smaller G1 Execution/Susquehanna and Two Sigma Securities. The next five combined for $61 million.

Wholesalers provide retail-price improvement by internalizing orders. Smaller trade sizes and fair-access rules force exchanges to display prices to all participants and allow the market makers to quote wider, as bids and offers can be hit not only by retail investors, but the largest institutions. (03/09/21)



Net Price Improvement by Top 4 Wholesalers

Source: SEC 605 Reports, Bloomberg Intelligence

2. GameStop, Tesla: 10% of Majors' Price Improvement

During the meme-stock trading frenzy of January, the four major market makers improved execution in GameStop and Tesla trades by $34.7 million. Citadel Securities accounted for 73% of price improvement on GameStop, well ahead of G1 Execution/Susquehanna (21%). Tesla's was more evenly split between Virtu (37%), Citadel Securities (31%) and G1 Execution (31%); Two Sigma had 1%. Better pricing relates to stock price, spread and market makers' ability to hedge or trade out of the stock, which is contingent on order flow, access to other markets, technology and trading style. (03/09/21)

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

Bloomberg® 03/09/2021 07:31:45

75

This document is being provided for the exclusive use of LARRY TABB at BLOOMBERG/ INTELLIGENCE BOSTON. Not for redistribution.

**Bloomberg Intelligence**



Source: SEC 605 Reports, Bloomberg Intelligence

**3. Four Biggest Execute 11.5% of Retail Stock Trades**

The top four wholesalers executed 67 billion shares in January (1.7 billion matched per day), translating to 11.5% of the 15.6 billion average daily U.S. equity volume traded. Citadel Securities executed 53%, followed by Virtu (27%), G1 Execution (13%) and Two Sigma (7%). The vast amount of execution by these four directly relates to the amount of retail order flow sent by the online self-directed brokers such as Charles Schwab-TD Ameritrade, Robinhood and Morgan Stanley/E*Trade.

The question of how market makers pay for orders yet improve execution was at the heart of the House committee hearing "Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide" and will be taken up by a Senate panel on March 9: "Who Wins on Wall Street? GameStop, Robinhood, and the State of Retail Investing." (03/08/21)



Source: SEC 605 Reports, Bloomberg Intelligence

To contact the analyst for this research:
Larry R Tabb at ltabb1@bloomberg.net

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

Bloomberg® 03/09/2021 07:31:45

76



**TOM QUAADMAN**
EXECUTIVE VICE PRESIDENT

1615 H STREET, NW
WASHINGTON, DC 20062-2000
(202) 463-5540
tquaadman@uschamber.com

March 15, 2021

The Honorable Sherrod Brown
Chairman
Committee on Banking,
Housing and Urban Affairs
United States Senate
Washington, DC 20510

The Honorable Patrick Toomey
Ranking Member
Committee on Banking,
Housing and Urban Affairs
United States Senate
Washington, DC 20510

Dear Chairman Brown and Ranking Member Toomey:

The U.S. Chamber of Commerce's (the Chamber) Center for Capital Markets Competitiveness (CCMC) writes regarding the hearing on March 9, 2021 titled "Who Wins on Wall Street? GameStop, Robinhood, and the State of Retail Investing." The Chamber is specifically concerned by proposals to impose a financial transaction tax (FTT). We submit this letter for the record to explain why an FTT is not a practical policy proposal and to bring greater clarity to several misleading statements made about FTTs during the hearing.

<u>Opposition to an FTT</u>

During the hearing, it was stated that an FTT is an idea whose time has come. The Chamber strongly disagrees with that idea, particularly based on what we know about the history of the FTT in the U.S., the deleterious impacts we know an FTT would have on the retirement community, investors, businesses, and the economy, and the 63% of bipartisan American poll respondents who are overwhelmingly opposed to an FTT.

**Historic, Bipartisan Congressional Opposition:** The U.S. has already lived through an unsuccessful experiment with an FTT from 1914 to 1965. After more than a half century with an FTT, the tax was ultimately repealed in an overwhelming bipartisan vote by a Democratic Congress. A 1965 report by the Committee on Ways and Means[1] found that taxes like the FTT "were not developed on any systematic basis and are often discriminatory in their application to the taxed industries or to the purchasers of the

---

[1] U.S. Government Printing Office. 1965. *Excise Tax Reduction Act of 1965, Report of the Committee on Ways and Means, House of Representatives, to Accompany H.R. 8371.* p. 1. Washington. https://www.finance.senate.gov/imo/media/doc/SRpt89-324.pdf

77

taxed products." We strongly discourage the Committee from reintroducing an FTT in the U.S.

**U.S. Chamber of Commerce:** The Chamber has consistently opposed legislation that would impose a financial transaction tax on financial trades, such as equities, bonds, and derivatives. Our 2019 report "Financial transaction taxes: A tax on investors, taxpayers, and consumers,"[2] outlines the numerous, serious drawbacks of an FTT that extend beyond retirement savers and investors to Main Street, businesses, and the economy. Appendix A includes the Executive Summary from the report and highlights the many negative consequences of an FTT.

**Bipartisan Americans:** Americans are deeply concerned about proposals to reimpose an FTT and there is robust, bipartisan opposition to an FTT. CCMC recently conducted a national poll to understand views on a proposed FTT. When they learned about an FTT, an overwhelming bipartisan majority of 63% expressed opposition to an FTT. When questioned on the intensity of their opposition, nearly half of voters (49%) expressed strong opposition to an FTT. We are particularly concerned about the chilling effect that an FTT could have on Americans' retirement savings. A majority responded that they would be less likely to invest if such a tax were to be enacted by Congress and a third said such a tax would make them less likely to invest in the market under this tax.

Furthermore, Americans surveyed believe an FTT would undermine Congress' policy priorities, such as growing the economy and jobs and helping Americans get back on their feet following the COVID-19 pandemic, while making it more difficult for Americans to save money for retirement and pay for their children's college. An FTT runs counter to these important policy goals. It is clear from respondents that they believe an FTT would hurt efforts to recover from the impact of the COVID-19 pandemic and harm Americans' ability to save for retirement. Appendix B provides a summary of the polling results.

<u>An FTT Would Place Significant Costs Upon Hard-working American Savers</u>

FTTs have been pitched by various proponents as a painless way to raise vast sums of money from Wall Street to fund other projects under consideration by Congress. And yet, as made clear during the hearing, supporters of an FTT understand that the tax is actually borne by investors and believe it is a reasonable trade-off to tax investors in order to slow down and limit high frequency trading. It was further suggested at the hearing that an FTT would be a negligible cost to the everyday investor. The imposition of an FTT means that Americans would either have less saved for retirement, a first home or their children's education, or they would have to extend their work years. It

---

[2] U.S. Chamber of Commerce, Center for Capital Markets Competitiveness. "CCMC 2019 Report." https://www.centerforcapitalmarkets.com/wp-content/uploads/2019/08/CCMC_FTT-Report_v2-DIGITAL.pdf

78

should be noted that many Americans relied on their pension, 401(k) or IRA to ride out the financial crunch created by the COVID-19 pandemic. The extra burden of an FTT placed on hardworking families as they seek to save and rebuild their retirement accounts is not negligible and it would instead hurt long-term investors and families.

Specifically, the tax would result in a massive increase in transactions costs at a time when investors benefit from historically low transaction costs. Commissions for stock trades in the United States are quite low and are free for most retail investors. Institutional investors on average pay a mere 0.03%.[3] However, the taxes proposed by both the Wall Street Tax Act and the Inclusive Prosperity Act would result in a massive increase in transaction costs for investors.

As the costs from an FTT compound over time, 401(k), IRA, and pension plan holders would see a diminution of their accounts. The Chamber has calculated the impact to investors under the Wall Street Tax Act and Inclusive Prosperity Act (See "Appendix C"). The analysis shows that despite working hard to save year after year, retirement savers would find themselves significantly penalized by an FTT. Specifically, a 401(k) participant who saves the average contribution each year would end up with $31,912 less under the Wall Street Tax Act and $153,401 less if subject to the Inclusive Prosperity Act. In both cases, these significant and unnecessary losses from one's life savings can be entirely prevented by opposing such legislation.

**Additional Consequences of an FTT**

In addition to the significant negative impact to American retirement savers, the effects of imposing an FTT extend beyond retirement savers, as explained further in Appendix A. The tax also harms consumers who would pay higher prices for groceries and gas, homeowners who would pay higher mortgage rates, and all taxpayers who would pay more as the cost of public projects increases. The cascade of these negative impacts would exacerbate the fiscal pain felt by many American families who are struggling, particularly as they are already falling behind on retirement savings due to COVID-19.

By creating market inefficiencies, the FTT would also harm the ability of businesses to effectively raise capital or make capital more expensive. Impeding capital formation can have adverse ripple effects throughout the economy.

Although supporters claim that an FTT would raise revenue, experience has shown that FTTs would not raise the revenue that proponents expect. By suppressing economic and trading activity and driving more trading offshore, the amount of revenue raised would be far less than estimated. The experience in other countries is that FTTs collect far less

---

[3] Virtu Global Cost Review, 4Q 2020.
https://www.virtu.com/uploads/documents/Virtu_EQ_GlobalCostReview_4Q20.pdf

79

than forecast, which is why so many countries that have imposed FTTs have eventually eliminated them.[4]

<u>Economist's Position Mischaracterized at Hearing</u>

At the hearing, specific reference was made to the support of an FTT by the late Professor James Tobin winner of the Nobel Prize. Professor Tobin proposed a tax on foreign currency trading, not domestic stocks and bonds.[5] It should be noted that Professor Tobin's proposal was made in the aftermath of the collapse of the Bretton Woods exchange system and during a period of stagflation. His main concern was with foreign exchange rates and the ability of national governments to maintain control over their macroeconomic and monetary policies. Professor Tobin suggested that suppressing trading by private entities would presumably slow down capital movements that would impair the ability of a government to implement its fiscal and monetary policies. Instead, an FTT would impose a tax on the trading of domestic stocks, bonds, and derivatives.

<u>Conclusion</u>

For these many reasons, we strongly discourage Congress from reintroducing an FTT in the U.S.

We thank you for considering our feedback and welcome answering any questions on this issue.

Sincerely,

Tom Quaadman

cc: Committee on Banking, Housing, and Urban Affairs

---

[4] CCMC 2019 Report. Countries like Germany, Sweden, and Japan have all tried imposing financial transaction taxes, but ultimately eliminated them.

[5] For a succinct exposition of Tobin's views, see his prologue to *The Tobin Tax:  Coping with financial volatility.* edited by Mahbub us Haq, Inge Kaul, and Isabelle Grunberg, Oxford University Press, 1996.

80



1615 H Street, NW
Washington, DC 20062-2000
(202) 463-5318

**Appendix A:** Executive Summary from "Financial Transaction
Taxes: A tax on investors, taxpayers, and consumers," authored
by the Center for Capital Markets Competitiveness

81



82

# FINANCIAL TRANSACTION TAXES:

## A tax on investors, taxpayers, and consumers

**James J. Angel, Ph.D., CFA**

Associate Professor of Finance
Georgetown University

angelj@georgetown.edu

McDonough School of Business
Hariri Building
Washington, DC 20057

202-687-3765

Twitter: @GUFinProf

*The author gratefully acknowledges financial support for this project from the U.S. Chamber of Commerce.*
*All opinions are those of the author and do not necessarily reflect those of the Chamber or Georgetown University.*



CENTER FOR CAPITAL MARKETS
COMPETITIVENESS.

83

# Executive Summary

Proposals for a financial transaction tax (FTT) have surfaced throughout the years in the United States and around the world. Recently, bills have been introduced in Congress that would tax financial transactions at rates of up to 0.5%. Similar bills have been proposed in previous Congresses. Proponents of such a tax contend that it would raise revenue while suppressing allegedly excessive trading activity. This paper examines the economic impact that an FTT would have in the U.S.

## Key Findings:

- **Main Street will pay for the tax, not Wall Street.**
  The real burden will be on ordinary investors, such as retirees, pension holders, and those saving for college. They will pay the tax directly when they trade, and pay it again as financial intermediaries pass on the taxes they face as a cost of doing business. FTTs are not actually a tax on financial intermediaries; they are a tax on investors.

- **An FTT will drive up the cost of trading by more than the amount of the tax.**
  The cost to a retail investor who buys a round lot of a $100.00 stock would be $50.00 in direct costs and even more in indirect costs. This represents a more than tenfold increase in the cost of trading in a world of $5.00 commissions.

- **Retirement savings will be hit hard.**
  Under the version of the tax proposed by Sen. Bernie Sanders (D-VT), a typical retirement investor will end up with 8.5% less in his or her 401(k) or IRA after a lifetime of savings. In dollar terms, the average IRA investor would have $20,000 less at retirement as a result of this tax.

- **An FTT will drive up the cost of home mortgages.**
  The yields on mortgage-backed securities will go up because of both the direct impact of an FTT on the cost of trading them and the impact of an increase in benchmark Treasury rates. Because the rate on home mortgages is related to the yields on these mortgage-backed securities, an FTT will be passed on to homeowners through higher mortgage rates.

- **Mutual fund expenses will go up and reduce mutual fund returns.**
  The transaction taxes paid directly and indirectly by mutual funds will increase their costs and decrease returns to investors. This will harm mutual fund investors such as 401(k) participants saving for retirement.

- **Pension fund expenses will go up and pension fund returns will go down.**
  Likewise, the transaction taxes paid by pension funds will reduce their returns, worsening existing problems with underfunded pensions and making it more costly for governments and corporations to provide pensions.

- **Taxpayers will pay more because government financing costs will go up.**
  An FTT on municipal and U.S. Treasury securities will lead to higher interest rates on those securities. This will increase government borrowing costs, which will be borne by all taxpayers, not just investors. This will also increase the cost of capital for public projects, such as infrastructure improvements.

84

- **Corporate financing costs will go up.**

  While the proposed FTTs do exempt new issues of equity and debt, they would apply to secondary market transactions. Investors will expect higher returns to offset the reduced cash inflows caused by an FTT, which will raise the costs of corporate financing.

- **Hedging costs for producers will go up, and consumers will pay for it.**

  Producers such as farmers, oil companies, and airlines use derivatives such as options and futures to manage their risk. Taxes such as FTTs are part of their cost of doing business that gets passed on to the consumer in the form of higher prices for groceries, gasoline, and travel.

- **GDP will be reduced by more than the net revenue raised.**

  An FTT will depress economic activity in several ways. The higher cost of capital will result in less investment and thus less economic growth, fewer jobs, and less income tax revenue. At the same time an FTT will depress trading activity and send it offshore, resulting in a loss in jobs and tax revenue, consistent with what has occurred in other countries that have experimented with FTTs. European Union economists have estimated that a proposed EU FTT, similar to the ones proposed in the U.S., would actually reduce GDP by more than the revenue raised.

- **FTTs will not raise the revenue that proponents expect.**

  By suppressing economic and trading activity and driving more trading offshore, the amount of revenue raised will be far less than estimated. The experience in other countries is that FTTs collect far less than forecast.

- **An FTT will cause stock prices to fall.**

  Stock prices are a function of after-tax cash flows received by investors. By decreasing the after-tax cash flows investors receive, an increase in taxes will cause the value of stocks to fall. This will hurt retirement savers and impose additional stress on already underfunded state and local pension funds. It will also result in less capital gains tax revenue to the government.

- **FTTs may increase market volatility.**

  In many cases around the world, the experience has been that volatility actually increased after FTTs were enacted due to trading activity shifting and liquidity decreasing, making markets less able to withstand future market stress events.

- **FTTs have consistently failed throughout history.**

  FTTs around the world have generated less revenue than forecast due to trading activity shifting to other jurisdictions. They ended up being scaled back due to their deleterious impact on the economy. Indeed, a Democratic Congress and president wisely scrapped the previous FTT in the United States.

- **The proposed FTTs are more onerous than in foreign countries.**

  Most countries with FTTs exempt liquidity providers such as market makers from FTTs because of their important role in smoothing market operations. The lack of such an exemption in the proposed FTTs would exacerbate their negative impacts.

85



86



1615 H Street, NW
Washington, DC 20062-2000
(202) 463-5318

**Appendix B:** Poll Finds Bipartisan Opposition to Financial Transaction Tax

87

# Poll Finds Bipartisan Opposition to Financial Transaction Tax



No matter how you approach a Financial Transaction Tax (FTT), the outcome will be the same: Main Street, consumers, taxpayers, retirees, states, and localities are the ones who will suffer. The U.S. Chamber of Commerce's Center for Capital Markets Competitiveness (CCMC) conducted a poll of 2,000 likely voters nationally to understand their views on a proposed FTT. According to the poll:

**63%**
voters oppose
the FTT

When voters learn about an FTT, nearly two-thirds oppose the tax:

- 63% of voters oppose an FTT, including a majority of Democrats (51%), Independents (69%), and Republicans (80%).

- When questioned on the intensity of their opposition, 49% of respondents expressed strong opposition to an FTT, almost a majority of voters (more than one-in-three Democrats strongly oppose an FTT, along with 57% of Independents and 72% of Republicans).



**51%**

Democrats oppose



**69%**

Independents oppose



**80%**

Republicans oppose

The tax itself is likely to have a chilling effect on voters' retirement savings:

- Half (51%) of voters say that if this tax were to pass, they would be less likely to invest.

- A third (34%) of voters would be much less likely to invest in the market under this new tax.

ALL VOTERS

34% of voters *much less likely* to invest ⌐
51% of voters *less likely* to invest

88

More importantly, voters believe an FTT will hurt efforts to achieve priority policy goals:



ECONOMY

- Growing the economy and jobs is the #1 priority voters have for the U.S. Government, but 63% said that an FTT would actually hurt efforts to restart the economy and bring back jobs (Democrats: 54% say it will hurt more than help. Republicans: 74% hurt more than help. Independents 70% hurt more than help).

63%
TOTAL VOTERS

54%
Democrats

70%
Independents

74%
Republicans

COVID-19 RECOVERY

- 64% say an FTT will hurt Americans as they're trying to get back on their feet following the COVID-19 pandemic (Democrats: 54% say it will hurt more than help. Republicans: 75% hurt more than help. Independents 72% hurt more than help).



64%
TOTAL VOTERS

54%
Democrats

72%
Independents

75%
Republicans

RETIREMENT/EDUCATION



- 65% say an FTT will harm efforts to ensure Americans have enough money saved for retirement.
- 63% even say an FTT will make it more difficult for Americans to pay for college.

65%
TOTAL VOTERS
RETIREMENT

63%
TOTAL VOTERS
EDUCATION

In a rare moment of bipartisanship, Democratic and Republican voters are united in opposition to an FTT. Majorities from both parties believe an FTT would hurt efforts to recover from the impact of the COVID-19 pandemic and harm Americans' ability to save for retirement.

Voters are looking to the federal government to help grow the economy and bring back jobs. They want the government laser-focused on the vaccine effort, along with longer-term goals of making healthcare more affordable and improving education. When voters from both parties speak with one voice, Congress needs to listen: Republicans and Democrats alike understand that an FTT runs counter to these goals.

If you have any questions, please contact Kristen Malinconico, Director, U.S. Chamber Center for Capital Markets Competitiveness, at kmalinconico@USChamber.com.

*Methodology: The survey was conducted by Teneo Research. The data was collected online between February 23 and 25, 2021 among a nationally proportional sample of 2,000 likely voters. The survey has a credibility interval of ±2.5% at the 95% confidence level.*



89



1615 H Street, NW
Washington, DC 20062-2000
(202) 463-5318

**Appendix C:** Retirement Investment Scenario

90

# Retirement Investment Scenario



This scenario estimates the impact of a Financial Transaction Tax (FTT) on a 401(k) investor who invests the average 401(k) contribution each year over the lifetime of his or her working career. The cumulative cost of the tax grows each year as the retirement saver loses the compounding of returns on the taxes paid.

A typical retirement investor will end up with $31,912 less under the Wall Street Tax Act and $153,401 less if subject to the Inclusive Prosperity Act.

## ASSUMPTIONS

**TIME FRAME |** An employee makes annual contributions to a 401(k) plan for 45 working years (approximately ages 21 to 66).

**ANNUAL 401(K) CONTRIBUTION |** At the end of each year, the employee contributes $11,350, which represents the average annual 401(k) contribution including the employee and the average employer match.[1]

**RATE OF RETURN |** A real rate of return of 5% is used. This is a conservative estimate given that the average inflation-adjusted return on the S&P500 from 1926 to 2020 was 8.5%. The inflation-adjusted real return is used to make the retirement accumulation comparable in spending power to today's dollars.

## ACCUMULATION WITHOUT AN FTT

With no FTT, this worker will accumulate $1,812,597 at retirement.

## ANALYSIS WITH AN FTT

The impact of the tax will be a function of the tax rate and turnover rate of the funds.

**TAX RATE |** We assess the impact of an FTT at both the proposed 0.10% rate from the Wall Street Tax Act and the 0.50% rate from the Inclusive Prosperity Act.

**TURNOVER RATE |** Retirement savers invest in a variety of different funds with widely varying turnover rates. Actively managed funds tend to have higher turnover. This analysis uses a turnover rate of 63%, which is the average turnover of a domestic stock fund according to Morningstar.[2]

**RATE OF RETURN |** The Wall Street Tax Act would reduce the return by the turnover rate times the tax rate, or 63% * 0.10%, or 0.063%. The rate of return with the FTT becomes 5.0% - 0.063% = 4.937%. For an FTT rate of 0.50%, the rate of return would be reduced to 5.0% - (63% * 0.50%) = 4.685%.

**OTHER IMPACTS |** No adjustment is made for the increases in transactions costs such as the bid-ask spread that are likely to occur as intermediaries such as market makers pass through the cost of the tax. Nor is any adjustment made for drops in overall asset prices in reaction to the tax. This results in a more conservative estimate of the impact.

### Impact of FTT on Lifetime Retirement Savings Accumulation

|  | Without an FTT | With the Wall Street Tax Act | With the Inclusive Prosperity Act |
|---|---|---|---|
| Annual Real Return | 5.000% | 4.937% | 4.685% |
| Annual Contribution | $11,350 | $11,350 | $11,350 |
| Years of Contributions | 45 | 45 | 45 |
| Accumulation at Retirement (today's dollars) | $1,812,597 | $1,780,685 | $1,659,196 |
| Change Due to Tax |  | $31,912 | $153,401 |

1. Fidelity Investments, Building Financial Futures: trends and insights of those saving for retirement across America, 4th Quarter 2020, https://sponsor.fidelity.com/bin-public/06_PSW_Website/documents/Building_Financial_Futures.pdf

2. Investopedia, Turnover Ratios and Fund Quality. https://www.investopedia.com/articles/mutualfund/09/mutual-fund-turnover-rate.asp

91



March 8, 2021

The Honorable Sherrod Brown              The Honorable Patrick Toomey
Chair                                    Ranking Member
Committee on Banking, Housing,           Committee on Banking, Housing,
and Urban Affairs                        and Urban Affairs
United States Senate                     United States Senate
Washington, D.C.  20515                  Washington, D.C.  20515


Dear Chairman Brown, Ranking Member Toomey, and Members of the Committee:

My name is Jennifer Schulp, and I am the Director of Financial Regulation Studies at the Cato Institute's Center for Monetary and Financial Alternatives. Thank you for providing the opportunity to submit a written statement in connection with the Committee's hearing entitled, "Who Wins on Wall Street? GameStop, Robinhood, and the State of Retail Investing." My comments below are focused on the state of retail investing and are similar to the written testimony that I submitted to the U.S. House Committee on Financial Services in connection with its February 18, 2021 hearing entitled, "Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide."[1]

**Retail Investing**

Retail, or individual, investors are important participants in our public equities markets. Although retail participation has ebbed and flowed over the years, approximately one-fifth of all market trading volume is now attributable to retail orders, which is a substantial increase over 2019.[2]

Most commentators pin the recent increase in retail participation to the availability of zero-commission trading. In late 2019, many large brokerages began offering zero-commission trading, following the lead of Robinhood Financial. But several other factors also likely attracted retail investors, including the widespread availability of fractional-share trading,[3] the ability to

---

[1] Schulp. "Testimony before the Committee on Financial Services, U.S. House of Representatives." Available at https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-schulpj-20210218.pdf
[2] Alexander Osipovich. "Individual-Investor Boom reshapes U.S. Stock Market." *Wall Street Journal*, August 31, 2020. Available at https://www.wsj.com/articles/individual-investor-boom-reshapes-u-s-stock-market-11598866200; Piece Crosby. "Reflections on 2020 and What's In Store for 2021: Through the Eyes of Retail Traders." *Nasdaq*, December 22, 2020. Available at https://www.nasdaq.com/articles/reflections-on-2020-and-whats-in-store-for-2021%3A-through-the-eyes-of-retail-traders-2020
[3] Fractional-share trading, which permits investors to buy a portion of a stock less than one share, increased in availability throughout 2020. Julia Carpenter. "When Some Investors Look at Stocks They See Dollars, Not Shares."

92

open accounts with low (or no) balances, and the ease of app-based trading platforms. Even limited entertainment options during the pandemic probably played a role in increased retail interest in investing. While Robinhood and other trading apps experienced tremendous growth in accounts in 2020, legacy brokerages, like Fidelity Investments, similarly experienced a surge in new retail accounts.[4]

Retail participation is beneficial for our equities markets. The fact that retail investors behave differently from institutional ones, and sometimes behave differently from each other can be particularly valuable in times of market stress. Where institutional liquidity dries up, for example, retail trading can help to lower bid-ask spreads and dampen the price impact of trades.[5] In fact, retail investors may have been a market-stabilizing force during the March 2020 coronavirus-induced market crash by staying the course with their investments and buying when stock prices dipped.[6]

Investing in the stock market also benefits individual investors by providing an important path to wealth. With average annual returns for the S&P 500 during the past 60 years of approximately 8%, long-term investors generally benefit by being invested in the market.[7]

Fortunately, there is already a history of strong retail participation in U.S. equities markets. When measured in 2019, approximately 38% of total U.S. equities were held directly by households.[8] However, with that said, only 15% of U.S. households directly hold stock, and ownership of equities is concentrated in the hands of the comparatively few and comparatively wealthy.[9]

---

*Wall Street Journal*, January 15, 2021. Available at https://www.wsj.com/articles/when-some-investors-look-at-stocks-they-see-dollars-not-shares-11610706630

[4] Justin Baer. "Fidelity's Retail Investor Accounts Rise 17% to 26 Million." *Wall Street Journal*. Available at https://www.wsj.com/articles/fidelitys-assets-under-management-rise-to-3-8-trillion-11614700831

[5] Gideon Ozik, Ronnie Sadka, and Syly Shen. "Flattening the Illiquidity Curve: Retail Trading During the COVID-19 Lockdown." *SSRN*, February 10, 2021. Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3663970

[6] Ivo Welch. "The Wisdom of the Robinhood Crowd." *NBER Working Paper*, No. 27866. Available at https://www.nber.org/system/files/working_papers/w27866/w27866.pdf; Gideon Ozik, Ronnie Sadka, and Syly Shen. "Flattening the Illiquidity Curve: Retail Trading During the COVID-19 Lockdown." *SSRN*, February 10, 2021. Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3663970

[7] J.B. Maverick. "What is the Average Annual Return for the S&P 500?" *Investopedia*, February 19, 2020. Available at https://www.investopedia.com/ask/answers/042415/what-average-annual-return-sp-500.asp

[8] SIFMA. "Who Owns Stocks in America." *SIFMA Insights*. Available at https://www.sifma.org/wp-content/uploads/2021/02/SIFMA-Insights-Who-Owns-Stocks-An-Update-FOR-WEB.pdf The 38% figure excludes stocks indirectly held by retail investors through mutual funds or other institutions.

[9] Board of Governors of the Federal Reserve System. "Changes in U.S. Family Finances from 2016 to 2019: Evidence from the Survey of Consumer Finances." *Federal Reserve Bulletin*, Vol. 106, No. 5. Available at https://www.federalreserve.gov/publications/files/scf20.pdf; Board of Governors of the Federal Reserve System. "Survey of Consumer Finances (SCF)." Available at https://www.federalreserve.gov/econres/scf/dataviz/scf/chart/#series:Directly_Held_Stocks;demographic:inccat;population:1,2,3,4,5,6;units:have

93

In fact, even if you include pooled investment funds, which is how the vast majority of households indirectly hold stocks as a part of their retirement assets, ownership is still skewed towards the wealthy. In 2019, about 53% of all households had stock market investments, but only 31% of families in the bottom half of the income distribution were invested.[10]

Stock ownership is also highly correlated with race, education, and age.[11] For example, in 2019, approximately 19% of white households directly held stock, compared to approximately 7% of Black households and 4% of Hispanic households.[12] Those with a college degree are about twice as likely to directly hold stock than those who just had some college education, and more than three times more likely than those with only a high school diploma.[13] And the older a person is, the more likely he or she is to own stock.[14] These patterns equally apply to indirect ownership of stock.

The retail investors who opened accounts in 2020, though, are different. Data released by brokerage firms identifies a high number of new clients who are first-time investors and who are younger than the average investor.[15] This is confirmed by recent research by the FINRA Investor Education Foundation and NORC at the University of Chicago ("FINRA/NORC Study"), which found that investors who opened a taxable investment account for the first time in 2020 were younger, had lower incomes, and were more racially diverse than those who had previously opened such accounts.[16] These new investors also held lower account balances, with about a third holding account balances less than $500. Indeed, the ability to invest with a small

---

[10] Board of Governors of the Federal Reserve System. "Changes in U.S. Family Finances from 2016 to 2019: Evidence from the Survey of Consumer Finances." *Federal Reserve Bulletin*, Vol. 106, No. 5. Available at https://www.federalreserve.gov/publications/files/scf20.pdf. By comparison, about 70% of families in the 50-80th percentiles held stock, and more than 90% of families in the top decile held stock.

[11] Lydia Saad. "What percentage of Americans Owns Stock?" *Gallup*, September 13, 2019. Available at https://news.gallup.com/poll/266807/percentage-americans-owns-stock.aspx

[12] Board of Governors of the Federal Reserve System. "Survey of Consumer Finances (SCF)." Available at https://www.federalreserve.gov/econres/scf/dataviz/scf/chart/#series:Directly_Held_Stocks;demographic:racecl4; population:1,2,3,4;units:have

[13] Board of Governors of the Federal Reserve System. "Survey of Consumer Finances (SCF)." Available at https://www.federalreserve.gov/econres/scf/dataviz/scf/chart/#series:Directly_Held_Stocks;demographic:edcl;po pulation:all;units:have

[14] Board of Governors of the Federal Reserve System. "Survey of Consumer Finances (SCF)." Available at https://www.federalreserve.gov/econres/scf/dataviz/scf/chart/#series:Directly_Held_Stocks;demographic:agecl;p opulation:1,2,3,4,5,6;units:have

[15] "Millennials Working from Home May be Moving the Market." *CNN*, June 12, 2020. Available at https://www.cnn.com/2020/06/12/investing/millennials-investing-robinhood/index.html; Vladimir Tenev. "Testimony before the Committee on Financial Services, U.S. House of Representatives." Available at https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenev-20210218.pdf

[16] FINRA. "Investing 2020: New Accounts and the People Who Opened Them." *Consumer Insights: Money & Investing*, February 2021. Available at https://www.finrafoundation.org/sites/finrafoundation/files/investing-2020-new-accounts-and-the-people-who-opened-them_1_0.pdf Evidence also suggests that women may have opened accounts at a higher rate in 2020 than previously. Carol Ryan. "Why Women Investors Won't Embrace Stocks." *Wall Street Journal*. Available at https://www.wsj.com/articles/why-women-investors-wont-embrace-stocks-11613125802

94

amount of money was a commonly cited reason for opening an account for the first time in 2020.

The 2020 Ariel-Schwab Black Investor Survey underscores the increase in diversity among investors in 2020, reporting that Black investors under the age of 40 are now participating in the stock market at a rate equal to their white counterparts.[17] Indeed, three times more young Black investors than young white investors entered the market for the first time in 2020.[18]

These changes in investor demographics may portend, as one of the FINRA/NORC Study researchers noted, "a shift towards more equitable investment participation."[19]

The FINRA/NORC Study also calls into question the popular narrative that the rise in retail participation is fueled by those seeking to engage in speculative behavior. New investors most often cited saving for retirement and learning about investing as goals. About a third of investors who opened accounts in 2020 did cite speculating as a goal, but the self-reported trading behavior of these investors is not consistent with day trading or similar strategies. While those who opened new accounts in 2020 appear to trade more frequently than existing account holders, approximately 40% of new investors reported making no trades per month and almost 90% made three or fewer trades a month.

It is also not clear that these new retail investors collectively are making poor decisions. The investing behaviors of retail investors has long been the subject of debate, but there is little consensus that new retail entrants are making systematically worse decisions than their predecessors. Rather, retail investors have received praise for identifying the market bottom in March 2020 and generating better performance than some hedge funds through the same volatile period.[20] Recent research studying investor holdings on Robinhood suggests that the narrative that retail investors were "cannon fodder" for more sophisticated investors is "incomplete to the point of being misleading."[21] While Robinhood investors were

[17] Charles Schwab. "New Ariel-Schwab Black Investor Survey Shows Black Americans Continue to Trail Their White Counterparts in Building Wealth." *Charles Schwab*. Available at https://www.aboutschwab.com/ariel-schwab-black-investor-survey-2021

[18] Ibid.

[19] Angelita Williams and Eric Young. "New Research: Global Pandemic Brings Surge of New and Experienced Retail Investors into the Stock Market." *FINRA Media Center*, February 2, 2021. Available at https://www.finra.org/media-center/newsreleases/2021/new-research-global-pandemic-brings-surge-new-and-experienced-retail

[20] Maggie Fitzgerald. "Robinhood Traders Nailed the Market Bottom, Debunking Theory Retail Investors are the Dumb Money." *CNBC*, June 15, 2020. Available at https://www.cnbc.com/2020/06/15/robinhood-traders-nailed-the-market-bottom-debunking-myth-retail-traders-are-the-dumb-money.html; Maggie Fitzgerald. "Follow Robinhood Traders? Amateurs' Favorite Stocks are Beating Hedge Fund Picks, Goldman Says." *CNBC*, June 15, 2020. Available at https://www.cnbc.com/2020/06/15/follow-robinhood-traders-amateurs-favorite-stocks-are-beating-hedge-fund-picks-goldman-says.html

[21] Ivo Welch. "The Wisdom of the Robinhood Crowd." *NBER Working Paper*, No. 27866. Available at https://www.nber.org/system/files/working_papers/w27866/w27866.pdf

95

overrepresented in certain odd stocks, those unconventional holdings were the exception, not the rule.[22]

The increased participation by retail investors in equities markets is positive news for both investors themselves and the markets. Opportunities for individuals to grow their own wealth should be welcomed and expanded, not restricted.[23]

**GameStop Phenomenon**

It remains difficult to analyze the impact of the trading in GameStop and other stocks because many facts are unknown at this time. While the popular narrative is that retail traders rose up to target hedge funds, we do not have the data to know what portion of GameStop's rise was attributable to retail investor behavior versus the behavior of other market participants. More so, we may never have the data to determine the diverse motivations of all the individual investors who traded in GameStop.

But some things seem clear. Importantly, the temporary volatility in GameStop and others did not present a systemic risk to the functioning of our markets. As the Treasury Department recognized, following a meeting with officials from the Securities and Exchange Commission (SEC), the Commodity Futures Trading Commission, the Federal Reserve, and the Federal Reserve Bank of New York, the market's "core infrastructure was resilient during high volatility and heavy trading volume."[24] This is not surprising. Despite the huge trading volume and rapid increase in value, the GameStop phenomenon affected a very small part of the market.[25]

The fact that GameStop traded temporarily, and perhaps still trades, above fair estimates of the company's value is not, by itself, a reason for concern. Stock prices move in and out of alignment all the time, and markets are no strangers to bubbles. If a company is valued by the market differently than a review of its "fundamentals" suggests, it might indicate that the analysis is missing relevant information about a company's prospects or that the company's stock price is due for a correction. The market's mechanisms, including the tool of short selling, generally work well to handle these circumstances. Stepping in to prevent trading when a stock

---

[22] Ibid.

[23] Another place to expand opportunities for retail investors is by revising or eliminating the accredited investor definition, which limits investment in certain exempt offerings to those who meet a minimum wealth standard. The accredited investor definition has disproportionate impacts on minority and rural communities. Jennifer Schulp. "Let's Not Backtrack on Loosening 'Accredited Investor' Rules." *MarketWatch*, January 29, 2021. Available at https://www.cato.org/article/lets-not-backtrack-loosening-accredited-investor-rules

[24] Jeanna Smialek and Deborah Solomon. "Yellen and Regulators Met Amid GameStop Frenzy to Discuss Market Volatility." *New York Times*, February 4, 2021. Available at https://www.nytimes.com/2021/02/04/business/economy/yellen-gamestop.html

[25] GameStop's market capitalization, even at its peak, was around $24 billion in an approximately $50 trillion market. YCharts. "GameStop Corp (GME)." *YCharts Data*. Available at https://ycharts.com/companies/GME/market_cap; Siblis Research. "Total Market Value of U.S. Stock Market." *Siblis Research Database*. Available at https://siblisresearch.com/data/us-stock-market-value/

96

price soars (or declines) contrary to conventional wisdom could limit legitimate information important to the market.

The SEC, among a host of others, is reviewing the relevant trading and conducting a study of the events.[26] I believe they likely have the tools necessary to address misconduct, if any occurred.

I cannot say, on this incomplete record, whether any regulatory changes are warranted, but areas for improvement may be identified as regulators learn more about what happened. Any proposals for change must recognize the potential for unintended consequences, which is particularly acute where retail investors participate in the market both in their own capacity and through the institutions that manage their retirement assets.

By no means, though, should the GameStop phenomenon result in changes that restrict retail investors' access to the markets. Reintroducing undue barriers to participation that have been removed, or introducing new restrictions, endangers the benefits brought by wider retail participation in our equities markets.

Respectfully,

Jennifer J. Schulp
Director of Financial Regulation Studies
Center for Monetary and Financial Alternatives
The Cato Institute

---

[26] Kate Davidson and Eliza Collins. "Regulators Say Market Infrastructure was Resilient in GameStop Frenzy." *Wall Street Journal*, February 4, 2021. Available at https://www.wsj.com/articles/u-s-regulators-met-to-discuss-recent-market-volatility-11612479757

97



*Invested in America*

March 12, 2021

The Honorable Sherrod Brown
Chairman, Committee on Banking, Housing
and Urban Affairs
U.S. Senate
Washington, DC 20510

The Honorable Pat Toomey
Ranking Republican, Committee on Banking,
Housing and Urban Affairs
U.S. Senate
Washington, DC 20510

Dear Chairman Brown and Ranking Member Toomey,

The Securities Industry and Financial Markets Association (SIFMA)[1] respectfully submits this letter for the record in connection with the March 9, 2021 hearing titled "Who Wins on Wall Street? GameStop, Robinhood and the State of Retail Investing."

The U.S. capital markets are where people – individually through direct investment in stocks and bonds and collectively through pension funds and mutual funds – invest and grow savings. By putting their capital to work in our markets, they invest in companies that drive innovation. They also invest in state and local infrastructure like roads, schools and hospitals. Combined, their savings fuel economic growth and job creation. As SEC Chairman nominee Gary Gensler said at his recent confirmation hearing before your committee, "the capital markets touch every part of our economy. They enable businesses to develop new products, build new facilities, and grow their payrolls. They help working families save for retirement and invest in their children's futures. And although it may not seem intuitive, when someone goes to take out a mortgage or open a credit card, our capital markets are on the other side of those transactions as well."

We believe that proposals to impose a financial transaction tax (FTT) on securities transactions would harm the very individuals that rely on the capital markets to grow savings and fund retirement. While proponents of an FTT claim that it would be a tax on the securities industry, in fact, it would be a new tax on all individual investors and pension beneficiaries.

Not only would this new tax harm average investors, retirement accounts and pension funds, it would also negatively impact the efficiency of U.S. markets, the deepest and most liquid in the world. At a time when the costs of investing for individuals have never been lower, it would be counterintuitive to raise such costs through an FTT, particularly when policy makers are rightfully seeking to increase retirement savings.

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's nearly 1 million employees, we advocate for legislation, regulation and business policy, affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA). For more information, visit http://www.sifma.org.

98



To understand how a financial transaction tax would impact Americans saving for retirement and other priorities, it is important to know who owns stocks in the U.S. We believe some of the testimony given at the March 9th hearing mischaracterizes stock ownership in America. One witness asserted that "directly owned stocks (and bonds) make up a relatively small share of near retirees' wealth at 8%" and "only 24% of older households own stocks directly outside of their retirement account." These statistics completely overlook the fact that Americans are building their retirement accounts with mutual funds and individual stocks.[2] Individual retirement accounts (IRAs) comprise $11 trillion in assets, of which 43.7% are mutual funds and 47.1% include individual stocks, ETFs and assets held in brokerage or trust accounts. Defined contribution plans comprise $7.4 trillion in assets, with 52.1% in annuities and 23.2% in equities. Additionally, 401k accounts continue to grow reaching $6.4 trillion in 2019 and these accounts are predominately equity based.

According to the Federal Reserve, 52.6% of households in the U.S. own stocks (65 million households). The Federal Reserve data also shows a median value of $40,000 for a household's stock holdings, which demonstrates a much wider universe of Americans own stocks. Extrapolating this $40,000 median stock holdings value to the U.S. Census Bureau data, it is in line with the median income listed for the third and fourth quintile income levels. These quintiles are the equivalent to an income range of $77,200 to $126,600 and therefore shows a large portion of the middle-class own stocks, not just the wealthiest Americans. Nevertheless, more can be done to give more Americans access to wealth building opportunities.

If an FTT were to be imposed, many retirement accounts such as pension funds, 401ks, IRAs, as well as 529s and the Federal Thrift Savings Plan, which are invested in target date funds, would be charged with this new tax each time they are rebalanced or the asset mix is changed, which occurs with great regularity. This year, Vanguard published an analysis[3] demonstrating that an FTT could "hinder millions of American investors striving to reach their long-term financial goals." According to the analysis, if a person saves $10,000 per year over 40 years in a balanced portfolio of actively managed stocks and bonds, a 10-basis-point tax would cost the investor nearly $36,000 — more than 3 ½ years of investor savings. If levied on purchases and sales, the tax would cost these same Americans more than $56,000. All told, such a penalty could cost the retirement saver as much as $200,000 — equivalent to 20 years of an investor's annual contributions. Given the financial stress facing Americans of all backgrounds due to the COVID-19 pandemic, policymakers should not make it harder for citizens to secure their financial future.

In addition to the cost on American savers, an FTT would also reduce the competitiveness and liquidity of the U.S. capital markets. As shown in SIFMA's report entitled "The Ramifications of a Financial Transaction Tax"[4], an FTT would increase volatility as trading volumes decline, increase financing costs for municipalities, the federal government and corporations, increase prices for consumer goods, and generally damage economic growth by decreasing revenues and jobs in the U.S.

---

[2] SIFMA Insights: Who Owns Stocks, An Update, February 2021
[3] Vanguard. (2020). Financial Transaction Tax: Main Street Bears the Burden.
[4] SIFMA. (2019). Ramifications of an FTT: A Financial Transaction Tax Will Harm U.S. Capital Markets & Individual Investors

99



Hong Kong is occasionally cited as an example of a market that has successfully implemented the FTT (stamp duty), however the facts tell a different story. In Hong Kong, the average cost to trade is 19.2 basis points. Of this, 17.5 basis points stems from the stamp duty or 91% of the cost to trade. While the explicit cost of the stamp duty is 10 basis points, there is a secondary increase in implicit costs from the widened bid-ask spread. More generally, across 14 separate transaction tax changes in Asia-Pacific markets, a 23% rise in transaction costs causes an immediate 1% decline in daily market returns.

Finally, as history shows us, the revenues generated by an FTT consistently fail to meet expectations. In nearly every jurisdiction that has enacted an FTT, the tax has not produced the projected revenue. Experiences with an FTT in Sweden, Italy and France only managed to deliver 3%, 20%, and 50% of expected revenues respectively in their first year while their capital markets experienced heightened volatility, lower returns, and the flight of trading volume to other jurisdictions.

A 1% tax on equity trades in Sweden resulted in a market decline of 5.3% in the 30 days leading up to the introduction of the tax. Given the lack of revenue raised and the amount of trading migration by the end of 1991, the FTTs in Sweden were eliminated, but trading volume never returned and the markets never fully recovered. In Italy, volatility and bid-ask spreads increased and while volumes did not decrease significantly in the second stage of implementation, academics believe this is because the volumes declined in the first stage when the high frequency trading tax was added. Finally, in France, the FTT resulted in 16% declines in trading within two months at the NYSE Euronext Paris, a 21% decline in volumes in the French CAC 40 in the first ten days and 16% in the first 40 days. Order book depth declined almost instantly after adoption.

In sum, we believe the imposition of an FTT would have negative consequences for individual investors and U.S. markets to the detriment of the broader economy. It would tax savings, reduce market liquidity, and discourage investment. We appreciate your consideration of our views on this important subject.

Sincerely,

Kenneth E. Bentsen, Jr.
President and CEO

100

**≡ CITADEL**

VIA ELECTRONIC MAIL

The Honorable Elizabeth Warren
United States Senate
309 Hart Senate Office Building
Washington, D.C. 20510

RE: February 16, 2021 Letter

Dear Senator Warren:

We write in response to your letter dated February 16, 2021. We appreciate the opportunity to explain Citadel Securities' business relationships and to respond to the requests in your letter, broken out by question number.

1.    Citadel Securities executes trades on behalf of institutions and every major retail broker dealer in the U.S., including Fidelity, Morgan Stanley/ E*Trade, Robinhood, Schwab/ TD Ameritrade, Vanguard, and many others. Robinhood is one of many retail broker dealers that directs a portion of its clients' orders to Citadel Securities, and Citadel Securities is one of a number of market makers receiving client orders from Robinhood. Neither Citadel Securities nor any affiliated entity own any stake in Robinhood.

By way of background, retail broker dealers are legally obligated to route their clients' orders to the source of best execution, which is determined, among other things, by price improvement, speed of completion, and platform resiliency.[1]  While many retail broker dealers charge market makers a fee to execute those trades—a practice known as payment for order flow or PFOF—some do not, and we execute trades for both.  PFOF is a long-standing and transparent practice that is accepted and regulated by the SEC.[2]

As disclosed quarterly under SEC Rule 606, certain retail broker dealers charge Citadel Securities a fee, or PFOF.  Such arrangements are publicly reported and disclosed in retail broker dealers' 606 reports, which provide information on any PFOF arrangements with market makers, including Citadel Securities.  As necessitated by its role as a market maker, Citadel Securities receives order information, generally by the receipt of FIX protocol messages.  The FIX message protocol – which is used across the industry – provides the terms of that order (e.g., security name, price, size, order type).  Citadel Securities does not receive any personally identifiable information from Robinhood or any other retail broker dealer.

2.    In its role as a market maker, Citadel Securities handles approximately 40 percent of all retail orders in the U.S. on a typical day.  Because retail order execution is a very competitive business, the magnitude of the orders routed to Citadel Securities reflects our firm's consistent provision of price

---

[1] *See* FINRA Rule 5310.
[2] *See* 17 C.F.R. § 242.606.

101

**CITADEL**

improvement, our ability to deliver best execution in all market conditions, and the resilience of our systems.  It also reflects the corresponding confidence the retail brokerage community has in our firm and our track record of success, which benefits retail investors.

Citadel Securities' computation based on publicly available data provides that the average daily bid-ask spread in GameStop from December 1, 2020, through February 11, 2021, was approximately $0.024.[3]  Bid-ask spreads reflect the consideration of the risk that market makers take on in making two-way markets and, as Citadel Securities has done, in keeping those markets available at all times.  During the last week in January, for example, Citadel Securities was the only major market marker to provide continuous liquidity every minute of every day.  Citadel Securities continued handling all of the retail volume that it received even as others were unable or unwilling to handle the heavy volumes.

3.       On January 25, 2021, it was announced that Citadel, the separate hedge fund business, and its partners had made a strategic investment in Melvin Capital's largest fund.  As of January 31, 2021, Citadel's investment in Melvin Capital was not profitable.  Citadel Securities, the market making business, had no role in the investment in Melvin Capital.

Consistent with its regulatory obligations under Section 13(f) of the Securities Exchange Act of 1934, Citadel discloses its securities holdings (as defined under SEC rules) quarterly in its Form 13F, the latest of which was made publicly available on February 16, 2021.

4.       As has now been widely acknowledged, neither Citadel nor Citadel Securities played a role in Robinhood's decision to impose trading restrictions on January 28, 2021.  Allegations to the contrary are completely false.  The internet-generated conspiracy theories on which they are based have long since been debunked, including by the sworn testimony of both Robinhood and Citadel executives, and in detailed explanations by the clearing agency whose margin calls are what in fact triggered the trading restrictions.

Citadel Securities has publicly confirmed it had "not instructed or otherwise caused any brokerage firm to stop, suspend, or limit trading or otherwise refuse to do business," and Citadel has likewise confirmed that it was "not involved in, or responsible for, any retail brokers' decision to stop trading in any way."[4]  Citadel and Citadel Securities had absolutely no involvement in—or advance knowledge of—Robinhood's decision to restrict trading of GameStop or any other "meme" stock.  In his sworn testimony before the U.S. House Committee on Financial Services ("HCFS"), Mr. Kenneth C. Griffin was unequivocal: "I want to be perfectly clear: we had no role in Robinhood's decision to limit trading in GameStop or any other of the 'meme' stocks."[5]  Mr. Griffin testified that he first learned of Robinhood's trading restrictions only after they were publicly announced,[6] and that no one

---

[3] This has been calculated, based on publicly available data, as the time-weighted median of the bid-ask spread during each day from 12/1/2020 through 2/11/2021, using 1-minute samples of the National Best Bid and Offer each day from 9:35 AM to 3:55 PM ET.

[4] *See* Michael Mackenzie et al., *Robinhood Raises $1bn from Investors and Taps Banks at End Of Wild Week*, FIN. TIMES (Jan. 29, 2021), https://www.ft.com/content/9a1b24e6-0433-462a-a860-c2504ea5e5c4.

[5] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearing Before the H. Comm on Fin. Services,* 117th Cong. 1 (2021) (written testimony of Kenneth C. Griffin), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-griffink-20210218.pdf.

[6] *Id.*

2

102

**CITADEL**

at Citadel or Citadel Securities had discussed with Robinhood restricting or otherwise doing anything to prevent trading in GameStop.[7]

As Robinhood has confirmed publicly, including in a February 12, 2021 letter responding to your request for information from the company (which has been publicly released),[8] Robinhood imposed trading restrictions on GameStop stock due to depository requirements from its clearinghouse, the National Securities Clearing Corporation ("NSCC"), and not as a result of direction from any market maker or other market participants. Robinhood has been crystal clear on this important point since such unfounded rumors surfaced. On January 31, 2021, Vlad Tenev, the Founder and CEO of Robinhood, was asked about the trading restrictions and responded: "[t]here was a rumor that Citadel or other market makers kind of pressured us into doing this and that's just false . . . from our perspective, you know, Citadel and other market makers weren't involved in that."[9] The following week, in a sworn declaration submitted in federal court, Jim Swartwout, Robinhood's President & COO, stated that the "speculation" that Citadel or Citadel Securities played a role in Robinhood's decision to restrict trading was "completely false."[10] He added that "[t]his was a decision [he] made on behalf of RHS and in consultation with [his] operations team at RHS and others at Robinhood."[11] On February 18, 2021, when asked during a hearing before the HCFS whether the decision to restrict trading was based on pressure from anyone on the witness panel—which included Mr. Griffin—Mr. Tenev responded, "Not at all. Zero pressure from anyone."[12]

The capital-based drivers of Robinhood's trading restrictions have likewise been confirmed by the Depository Trust & Clearing Corp. ("DTTC") (the parent company of the NSCC), the primary registered clearing agency for equities transactions in the U.S., which has publicly stated that it increased margin requirements for Robinhood (and other brokers) spurred by extraordinary volatility in share prices, including GameStop.[13] Robinhood has similarly made clear that its decision to restrict

---

[7] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearing Before the H. Comm on Fin. Services*, 117th Cong. at 3:11:25-3:11:51 (2021) (oral testimony of Kenneth C. Griffin).

[8] Letter from Robinhood to the Honorable Elizabeth Warren (Feb. 12, 2021),
https://www.warren.senate.gov/imo/media/doc/Robinhood%20Response%20to%20Feb%202%20Letter.pdf.

[9] *See* Siladitya Ray, *Robinhood CEO Dismisses Elon Musk's 'Conspiracy Theories' About GameStop Trade Limits*, FORBES (Feb. 1, 2021), https://www.forbes.com/sites/siladityaray/2021/02/01/robinhood-ceo-dismisses-elon-musks-conspiracy-theories-about-gamestop-trade-limits.

[10] *Cobos v. Robinhood Financial LLC*, 21-cv-843, Declaration of Jim Swartwout, Dkt. No. 27-3 ¶ 33 (C.D. Cal. Feb. 8, 2021).

[11] *Id.* ¶ 34.

[12] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearing Before the H. Comm on Fin. Services*, 117th Cong. at 00:52:45 (2021) (oral testimony of Vlad Tenev, CEO, Robinhood Markets, Inc.).

[13] *See* Wayne Duggan, *How And Why Did The Stock Market Crack This Week?* BUSINESS INSIDER (Jan. 29, 2021) ("In light of the controversial decisions made on Thursday, the Depository Trust & Clearing Corporation (DTTC) issued the following statement explaining the measures taken by its clearing house, National Securities Clearing Corporation (NSCC): 'In recent days, certain securities, including GME, AMC and others, have experienced extreme volatility that have generated substantial risk exposures at firms that clear these trades at NSCC, particularly if the clearing member or its clients are predominantly on one side of the market. Because NSCC guarantees settlement of trades among its clearing members, NSCC collects margin according to calculations that are set forth in its rules. When volatility increases, portfolio margin requirements increase too, and NSCC clearing members may pass on these costs to their clients, including brokerages that clear through them. Margin requirements protect the entire industry against defaults and systemic risk in volatile markets.'"), https://markets.businessinsider.com/news/stocks/how-and-why-did-the-stock-market-crack-this-week-1030021400; *see also* Letter from DTTC to The Hon. Patrick McHenry, Ranking Member, House Committee on Financial Services at 4 (Feb. 18,

103

**CITADEL**

trading resulted from depository requirements from its clearinghouse, the NSCC.  Mr. Tenev testified
to the HCFS that, at approximately 5:11 a.m. on January 28, 2021, Robinhood received an email from
the NSCC that Robinhood had a deposit deficit of around $3 billion due to volatility in the "meme"
stocks, and that as a result of this "unprecedented" depository requirement, Robinhood restricted
trading of certain stocks.[14]  This timeline is corroborated by a written statement submitted to the HCFS
by the DTCC that details the reasons behind NSCC's decision to increase daily margin requirements
for Robinhood and others as noted in the 5:11 a.m. January 28 email referenced above.[15]  Robinhood's
explanation is further supported by its decision to raise approximately $3.4 billion in new capital in the
days after January 28, 2021 to—in the words of Mr. Tenev—"ensure that we could meet future
potential deposit requirements."[16]

Citadel Securities is committed to the healthy functioning of the U.S. equities markets, and we
appreciate the opportunity to provide information on the recent market events.  Please do not hesitate
to contact us if you have further questions.

Sincerely,

Shawn F. Fagan
Managing Director and Chief Legal Officer

---

2021) ("Many clearing members whose unsettled portfolios were exposed to volatile meme stocks saw significant increases
in the VaR charges that derived from the risk posed by increased volume and price volatility in these securities. Substantial
VaR charge increases also generated capital premium charges for clearing members whose core requirements exceeded their
capital cushions. Several clearing members were subject to capital premium charges, which were automatically generated by
NSCC's systems based on the formula in NSCC's rules.").

[14] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearing
Before the H. Comm on Fin. Services*, 117th Cong. at 9 (2021) (written testimony of Vlad Tenev, CEO, Robinhood Markets,
Inc.), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf.

[15] Letter from DTCC to Hon. Patrick McHenry at 4 (Feb. 18, 2021), https://www.dtcc.com/~/media/Files/PDFs/DTCC-
Statement-February-2021-Mike-Bodson.pdf.

[16] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide: Hearing
Before the H. Comm on Fin. Services*, 117th Cong. at 10 (2021) (written testimony of Vlad Tenev, CEO, Robinhood Markets,
Inc.), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-tenevv-20210218.pdf.

4

104



Robert W. Cook
President and Chief Executive Officer

February 23, 2021

The Honorable Elizabeth Warren
United States Senate
309 Hart Senate Office Building
Washington, DC 20510

Dear Senator Warren:

The Financial Industry Regulatory Authority (FINRA) appreciates the opportunity to respond to your letter of February 16, 2021, regarding the recent market events related to trading in GameStop and similarly volatile stocks, particularly with respect to the activities of online trading platforms and their dealings with retail customers.

FINRA's mission is to protect investors and promote market integrity, and we agree that these events require thorough investigation and careful study – not only to ensure enforcement of existing rules, but also to assess whether current standards applicable to broker-dealers should be enhanced to better protect investors in light of changes in technology, investor behavior and the broader evolution of the markets. Your letter raises important issues in that regard. Below, we have set out responses to your specific question topics.

<u>Background</u>

As you know, FINRA is a not-for-profit, self-regulatory organization responsible for regulating its member broker-dealers and their associated persons pursuant to the Securities Exchange Act of 1934 (Exchange Act). Operating under the oversight of the Securities and Exchange Commission (SEC or Commission), FINRA fulfills its mission by, among other things, adopting rules that supplement those of the SEC (and that are subject to approval by the SEC), examining its member firms for compliance with FINRA rules and SEC rules applicable to broker-dealers, surveilling trading in the securities markets and enforcing member firm compliance where necessary.

The SEC has stated that it will be conducting a review of recent market events[1] and publishing a report of its findings.[2] FINRA has offered to support that effort however the SEC deems appropriate. We believe that a comprehensive review of these events by the SEC is both a necessary and important step to help inform potential regulatory responses by the SEC, FINRA or other regulators.

In considering such responses, we note that the SEC has primary regulatory authority with respect to several of the topics raised in your letter. These include: the development

---

[1]   *See* Statement of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding Recent Market Volatility, dated January 29, 2021.

[2]   *See* Statement from Treasury Regarding the Meeting Between the Treasury Department, Securities and Exchange Commission, Federal Reserve Board, Federal Reserve Bank of New York, and Commodity Futures Trading Commission, dated February 4, 2021.

Investor protection. Market integrity.                    1735 K Street, NW          t  202 728 8824
                                                         Washington, DC             f  202 728 8075
                                                         20006-1506                 www.finra.org

The Honorable Elizabeth Warren
February 23, 2021
Page 2

by the SEC of a national market system defining the overall structure of the securities
markets, which has included decades of analysis and regulation by the SEC of the
practice of payment for order flow on the exchanges and over-the-counter markets; the
SEC's financial responsibility requirements for broker-dealers, whether or not FINRA
member firms, which govern their capital, liquidity and protection of customer funds and
securities; determining the scope and application of Regulation Best Interest (Reg BI)
(which imposes a "best interest" standard of conduct for recommendations of securities
and strategies to retail customers) with respect to online trading platforms; and the
authority to prohibit mandatory predispute arbitration agreements between broker-
dealers or investment advisers and their customers. As discussed below, certain of
FINRA's own rules, as approved by the SEC, help supplement or support the SEC's
approach to these areas under federal law.

In further support of the SEC, FINRA has responsibility to help enforce the SEC's
requirements with respect to FINRA broker-dealers – in addition to enforcing
FINRA's own rules. Even as the SEC conducts its broader review of the recent market
events, FINRA is actively considering a range of matters related to those events, closely
coordinating with the SEC and other regulatory authorities. Those efforts involve
extensive collaboration across multiple FINRA departments, including those that
supervise member firm activities involving customers and the markets and those that
investigate potential regulatory violations and bring enforcement actions for those
violations. While we are not in a position to address any specific investigative or
supervisory matter, FINRA will thoroughly investigate the conduct of those over whom it
has jurisdiction – its member firms and their registered personnel – and take appropriate
regulatory or disciplinary action to remediate violations of applicable legal requirements
where warranted.

FINRA is committed to dedicating the resources and expertise needed to supervise
broker-dealers' compliance with applicable requirements. To support this objective,
FINRA deploys a risk assessment program to monitor member broker-dealers for
potential risks to investors and markets. Informed by these risk assessments, FINRA
examines member firms regularly to assess and test their policies, procedures and
supervision for compliance with applicable rules.[3] FINRA also conducts automated
surveillance of market activities. Based on these risk monitoring, examination and
surveillance activities, FINRA investigates and takes disciplinary actions against firms
and individuals as necessary. When it encounters potential violations that involve
persons beyond FINRA's jurisdiction or that are linked to an existing SEC matter, FINRA
refers the matter to the SEC (or other relevant authority) for its action.

In addition, the FINRA Investor Education Foundation (Foundation) provides free,
unbiased information and tools to help investors protect themselves and better
understand the markets and basic principles of investing through multiple channels.[4] The

---

[3]     In addition to routine firm examinations, FINRA also conducts many investigations and
         reviews "for cause," meaning these investigations and reviews are triggered by specific
         allegations or events, such as customer complaints, whistleblower tips or arbitrations.

[4]     More information about the Foundation is available at: https://www.finrafoundation.org/.
         See also, Following the Crowd: Investing and Social Media (January 29, 2021), available
         at https://www.finra.org/investors/alerts/following-crowd-investing-and-social-media.

106

The Honorable Elizabeth Warren
February 23, 2021
Page 3

Foundation also engages in research to better understand the financial capability of
American households and to explore trends and circumstances affecting the way
Americans manage and invest their money. For example, to assist us in understanding
new investors and their educational needs in light of the changing nature of technology
and investor demographics, the Foundation conducted a review in the past year of
investors who opened new, taxable investment accounts during 2020, including first-time
investors.[5]

**Responses to Question Topics**

Question 1: Best Execution

A firm's duty of best execution is one component of the overarching national market
system regulatory structure implemented and overseen by the SEC. As discussed more
fully in response to Question 4 below, this regulatory structure also addresses, among
many other related matters, the payment for order flow in exchange and over-the-counter
markets.[6]

FINRA oversees member firms' compliance with their duty of best execution through an
array of approaches, including automated surveillance of trading, routine examinations,
targeted "sweep" examinations, rulemaking and detailed interpretive guidance and
economic analysis. For example, in *Regulatory Notice* 15-46, FINRA comprehensively
rearticulated broker-dealers' best execution requirements. FINRA also has identified best
execution in its annual regulatory priorities since 2013 and has provided firms additional
guidance on common best execution examination findings each year since 2017, when
FINRA began publishing its annual examination findings report.[7]

---

[5]     FINRA Investor Education Foundation & NORC, *Investing 2020: New Accounts and the
        People Who Opened Them* (February 2, 2021), available at
        https://www.finrafoundation.org/insights-new-accounts.

[6]     As discussed below, the SEC has reviewed the practice of payment for order flow a
        number of times since the practice emerged in the 1980s and has pursued an approach
        based primarily on disclosure to address concerns about the potential conflicts of interest
        caused by payment for order flow arrangements. *See, e.g.*, Memorandum to the Equity
        Market Structure Advisory Committee (EMSAC) from the SEC Division of Trading and
        Markets, Certain Issues Affecting Customers in the Current Equity Market Structure
        (January 26, 2016), at pg. 7-8, available at https://www.sec.gov/spotlight/equity-market-
        structure/issues-affecting-customers-emsac-012616.pdf (describing the SEC's prior
        reviews of the practice and discussing relevant payment for order flow disclosure
        requirements in Exchange Act Rule 10b-10 and Rules 606 and 607 of Regulation NMS).

[7]     All of these annual reports are available publicly on FINRA's website at
        https://www.finra.org/media-center/reports-studies. Beginning this year, FINRA replaced
        the separate annual priorities letters and reports on exam and risk monitoring findings
        with the 2021 Report on FINRA's Examination and Risk Monitoring Program (Examination
        and Risk Monitoring Report, or Report). For selected regulatory obligations, the Report:
        (1) identifies the applicable rules and key related considerations for member firm
        compliance programs; (2) summarizes noteworthy findings from recent examinations and

107

The Honorable Elizabeth Warren
February 23, 2021
Page 4

Where member firms fall short of their best execution obligations, enforcement is an important tool, as was the case in the proceeding you note against Robinhood. In that particular matter, Robinhood was censured and fined,[8] and FINRA further required Robinhood to comply with specific undertakings that included retaining an independent consultant to review the adequacy of the firm's policies, systems, procedures and training related to achieving compliance with FINRA's best execution rule. Consistent with this required undertaking, Robinhood engaged an independent consultant to review its best execution program and received the independent consultant's report in April 2020. In June 2020, Robinhood certified to FINRA that it adopted and implemented all recommendations as set forth in the independent consultant's report. Further in response to the report, Robinhood revised its Written Supervisory Procedures and Execution Quality Procedures Manual.[9]

These steps were noted recently in the separate SEC action against Robinhood that you cite, which concluded after the FINRA action but concerned distinct best execution violations under federal antifraud provisions that preceded FINRA's action and the undertakings that FINRA imposed. FINRA notes that the SEC action also imposed new undertakings that require a similar independent consultant report. While we are not able to address ongoing supervisory, investigative or enforcement matters involving Robinhood or any other particular firm, we do review firms for compliance with undertakings in the course of FINRA's continued focus on an area of conduct that has required them.

<u>Question 2: "Game-Like" Features and Emerging Communication Risks</u>

FINRA's 2021 Examination and Risk Monitoring Report noted member firms' use of emerging digital communication channels, including app-based platforms with interactive or "game-like" features that may be intended to influence customers, and related forms of marketing.[10] The game-like features we have seen across multiple firms include, among others, items such as badges that serve as visual markers of achievement,

---

outlines effective practices that FINRA observed during its oversight; and (3) provides additional resources that may be helpful to member firms in achieving compliance.

[8]   *See* Robinhood Financial, LLC, Letter of Acceptance, Waiver and Consent (AWC) (FINRA Case No. 2017056224001).

[9]   *See* In the Matter of Robinhood Financial, LLC, Securities Exchange Act Release No. 90694 (December 17, 2020) (discussing, in the context of the SEC's action against Robinhood, the remedial steps the firm took in response to FINRA's action). This letter refers to Robinhood generally for discussion purposes. FINRA notes that while its proceeding specifically involved Robinhood Financial, LLC, the remediation steps described in the SEC action in response to FINRA's action discuss improvements made both by Robinhood Financial, LLC, as well as its affiliated firm, Robinhood Securities, LLC, to which Robinhood Financial, LLC began sending all customer orders for trade execution beginning in November 2019.

[10]   *See* 2021 Report on FINRA's Examination and Risk Monitoring Program at p.22. https://www.finra.org/sites/default/files/2021-02/2021-report-finras-examination-risk-monitoring-program.pdf

108

The Honorable Elizabeth Warren
February 23, 2021
Page 5

leaderboards that rank participants, social networking features (including in-app messaging) and prizes for games (such as free stock) to encourage account sign-ups. These developments in product offerings are not confined to broker-dealers and appear in many financial services and other consumer-oriented businesses.

These features can appear in many aspects of how broker-dealers interact with customers, from initial advertisements through the opening of accounts and the presentation of different investment choices to communications following a trade. While some of these offerings may be designed to better enable the delivery of information to investors or to improve investor access to firm systems and investment products and services, they may also result in increased risks to customers if not designed with appropriate compliance considerations in mind, raising important regulatory questions, such as:

- *Advertising and marketing.* Are a member broker-dealer's communications to investors – regardless of format and technology – in compliance with FINRA's rules regarding communications with the public?[11]

- *Recommendations to customers.* Depending on the facts and circumstances, do some of these interactions constitute "recommendations" that would be covered by the SEC's Reg BI, which requires a broker-dealer making recommendations of securities to act in a retail customer's "best interest"? If not, should they?[12]

- *Other influences on customers.* Are there other game-like aspects of platform design that are intended to influence customers where the potential risks to investors and markets warrant attention beyond the application of existing rules?

FINRA agrees with the SEC that "this is a dynamic, expanding, and ever-changing marketplace, and that it is our responsibility to consider whether existing protections can be improved."[13] Accordingly, we are committed to supporting the SEC staff's review (announced in October 2020)[14] of the increase in self-directed trading by retail investors that is not covered by Reg BI, and the effectiveness of existing regulatory requirements in protecting investors in those circumstances. FINRA is also committed to supporting the SEC as it continues to oversee the implementation of Reg BI and considers further

---

[11]   *See* FINRA Rule 2210(d)(1).

[12]   Reg BI applies if there is a "recommendation," and the determination of whether there is a "recommendation" depends on the facts and circumstances of a firm's interaction with its customer. Differences in platform design and the nature of communications may affect whether or not a firm provides a "recommendation" for purposes of Reg BI.

[13]   *See* Joint Statement Regarding Complex Financial Products and Retail Investors, dated October 28, 2020.

[14]   *See id.*

109

The Honorable Elizabeth Warren
February 23, 2021
Page 6

refinements in Reg BI's application. At the same time, FINRA is also considering the effectiveness of its own rules in addressing these developments.

Although Robinhood is in the best position to describe its services in detail, the firm's platform incorporates digital interactions that could be viewed as having game-like features, as has been widely reported. At this point we cannot discuss the status or conclusions of any FINRA supervisory, investigative or enforcement matters involving Robinhood or any other particular firm. However, as noted above we are generally assessing the use of these types of digital interactions within the securities industry, how they may impact investors' decision-making, both positively and negatively, and risks they may create for investors.

Question 3: Registration and Licensing

FINRA rules require generally that individuals associated with a FINRA member and engaged in the investment banking or securities business of the member be appropriately registered with FINRA as a "principal" or "representative."[15]

- The term "principal" is defined under FINRA rules as any person associated with a member,[16] including, but not limited to, sole proprietor, officer, partner, manager of office of supervisory jurisdiction, director or other person occupying a similar status or performing similar functions, who is actively engaged in the management of the member's investment banking or securities business, such as supervision, solicitation, conduct of business in securities or the training of persons associated with a member for any of these functions.[17]

---

[15]  *See* FINRA Rule 1210 (Registration Requirements); *see also* Exchange Act Rule 15b7-1 (Compliance with Qualification Requirements of Self-Regulatory Organizations). Exemptions from registration are set forth in Rule 1230.

[16]  For purposes of the FINRA registration rules, the term "person associated with a member" includes: (1) a natural person who is registered or has applied for registration with FINRA; (2) sole proprietor, partner, officer, director, or branch manager of a member or other natural person occupying a similar status or performing similar functions; or (3) a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member. *See* Article I, Section (rr) of the FINRA By-laws. The term "investment banking or securities business" generally means the business of underwriting or distributing shares of securities, purchasing securities and offering the same for sale as a dealer or purchasing and selling securities upon the order and for the account of others. *See* Article I, Section (u) of the FINRA By-laws.

[17]  *See* FINRA Rule 1220(a)(1) (Definition of Principal). The term "actively engaged in the management of the member's investment banking or securities business" includes: (1) the management of, and the implementation of corporate policies related to, the member's investment banking or securities business; (2) the exercise of managerial decision-making authority with respect to the member's investment banking or securities business; or (3) the exercise of management-level responsibilities for supervising any aspect of the member's investment banking or securities business, such as serving as a

110

The Honorable Elizabeth Warren
February 23, 2021
Page 7

- A "representative" is defined under FINRA rules as any person associated with a member, including assistant officers other than principals, who is engaged in the member's investment banking or securities business, such as supervision, solicitation, conduct of business in securities or the training of persons associated with a member for any of these functions.[18]

A FINRA member firm's chief executive officer (CEO) and chief financial officer (CFO), or individuals who are the functional equivalent of a member firm's CEO or CFO, are considered principals under FINRA rules.[19] Other senior or executive management of a member firm, such as officers, may be considered principals either because they are persons associated with the member who are actively engaged in the management of the member's investment banking or securities business or because they are performing a function, such as the head of a business unit, that is required to be performed by a principal of the member. The determination of whether an individual is functioning as a principal or representative and of the appropriate registration category for such individual can be fact-specific and requires careful assessment of the individual's activities.

The FINRA registration requirements are not limited in scope to executives of FINRA member firms. Many member firms are subsidiaries of one or more holding companies. Senior individuals employed at a holding company for a member firm may be subject to registration as principals depending on their functions with respect to the member firm. For instance, the requirement to be appropriately registered with FINRA as a principal would apply to an individual who is directly or indirectly controlling a FINRA member firm, such as the CEO of the parent or holding company of a FINRA member firm, if under the relevant facts and circumstances that person is "actively engaged in the management of the member's investment banking or securities business." On the other hand, depending on the nature of the person's responsibilities, and other facts and circumstances, the CEO or other senior person of the parent or holding company of a FINRA member may not be required to register with FINRA.

Question 4: Payment for Order Flow

As noted above, FINRA's approach to best execution operates in the context of the broader set of interrelated market structure rules established by the SEC, and FINRA continues to coordinate closely with the SEC in this area.

The SEC has periodically reviewed the practice of payment for order flow since it emerged in the 1980s, including most recently with its Equity Market Structure Advisory Committee (EMSAC). In a 2016 SEC staff memorandum addressed to the EMSAC, the SEC Division of Trading and Markets described components of a broker-dealer's duty of best execution as articulated under SEC guidance and FINRA rules, and noted the Commission's longstanding view that "a broker-dealer does not necessarily violate its

---

voting member of the member's executive, management or operations committees. *See id.*

[18]   *See* FINRA Rule 1220(b)(1) (Definition of Representative).

[19]   *See* FINRA Rule 1220(a)(1). A FINRA member's CEO and CFO (or equivalent officers) are considered principals based solely on their status.

111

The Honorable Elizabeth Warren
February 23, 2021
Page 8

best-execution obligation merely because it receives payment for order flow," but that "the existence of payment for order flow raises the potential for conflicts of interest for broker-dealers handling customer orders."[20] The memorandum explained further that "[t]o date, the Commission has pursued an approach based primarily on disclosure to address concerns about the potential conflicts of interest caused by payment-for-order-flow arrangements."[21]

Following the EMSAC's debate of several regulatory alternatives to address payment for order flow, which considered, among other things, the potential unintended consequences of banning the practice altogether, the EMSAC recommended certain enhanced disclosures,[22] and the Commission subsequently took steps that advanced its disclosure-based approach. Specifically, in 2018, the Commission adopted amendments to Rule 606 of Regulation NMS that require, among other things, new aggregate payment for order flow disclosures in broker-dealer's public quarterly reports.[23] These new disclosures have increased the public transparency of payment for order flow arrangements and have served to inform much of the current debate around the practice.

Operating in the context of this overall approach to best execution and payment for order flow, FINRA reviews whether member firms – including wholesale retail market makers and introducing firms – are meeting their regulatory obligations. FINRA recently highlighted these efforts in the Examination and Risk Monitoring Report.[24] The Report

---

[20]   *See* Division of Trading and Markets Memorandum to the EMSAC, *supra* note 6, at pg. 7-8. Specifically, as noted in the memorandum, Exchange Act Rule 10b-10 requires that a broker-dealer indicate on customer confirmation statements when payment for order flow – which is defined broadly under the rule – has been received on a transaction, and also indicate that the source and nature of the compensation received in connection with the particular transaction will be furnished upon the customer's written request. The memorandum also cites relevant disclosure requirements in Rule 606 of Regulation NMS, which generally requires broker-dealers to publish quarterly public reports that identify the top ten venues to which they route orders for execution and discuss material aspects of payment for order flow arrangements, and Rule 607 of Regulation NMS, which requires broker-dealers to disclose upon opening a new customer account and on an annual basis thereafter policies relating to payment for order flow and order routing. *See id.* (discussing these requirements in more specific detail).

[21]   *See id.* at p. 8.

[22]   *See* EMSAC Recommendations Regarding Modifying Rule 605 and Rule 606 (November 29, 2016), available at https://www.sec.gov/spotlight/emsac/emsac-recommendations-rules-605-606.pdf.

[23]   *See* Securities Exchange Act Release No. 84528 (November 2, 2018), 83 FR 58338 (November 19, 2018) (Disclosure of Order Handling Information Adopting Release). In addition to the enhanced Rule 606 disclosures the Commission adopted following EMSAC discussion, the Commission also adopted a rule to require a pilot program designed to study the impacts of exchange access fees and rebates on order routing, although that rule was recently vacated in federal court. *See* N.Y. Stock Exch. LLC v. SEC, 962 F.3d 541 (D.C. Cir. 2020).

[24]   *See* 2021 Report on FINRA's Examination and Risk Monitoring Program at pg. 31-33. https://www.finra.org/sites/default/files/2021-02/2021-report-finras-examination-risk-monitoring-program.pdf.

112

The Honorable Elizabeth Warren
February 23, 2021
Page 9

identified a number of considerations a member firm should take into account in achieving best execution compliance, including how the firm ensures that it is not unduly influenced by economic incentives, such as payment for order flow or other routing inducements. The Report further discussed examination findings indicating areas in which some firms needed to improve their procedures for assessing execution quality and mitigating routing conflicts. In addition, FINRA noted its ongoing targeted examination efforts to evaluate, among other things, whether "zero-commission" trading adversely affected firms' compliance with their best execution obligations.[25]

As FINRA reviews member firms' order handling and routing activity, FINRA applies SEC guidance as well as the requirements set out in FINRA Rule 5310 and published guidance thereunder. In particular, FINRA guidance – consistent with controlling SEC guidance referred to above – makes clear that member firms cannot allow routing inducements (including payment for order flow) to interfere with their duty of best execution. FINRA guidance also stresses the need for member firms to consider price improvement opportunities, including those that may be available outside existing internalization or payment for order flow arrangements, when conducting customer order execution quality reviews.[26] Simply put, FINRA Rule 5310 requires member firms to assure that they direct customer orders to markets that provide the most beneficial terms for such orders.[27] To support this overarching objective, the Rule requires member firms to compare any material differences in execution quality their customers will receive at competing markets – including markets they may have existing routing arrangements with, as well as those they do not.[28] And the Rule states that firms should consider how existing routing arrangements that involve internalization or payment for order flow factor into their routing decisions.[29] Where firms have not sufficiently considered whether their customers may receive better execution quality at competing markets that the firms do

---

[25]   FINRA's targeted examination letters on zero commissions are posted publicly on FINRA's website and available at https://www.finra.org/rules-guidance/guidance/targeted-examination-letters. In addition to the targeted review currently underway on the impact of zero commissions, FINRA previously conducted targeted examinations of order routing and execution quality, beginning in 2014, and order routing conflicts, beginning in 2017. These best execution examinations of numerous firms focused on equities and, in some cases, options. They included a review of the impact of the receipt of order routing inducements, such as payment for order flow and liquidity rebates, on a firm's order routing practices and decisions. These examinations also included a review of the firms' procedures related to the requirement that they regularly and rigorously examine execution quality likely to be obtained from the different markets or market makers trading a security.

[26]   See, e.g., Regulatory Notice 15-46 (November 2015) (discussing payment for order flow and the execution quality review requirements in FINRA Rule 5310.09).

[27]   See FINRA Rule 5310.09(b).

[28]   See id.

[29]   See FINRA Rule 5310.09(b)(8).

113

The Honorable Elizabeth Warren
February 23, 2021
Page 10

not have relationships with, FINRA has charged them with violations of the best
execution rule.[30]

In addition to reviewing firms' best execution practices, FINRA also examines firms for
compliance with the SEC's new Rule 606 disclosure requirements referred to above.
FINRA is also considering whether it can take further steps – including focused
economic analysis, investor education, and tools to facilitate investor access to Rule 606
disclosures – to support the effectiveness of the new requirements and thereby
complement the Commission's efforts. FINRA stands ready to engage with the SEC and
Congress on any other steps that may be appropriate to address routing conflicts and
reinforce the duty of best execution.

Question 5: Dispute Resolution and Arbitration

As you note, broker-dealers and investment advisers often require customers to enter
into agreements to arbitrate disputes arising from the services provided to such
customers. With respect to FINRA's member firms, FINRA rules do not require such
agreements, nor do they preclude customers from pursuing relief in state or federal
courts.[31]

It is important to note that the Supreme Court has held that predispute arbitration
agreements are enforceable as to claims brought under the Exchange Act.[32]
Subsequently, in Dodd-Frank, Congress provided the SEC (not FINRA) with explicit

---

[30]    *See, e.g.*, Robinhood Financial, LLC, Letter of Acceptance, Waiver and Consent (FINRA
        Case No. 2017056224001), *supra* note 8 (describing violations of FINRA's best execution
        rule because the firm routed its customers' order to four broker-dealers that all paid for
        the order flow, and "did not exercise reasonable diligence to ascertain whether these four
        broker-dealers provided the best market for the subject securities to ensure its customers
        received the best execution quality from these as compared to other execution venues");
        E*Trade Securities LLC, Letter of Acceptance, Waiver and Consent (FINRA Case No.
        20130368815-01) (describing violations of FINRA's best execution rule because the firm
        lacked sufficient information to reasonably assess the execution quality it provided to its
        customers because, among other things, the firm "did not take into account the
        internalization model employed by the firm" and "was overly reliant on comparisons of the
        firm's overall execution quality with industry and custom averages, rather than focusing
        on comparisons to the actual execution quality provided by the market centers to which
        the firm routed orders").

[31]    *See* FINRA Rule 12200.

[32]    Until the Supreme Court's decision in *Shearson/American Express, Inc. v. McMahon*, 482
        U.S. 220 (1987), the courts would not enforce predispute arbitration agreements relating
        to federal securities law claims. In addition, until its rescission in 1987, SEC Rule 15c2-
        2(a) provided that: "It shall be a fraudulent, manipulative or deceptive act or practice for a
        broker or dealer to enter into an agreement with any public customer which purports to
        bind the customer to the arbitration of future disputes between them arising under the
        federal securities laws, or to have in effect such an agreement, pursuant to which it
        effects transactions with or for a customer." As a result of *McMahon* and the rescission of
        Exchange Act Rule 15c2-2(a), firms can compel arbitration of customer claims through
        inclusion of predispute arbitration provisions in their customer agreements.

114

The Honorable Elizabeth Warren
February 23, 2021
Page 11

authority to prohibit or place limitations on the use of such agreements.[33] The SEC has not exercised that authority.

Where member firms do use mandatory arbitration clauses, FINRA rules establish minimum disclosure requirements regarding the use of such agreements, and impose certain other conditions and limitations.[34] For example, FINRA rules protect a customer's right to pursue class actions in court notwithstanding any predispute arbitration agreement.[35] Member firms with provisions in predispute arbitration agreements or any other customer agreements that do not comply with FINRA rules may be subject to disciplinary action.[36]

FINRA's primary role in the arbitration process is to administer cases brought to the forum in a neutral, efficient and fair manner. In its capacity as a neutral administrator of the forum, FINRA does not have any input into the outcome of arbitrations.[37] Investors have the option to have their case decided exclusively by public arbitrators, who have no ties to the securities industry. To provide transparency about awards rendered in the forum, FINRA makes all awards publicly available and publishes detailed arbitration statistics on its website, including the number of cases filed and their respective outcomes.[38]

FINRA recognizes the importance of providing a diverse pool of arbitrators from which parties can choose. FINRA has embarked on an aggressive campaign to recruit new arbitrators with a particular focus on adding arbitrators from diverse backgrounds,

---

[33]  Section 921 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), authorizes the SEC to limit or prohibit the use of customer agreements to arbitrate future disputes if it finds that such limitation or prohibition is in the public interest and for the protection of investors.

[34]  *See* FINRA Rule 2268.

[35]  *See* FINRA Rules 2268 and 12204.

[36]  For example, in 2014, FINRA's Board of Governors issued a decision finding that a firm violated FINRA rules when it inserted provisions in predispute arbitration agreements that prevented customers from bringing or participating in judicial class actions and prevented FINRA arbitrators from consolidating more than one party's claims. *See Dep't of Enforcement v. Charles Schwab & Co.*, No. 2011029760201, 2014 FINRA Discip. LEXIS 5 (FINRA Bd. of Governors Apr. 24, 2014).

[37]  The arbitration forum administered by FINRA is intended to provide impartial dispute resolution that is less costly and faster than traditional litigation. The forum charges low arbitration fees, uses a customer friendly discovery guide, strictly limits dispositive motions made prior to the party resting its case, and provides sanctions for frivolous motions and abusive motion practices. *See, e.g.,* FINRA Rules 12212, 12504, 12506 and 12511. In addition, member firms pay for most costs, and FINRA waives fees for customers experiencing financial hardship. Information regarding FINRA's arbitration program is available at http://www.finra.org/arbitration-and-mediation.

[38]  *See* http://www.finra.org/arbitration-and-mediation/arbitration-awards and http://www.finra.org/arbitration-and-mediation/dispute-resolution-statistics.

115

The Honorable Elizabeth Warren
February 23, 2021
Page 12

professions and geographical locations, and we publish on our website information regarding the results of an anonymous and voluntary demographic survey sent to FINRA arbitrators.[39]

Your letter also asks about FINRA's requirements for payment of arbitration awards. FINRA rules require prompt payment of such awards.[40] FINRA suspends from membership (or association with a member) any member firm or associated person who fails to pay an arbitration award.[41] FINRA also publishes a list of firms and associated persons responsible for unpaid awards,[42] and makes this information available to investors through the firm's or individual's BrokerCheck® record. However, FINRA's suspension for nonpayment of awards applies only to the activities under FINRA's jurisdiction and cannot prevent the person from continuing to work with retail investors in *other* parts of the financial services industry, such as by acting as an investment adviser.[43]

---

[39]    As of February 17, 2021, FINRA's arbitrator roster is composed of 4,327 non-public arbitrators and 3,873 public arbitrators, totaling 8,200 arbitrators. Based on the above-referenced survey, of the arbitrators who joined the roster in 2020, 40 percent were female, 14 percent were African American or Black, 3 percent were Hispanic or Latino, and 4 percent were Asian. In 2019, 39 percent were female, 19 percent were African American or Black, 6 percent were Hispanic or Latino, and 3 percent were Asian. In addition to greater diversity among newer arbitrators, the demographics of the established roster are beginning to shift. Notably, the percentage of women on the established roster has increased from 24 percent in 2016 to 30 percent in 2020 and the percentage of African American or Black arbitrators has increased from 5 percent in 2016 to 9 percent in 2020. *See* https://www.finra.org/arbitration-mediation/our-commitment-achieving-arbitrator-and-mediator-diversity-finra.

[40]    *See* FINRA Rule 12904(j). Customers who obtain a monetary award in arbitration can have the award confirmed in court, putting them in the same position – in terms of their ability to collect on that award – as if they had initially obtained the award through court proceedings. Thus, a customer's recovery depends on factors such as the ability of the respondent to pay, not on whether the customer obtained the award in arbitration or in court.

[41]    *See* FINRA Rule 9554(a). An associated person or firm has four available defenses to FINRA disciplinary measures for nonpayment in customer cases. *See Notice to Members 00-55* (August 2000).

[42]    *See* https://www.finra.org/arbitration-mediation/member-firms-and-associated-persons-unpaid-customer-arbitration-awards. The list also includes those firms and individuals with unpaid customer arbitration awards, but where bankruptcy is a defense to the non-payment. These firms or individuals may be active in the brokerage industry notwithstanding any unpaid award due to the bankruptcy defense to non-payment.

[43]    *See* FINRA Rule 9554(a). In addition, firms with unpaid awards cannot re-register with FINRA, and individuals cannot register as representatives of any member firm, without paying or discharging the outstanding award. With respect to new member firms, in accordance with the standards for admission under the rules governing FINRA's Membership Application Program, FINRA can presumptively deny a new membership

116

The Honorable Elizabeth Warren
February 23, 2021
Page 13

FINRA has been focused on other ways to strengthen its rules to reinforce payment of awards.[44]  For example, FINRA recently amended its Membership Application Program rules to create further incentives for the timely payment of awards.[45] In addition, FINRA continues to focus on addressing member firms and brokers with a significant history of misconduct, and has recently taken significant steps in this area, which may have important ancillary benefits for the payment of awards.[46] As our new rule changes go into effect, we will continue to review our practices in this area.

Regarding reporting of settlements of arbitration claims, while we are not in a position to address any specific investigative or supervisory matter, member firms are required to report to FINRA if the member firm or an associated person is a defendant or respondent in a securities- or commodities-related civil litigation or arbitration, or is the subject of any

---

application if the applicant or its associated persons have a pending arbitration claim or are subject to an unpaid arbitration award. *See* FINRA Rule 1014(a).

[44]    FINRA issued a Discussion Paper – entitled *FINRA Perspectives on Customer Recovery* – to encourage a continued dialogue about addressing the challenges of customer recovery across the financial services industry, including recovery in FINRA's forum. In addition, to better inform discussions regarding customer recovery, FINRA also makes available on its website data on unpaid arbitration awards arising in the FINRA forum for the past five years. *See* https://www.finra.org/arbitration-mediation/statistics-unpaid-customer-awards-finra-arbitration

[45]    The amendments prevent a member firm with substantial arbitration claims from avoiding payment of the claims should they go to award or result in a settlement by shifting its assets, which are typically customer accounts, or its managers or owners, to another firm and closing down. The amendments also address situations in which member firms are considering hiring individuals with pending arbitration claims. *See* Securities Exchange Act Release No. 88482 (March 26, 2020), 85 FR 18299 (April 1, 2020) (Order Approving File No. SR-FINRA-2019-030).

In addition, FINRA has amended its rules to expand a customer's options to withdraw an arbitration claim (or take certain other steps) if a member firm or associated person becomes inactive before a claim is filed or during a pending arbitration. *See* Securities Exchange Act Release No. 88254 (February 20, 2020), 85 FR 11157 (February 26, 2020) (Order Approving File No. SR-FINRA-2019-027).

[46]    For example, FINRA recently filed with the SEC a proposed rule change to adopt Rule 4111 (Restricted Firm Obligations) to allow FINRA to impose obligations on FINRA member firms that have significantly higher levels of risk-related disclosures than similarly sized peers. The proposal is designed to address a broad range of investor protection concerns and may deter behavior that could otherwise result in unpaid arbitration awards, incentivize firms to obtain insurance coverage for potential awards, and incentivize the payment of unpaid awards through presumptions that would apply to requests for withdrawals from restricted deposits. *See* Securities Exchange Act Release No. 90527 (November 27, 2020), 85 FR 78540 (December 4, 2020) (Notice of Filing of No. SR-FINRA-2020-041).

In addition, FINRA recently amended its rules to address brokers with a significant history of misconduct. *See* Securities Exchange Act Release No. 90635 (December 10, 2020), 85 FR 81540 (December 16, 2020) (Order Approving File No. SR-FINRA-2020-011).

117

The Honorable Elizabeth Warren
February 23, 2021
Page 14

claim for damages by a customer that relates to the provision of financial services or
relates to a financial transaction, and such civil litigation, arbitration or claim for damages
has been disposed of by judgment, award or settlement exceeding certain dollar
thresholds.[47] FINRA staff review arbitration claims and disclosures reporting arbitration
awards or settlements to determine whether the issues raised in the arbitration or
settlement require a further regulatory review or response.

Question 6: Financial Responsibility and Market Volatility

We are not in a position to discuss any FINRA investigative or supervisory matter
involving a particular firm. Generally, however, a broker-dealer's financial responsibility is
subject to extensive regulation by the SEC, primarily through the SEC's Net Capital
Rule[48] and Customer Protection Rule.[49]

The SEC's Net Capital Rule is designed to assure that a broker-dealer always has
sufficient liquid assets to promptly satisfy the claims of customers and creditors if the
broker-dealer goes out of business.[50] In addition to the maintenance of liquid assets
sufficient to satisfy customer and creditor claims required by the Net Capital Rule, the
SEC and FINRA have emphasized the importance of broker-dealers developing and
maintaining funding and liquidity risk management practices to prepare for adverse
circumstances.[51] Moreover, the SEC's Customer Protection Rule protects customer

---

[47]   *See* FINRA Rule 4530(a)(1)(G). In addition, member firms are generally required to file
with FINRA copies of any customer-initiated securities- or commodities-related civil
litigation or arbitration in which the member or an associated person is named as a
defendant or respondent as well as to report to FINRA summary information regarding
any written customer complaints, which may include a customer claim for damages. *See*
FINRA Rules 4530(d) and (f). Member firms must comply with these initial filing and
reporting obligations irrespective of the eventual disposition of the matter.

[48]   *See* Exchange Act Rule 15c3-1.

[49]   *See* Exchange Act Rule 15c3-3.

[50]   More specifically, the SEC's Net Capital Rule requires a broker to compute its "net
capital" by beginning with its GAAP equity (*i.e.*, the amount by which the value of its
assets exceeds the amount of its liabilities under Generally Accepted Accounting
Principles) and qualifying subordinated debt, and then subtracting the value of any illiquid
assets (*e.g.*, non-marketable securities, fixed assets and any other assets that cannot be
readily converted to cash) and also subtracting specified percentages of the values of its
securities positions ("haircuts") that are intended to provide a cushion for market
fluctuations and to allow for the costs of their liquidation. A broker that carries customer
accounts must maintain minimum net capital that is generally equal to two percent of its
aggregate reserve formula debits. *See* Exchange Act Rule 15c3-1(a)(1)(ii). Subject to a
number of procedural and other requirements, FINRA Rule 4110 provides a special
process for FINRA to supplement the SEC's Net Capital Rule by prescribing greater net
capital requirements for its carrying or clearing member firms when necessary for the
protection of investors or in the public interest.

[51]   *See, e.g.*, Exchange Act Rule 17a-3(a)(23) (requiring larger broker-dealers to "document
the credit, market, and liquidity risk management controls established and maintained by
the broker or dealer to assist it in analyzing and managing the risks associated with its
business activities"); SEC Office of Compliance Inspections and Examinations (OCIE)

118

The Honorable Elizabeth Warren
February 23, 2021
Page 15

funds and securities held by a broker-dealer by generally prohibiting the broker-dealer from using those funds and securities to support its proprietary trading activities.[52]

The Federal Reserve sets initial margin requirements for broker-dealers,[53] and FINRA sets maintenance margin requirements.[54] In addition, a member firm is expected to have procedures to evaluate and if necessary adjust its own higher "house margin" requirements in response to volatile trading conditions.[55] Margin helps protect the member firm from credit risk from the customer and is a key part of the financial responsibility requirements for broker-dealers. In particular, FINRA's maintenance margin requirements are designed to require member firms to protect themselves by obtaining margin that is generally sufficient to satisfy their customers' obligations to them in the event a liquidation is necessary.

Increases in a broker-dealer's deposit requirements at clearing organizations (resulting, for example, from an increased level of customer or proprietary trading activity or increased volatility)[56] may have a significant impact on a broker-dealer's cash flow needs

---

Examination Priorities 2016 (including evaluation of broker-dealers' liquidity risk management practices as an examination focus); FINRA *Regulatory Notice* 15-33, Liquidity Risk (providing additional guidance on effective liquidity risk management practices that firms should consider and implement, including descriptions of specific stress criteria that FINRA has used in reviews of liquidity risk at its member firms and descriptions of effective and ineffective practices observed in the course of those reviews); FINRA *Regulatory Notice* 10-57, Funding and Liquidity Risk Management Practices (announcing FINRA's expectation that broker-dealers regularly assess their funding and liquidity risk management practices to maximize the likelihood that they can continue to operate under adverse circumstances and describing elements of sound practices for funding and liquidity risk management); Joint Statement: Broker-Dealer Risk Management Practices, OCIE, NYSE & NASD (July 29, 1999), *available at* https://www.sec.gov/news/studies/bdriskp.htm.

[52]  More specifically, the SEC's Customer Protection Rule requires broker-dealers to have possession or control of all fully paid and excess margin securities held for the account of customers. It also requires brokers to make periodic computations using a specified "reserve formula" to determine the amount (if any) by which the aggregate amount of money it has received from customers or obtained from the use of customer securities ("credits" in the reserve formula) exceeds the amount owed to it by customers or in respect of customer transactions ("debits" in the reserve formula), and to deposit such excess in a special reserve bank account for the exclusive benefit of customers.

[53]  Regulation T, 12 C.F.R. part 220.

[54]  FINRA Rule 4210(c)-(g).

[55]  FINRA Rule 4210(d), (f)(1) and Interpretation /01 to Rule 4210(f)(1). FINRA also periodically reminds member firms of these obligations. *See, e.g.*, FINRA *Regulatory Notices* 11-15 and 09-53, and NASD *Notice to Members* 99-33.

[56]  Clearing organization deposit requirements do not impact a broker-dealer's net capital for purposes of the SEC's Net Capital Rule, because that rule specifically provides that such clearing deposits do not need to be deducted in the computation of a broker-dealer's net capital. *See* Exchange Act Rule15c3-3(c)(2)(iv)(E)(3).

119

The Honorable Elizabeth Warren
February 23, 2021
Page 16

and operating liquidity, depending on the relative size of the increase and the broker-dealer's liquidity. Increased clearing deposit requirements generally must be satisfied by depositing proprietary liquid assets (cash or liquid securities) in accordance with the rules of the relevant clearing organization.

FINRA's risk monitoring program includes the regular review and assessment of a member firm's financial filings (in addition to a wide range of other information, such as arbitration filings, customer complaints, tips, actions by other regulators and externally sourced information). FINRA staff involved in this risk monitoring program communicate with member firm staff concerning activities that may create financial pressures on the firm's capital and liquidity, including deposits required by clearing organizations. The frequency and nature of those communications, which can be initiated by a firm or FINRA staff, depend on our assessment of a firm's risks and its systemic impact. In times of significant market volatility, communications between impacted firms and their assigned risk monitoring staff typically increase and focus closely on operational issues (*e.g.*, system outages), net capital status, liquidity pressures, credit and market risk concerns and sales practice issues. In connection with these communications, we may request additional reporting by the firm to facilitate enhanced monitoring. In addition, FINRA staff actively coordinate and share this type of information with the SEC in times of market volatility or other market- or firm-specific stress events. During the market volatility events of late January, FINRA maintained communications with a number of firms and with the SEC consistent with this approach.

<u>Question 7: Existing Regulations and Resources</u>

As noted above, we are reviewing recent market events to determine whether any existing rules or regulations were violated. In addition, we look forward to supporting the SEC, as appropriate, in conducting its review of these events. We expect to align our regulatory responses with the findings and recommendations resulting from that review and to coordinate those responses with the SEC, particularly since as discussed above many of the relevant issues being considered are primarily governed by SEC rules and policy. As always, we will share insights from our regulatory operations with the SEC to help inform its response to recent events.

In the interim, we are also considering whether additional guidance or rulemaking by FINRA would be appropriate in a variety of areas highlighted by recent market events. This evaluation will consider, for example, FINRA rules and guidance concerning firms' operations and engagement with customers during volatile market conditions. We are also considering whether there are ways to apply current SEC rules and policies more effectively.

FINRA draws on personnel from various departments across the organization, including its Enforcement, Member Supervision and Market Regulation functions, among others, to respond to major market events such as this. We will continue to assess the adequacy of our personnel and other resources to support our extensive efforts to protect investors and preserve market integrity and will add resources if needed.

120

The Honorable Elizabeth Warren
February 23, 2021
Page 17

Conclusion

FINRA is committed to its mission of protecting investors and promoting market integrity, and to adapting its regulatory programs to new broker-dealer business models and technologies, as well as the evolving ways in which investors access the capital markets. The recent market events involving trading in GameStop and similarly volatile stocks have raised important questions regarding the rules governing broker-dealer activity, many of which involve areas of market oversight and policymaking traditionally conducted primarily by the SEC. Accordingly, FINRA supports the SEC's announced review of these matters and will coordinate its potential regulatory responses with the SEC and other regulatory authorities based on the results of that review. FINRA also will continue to investigate specific matters involving its broker-dealer members related to these market events and take appropriate action, including potential disciplinary action, if the facts warrant. In addition, FINRA will consider whether additional rulemaking or guidance may be appropriate.

We share your interest in protecting investors and look forward to working with the SEC and Congress on these issues. If you have any questions, please do not hesitate to contact me at (202) 728-8425, or your staff may contact Greg Dean, Senior Vice President, Office of Government Affairs at (202) 728-8217. In addition, we would be happy to meet with you or your staff to discuss this matter further.

Sincerely,

Robert W. Cook
President and Chief Executive Officer

121



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF THE CHAIR

February 25, 2021

The Honorable Elizabeth Warren
United States Senate
309 Hart Senate Office Building
Washington, DC  20510

Dear Senator Warren:

      Thank you for your January 29, 2021 letter regarding the recent volatility in the market, particularly with regard to shares of GameStop Corp. (GME).  I appreciate your input and the thoughtful questions you have raised on these important and evolving issues.  I remain focused on the functioning of our markets and particularly on any potential negative impacts these events may have on investors and market confidence.  The staff has and will continue to consider all the issues you raise as they conduct a study of these events.

      The Commission remains fully committed to its mission of protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation.  This work includes closely monitoring and evaluating the recent volatility, consulting with our regulatory partners, and reviewing actions by market participants and others in order to protect investors and to identify and vigorously pursue any potential wrongdoing.  Additionally, I am committed to working with staff and my colleagues to conduct a timely study of these market events and the myriad of issues implicated by them, including those you raised.[1]

      These events and associated impacts are still being analyzed.  Based on this analysis, the Commission will consider what regulatory actions may be appropriate.  In response to your letter's questions, I briefly discuss below our current understanding of the recent market volatility and its impact on the financial system, and regulatory actions we are taking in response to recent market volatility, including the enforcement of Commission rules designed to support market infrastructure operations and to promote resiliency.  I further discuss fraud and market

---

[1] Treasury Secretary Yellen recently announced that, while the core market infrastructure was resilient during high volatility and heavy trading volumes, the top financial regulators "agree on the importance of the SEC releasing a timely study of the event."  Prior staff studies following market events – such as following the 2010 flash crash and the 2014 Treasury market volatility – facilitated discussion and evaluation of appropriate policy considerations.  *See Findings Regarding the Market Events of May 6, 2010,* Report of the Staffs of the CFTC and SEC to the Joint Advisory Committee on Emerging Regulatory Issues (Sept. 30, 2010), *available at* https://www.sec.gov/files/marketevents-report.pdf; *Joint Staff Report: The U.S. Treasury Market on October 15, 2014* (July 13, 2015), *available at* https://www.sec.gov/files/treasury-market-volatility-10-14-2014-joint-report.pdf.

122

The Honorable Elizabeth Warren
Page 2

manipulation and highlight some of the Commission staff's actions to date in response to the recent volatility.

<u>Market Volatility and Systemic Impact</u>

In response to your first question, the Commission staff is diligently examining the causes of the recent dramatic shifts in GameStop share prices, including the impact of the short positions of large investors such as hedge funds, the role that social media such as online message boards may have played, as well as trading restrictions imposed by certain broker-dealers, and whether these practices violated existing securities laws.[2]  Once we have a better understanding of the facts, we will be in a better position to assess whether the changes in GameStop share prices are consistent with a "fair, orderly, and efficient" market function.[3]  As discussed in more detail below, it would be premature to comment on whether or not any specific individual or entity's conduct violated existing law.

Regarding your second question, we share your concern that "wild swings in value of GameStop and other companies affected by similar trading schemes" may present "systemic concerns for financial systems or the stock market."[4]  As we learned from the 2008 financial crisis and Congress's legislative response, it is important that regulators remain on guard against systemic risks to our financial system, and the Commission appreciates your consistent dedication to ensuring that the SEC is doing so.  That said, it does appear that our core market infrastructure has proven resilient during the recent events, as my colleagues and I have noted.[5]  To date, the Commission staff are not aware of any structural issues resulting from recent significant volatility in the price of certain stocks that indicate a disruption of core market infrastructure.  Additionally, the Commission staff regularly monitors the functioning of market infrastructure with an eye toward identifying structural issues that may interfere with fair and orderly markets.  Nevertheless, I will be instructing the staff in the ongoing study to take a focused look at the possibility that such trading events could pose systemic risks in the future.  I welcome the opportunity to engage with you and your staff on this subject going forward.

In response to your question about "what steps … the SEC [will] take to ensure that securities markets better reflect prices that are in line with the intrinsic and fundamental value of underlying companies,"[6] I share your concerns about stock prices that significantly deviate from what appears justified by market fundamentals, and the Commission is considering this carefully in its study.  At all times, but especially in times of market turbulence, it is imperative that

---

[2] *See NPR, SEC Acting Chair Unpacks the GameStop, Reddit, Robinhood, Wall Street Debacle* (Feb. 1, 2021, 4:28pm), *available at* https://www.npr.org/2021/02/01/962946809/sec-acting-chair-unpacks-the-gamestop-reddit-robinhood-wall-street-debacle.
[3] Letter from Sen. Elizabeth Warren to Allison Herren Lee, Acting Chair, Commission 4 (Jan. 29, 2021), *available at* https://www.warren.senate.gov/imo/media/doc/01.29.2021%20Letter%20from%20Senator%20Warren%20to%20Acting%20Chair%20Lee.pdf.
[4] Letter from Sen. Elizabeth Warren to Allison Herren Lee, *supra* note 3, at 4.
[5] *Statement of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding Recent Market Volatility* (Jan. 29, 2021), *available at* https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29.
[6] Letter from Sen. Elizabeth Warren to Allison Herren Lee, *supra* note 3, at 4, 5.

123

The Honorable Elizabeth Warren
Page 3

markets continue to function and remain fair, orderly, and efficient.  As you note, disorderly, inefficient, and unfair securities markets can have a negative impact on investors, communities, consumers, and workers.  For example, if a short seller disseminates misleading or false information about a company, this could negatively impact the company and even threaten its viability as an on-going business, thereby harming:  (1) investors through a reduction in the stock price; (2) workers who are laid off or see a reduction in the value of their stock holdings in the company; (3) communities through the economic effects of those layoffs; and (4) consumers who may lose access to the company's products or services.[7]  Significant volatility in prices of particular equities can ultimately increase the likelihood of investor harm,[8] and, consequently, the Commission staff monitors situations such as these very closely.

The Commission is always concerned with the impact of significant volatility that is not explained by apparent market fundamentals.  As you know, the Commission and other governmental authorities and market participants continue to work together to ensure that markets function during times of market volatility.  Our regulatory tools have evolved to address the challenges that our markets have confronted in previous stressful events, such as the market volatility in March 2020 and the "flash crash" in May 2010.  The Commission also has regulations in place designed to address market infrastructure and to promote resilience.  For example, the Commission's Regulation Systems Compliance and Integrity (SCI) strengthens the technology infrastructure of the U.S. securities markets.  Specifically, the rules are designed to reduce the occurrence of systems issues, improve resilience when systems problems do occur, and enhance the Commission's oversight and enforcement of securities market technology infrastructure.  The Commission staff will examine closely whether these rules and others performed as designed in response to the issues raised by these events in order to identify any gaps that may need to be addressed.

Further, the Commission has always remained focused on whether investors have access to sufficient information to make informed investment decisions.  As part of the staff's efforts to protect investors in response to the recent volatility, the Commission's Office of Investor Education and Advocacy recently issued a staff bulletin highlighting the risks associated with volatile markets and short-term trading based on social media.[9]  Our Division of Corporation Finance also issued a sample comment letter that highlights disclosure considerations for companies seeking to raise capital in securities offerings amid market and price volatility.  This letter includes sample comments regarding disclosure, among other things, about inconsistencies between recent changes in a company's stock price and changes in actual or expected operating performance, financial condition, or other indicators of value.

That said, these tools clearly have not eliminated all extreme volatility from the markets. I believe the Commission should take this opportunity to consider additional changes to our regulations to, among other things, provide better safeguards against prices dramatically departing from fundamental values.  Our markets are the best in the world, but we do not rest on

---

[7] *See, e.g.*, Joshua Mitts, Short and Distort, Columbia Law and Economics Working Paper No. 592 (Feb. 13, 2020), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3198384.
[8] *See* George Sisti, Do the math: Volatility hurts your portfolio, MARKETWATCH (Feb. 13, 2013), *available at* https://www.marketwatch.com/story/do-the-math-volatility-hurts-your-portfolio-2013-02-26
[9] *Investor Alert: Thinking About Investing in the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading Based on Social Media* (Jan. 29, 2021), *available at* https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-62.

124

The Honorable Elizabeth Warren
Page 4

that premise.  We must ensure that our regulations and actions keep pace with the challenges of modern markets.  Until we have a better understanding of exactly what happened, it is premature to identify fully all the steps that should be taken to fix potential issues.  Nevertheless, at this point, I believe we should seriously consider additional regulations in a few areas.  Specifically, I believe the Commission should consider crafting regulations that require firms providing options trading to retail customers to disclose more information to those customers and more closely examine whether retail customers understand such products.  It is critical that firms conduct sufficient due diligence about whether individual customers qualify to trade options and other complex products before those customers begin trading such products.  Additionally, I believe the Commission should consider requiring increased disclosure of short-selling to regulators and the general public as well as completion of the Dodd-Frank mandate for a rule under Section 929X of Dodd-Frank.[10]  Finally, I believe the Commission should examine the effects of certain firms receiving payment for access to their order flow to determine, among other things, whether these practices are properly and thoroughly disclosed and fully consistent with best execution obligations.  As noted above, however, we are continuing to analyze the recent market events, and the outcome of that review may ultimately lead us toward different or additional policy considerations.

Fraud and Market Manipulation

    With respect to your fourth question regarding market manipulation, the Commission takes market manipulation seriously and has a long history of investigating and prosecuting those who seek to fraudulently manipulate stock prices and interfere with the free and fair operation of the market.  While I am unable to discuss the existence or nature of any specific investigation regarding recent market events or provide a detailed timeline regarding steps we are taking to update and implement rules defining market manipulation, I can assure you that in the course of our review of the events, we are evaluating whether the SEC's current regulatory regime is sufficient to address potential misconduct that may have occurred in connection with the recent market volatility.  To the extent it is helpful for now, I provide below a brief overview of regulations designed to prevent market manipulation.

    As you know, the federal securities laws and regulations broadly prohibit fraud in the offer, purchase, or sale of securities, including activity designed to fraudulently manipulate a stock's price.  For example, it can be a violation of Section 10(b) of the Securities and Exchange Act of 1934, or Section 17(a) of the Securities Act of 1933, to disseminate false or misleading information about a security in an effort to artificially pump up its price and profit therefrom.  Similarly, Section 9(a) of the Exchange Act makes it illegal to engage in trading that is designed to artificially increase or decrease the price of a security for the purpose of inducing others to buy or sell the stock.  These are only some examples of ways in which individuals or entities may engage in market manipulation in violation of the federal securities laws.  To the extent that our review of the facts in this situation reveals regulatory gaps in the SEC's enforcement regime, we would welcome a conversation regarding potential action to fill those gaps.

    It should be noted, however, that some of the activities associated with recent market events may not squarely fall within our current authority to prevent and police market

---

[10] See Dodd-Frank Act Section 929X(a) (codified as amended at 15 U.S.C. § 78m(f)(2) (2012)).

125

The Honorable Elizabeth Warren
Page 5

manipulation.  Much of our enforcement authority regarding market manipulation revolves around the concept of "deceit;" in other words, conduct with an intent to knowingly mislead or misrepresent a person's interests or holdings.  If a person or persons involved in causing a major market event could not be shown to have engaged in knowing or reckless deceit, there could be uncertainty regarding the success of an action brought for market manipulation.  We continue to analyze and consider this issue carefully.

In addition, the Commission's examination and enforcement efforts to address conduct that violates the federal securities laws also promote market integrity.  Timely identification of misconduct that harms investors and undermines confidence in our markets is critical, and the Commission's examination and enforcement staff routinely inspect and investigate potential non-compliance with applicable regulatory obligations.

In particular, the Division of Examinations is currently conducting examinations to review actions taken by various regulated entities (including broker-dealers and clearing agencies) related to the recent volatility to, among other things, promote compliance with the federal securities laws.  Coordinating with divisions and offices across the Commission, our Division of Enforcement proactively surveils the market for possible violations of the federal securities laws, including misconduct involving fraud, manipulation, and misrepresentations in disclosures to the customers of broker-dealers.  When Commission staff identify possible instances of such violations, they work to halt the misconduct and prevent or minimize investor harm.

As a matter of policy, the Commission conducts investigations on a confidential basis and generally does not acknowledge the existence or non-existence of any investigation unless or until charges are filed.  This is to protect the integrity of our investigations, safeguard the privacy of witnesses, and avoid damaging the reputation of persons who may not be charged.  Accordingly, as noted above, I cannot comment specifically on whether any particular matters raised in your letter are currently under investigation, but I assure you that the Commission staff is considering carefully the information included in your correspondence in connection with our statutory and regulatory responsibilities.

I would also note that data collected by the Consolidated Audit Trail (CAT) is intended, in part, to assist Commission staff in investigations of potentially manipulative trading.  Broker-dealers are now reporting core transactional data for equities and simple electronic options to the CAT.  This data assists in understanding trading activities and in conducting investigations, but will be most useful when all data elements are reported and complete.  Pursuant to amendments adopted by the Commission on May 15, 2020, an implementation plan and quarterly progress reports are now published on the CAT NMS Plan website (catnmsplan.com).  The implementation timeline provided on the website for the CAT NMS Plan indicates that implementation should be completed in 2022.

While we would welcome additional resources given the size and complexity of our markets and the ongoing and evolving risk of fraud and market manipulation, we are working to identify and address possible violations of the existing federal securities laws.  The Commission staff are also considering the effectiveness of existing regulations to protect investors, to

126

The Honorable Elizabeth Warren
Page 6

maintain fair, orderly, and efficient markets, and to facilitate capital formation, and will make
recommendations for potential action to address any issues or gaps identified.

*** 

Thank you again for your letter and your continued, thoughtful focus on our mission.
Please do not hesitate to contact me at (202) 551-2100, or have a member of your staff contact
Justin Slaughter, Director of the Office of Legislative and Intergovernmental Affairs, at (202)
551-2010 if you have any additional concerns or comments.

Sincerely,

Allison Herren Lee
Acting Chair

127



85 Willow Road
Menlo Park, CA 94025
robinhood.com

February 12, 2021

The Honorable Elizabeth Warren
309 Hart Senate Office Building
Washington, DC 20510

<u>Response to February 2, 2021 Letter re: Robinhood</u>

Dear Senator Warren,

I write in response to your letter, dated February 2, 2021, regarding the measures taken by Robinhood[1] in response to the recent market volatility. We appreciate your interest in this matter, and welcome the opportunity to describe why RHS decided temporarily to restrict the purchase of certain securities on January 28, 2021. We continue to prioritize our customers and our mission to increase access to investing, and we believe the steps taken by RHS reflect this commitment. Should additional responsive information become available, we respectfully reserve the right to supplement this response as appropriate.

\* \* \*

1. **Robinhood announced on January 28, 2021 that it was restricting "transactions for certain securities to position closing only," abruptly changing the rules for small investors with no warning or recourse. Why did Robinhood make this decision?**

   a. **Please explain in detail the factors that led Robinhood to limit customers from making trades on GameStop and other stocks.**

   As brokerage firms, RHF and RHS have many financial requirements, including U.S. Securities and Exchange Commission ("SEC") net capital obligations and clearinghouse deposit requirements. Some of these requirements fluctuate based on volatility in the markets and can be substantial in the current environment. These requirements exist to protect investors and the markets, and we take our

---

[1] Unless otherwise specified, references to Robinhood herein refer collectively to Robinhood Markets, Inc. ("RHM"), Robinhood Financial LLC ("RHF"), and Robinhood Securities, LLC ("RHS"). RHM wholly owns RHF, which acts as an introducing broker for its customers by taking their trade orders. RHF also wholly owns RHS, which, as a member of SEC-registered clearinghouses, serves as a clearing broker for RHF. In that capacity, RHS executes customer orders received from RHF by routing them to market makers and also clears and settles trades for RHF.

128



responsibilities to comply with them seriously, including through the measures taken by RHS to temporarily limit customer purchases of certain securities.

In late January 2021, trading activity in a small number of stocks triggered massive volatility that prompted clearinghouses to take swift action to increase deposit requirements. These deposits are the collateral RHS posts to ensure access to clearinghouse services on behalf of Robinhood's customers. In a matter of days, RHS's clearinghouse-mandated deposit requirements related to stocks increased ten-fold. This led us to put temporary buying restrictions on a small number of securities, including GameStop, which accounted for hundreds of millions of dollars in deposit requirements. Consistent with our customer agreement, we took steps to limit buying in those securities to ensure we could meet our deposit requirements. We met and have continued to meet these requirements.

      **b.   Please explain what contractual provisions with its users allowed Robinhood to summarily bar or otherwise restrict trading activity related to GameStop and other companies and how these provisions were communicated to users.**

When opening an account with RHF, all customers are required to sign a customer agreement, in which the customer acknowledges that RHF retains authority, in its "sole discretion and without prior notice," to restrict customer trading activity.[2] Agreements with these terms are standard across the industry.[3] ⁴

**2.    News reports indicate that Robinhood's actions to restrict trading of certain securities, such as GameStop stocks, "suggest that the stock trading platform may not have had enough cash on hand to stay within regulatory rules for brokerage firms," potentially because "Robinhood may have been exposed to too much risk associated with margin trading." Are these reports accurate?**

By January 28, Robinhood customers could not trade GameStop, among other stocks, on margin. Other brokers took similar actions.[4] As described above, RHS restricted trading in certain securities,

---

[2] See Ex. A (RHF & RHS Customer Agreement (last updated Dec. 30, 2020)) ¶ 5(F) ("I understand Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities."); id. ¶ 16 ("I understand that Robinhood may, in its discretion, prohibit or restrict the trading of securities . . . in any of My Accounts.).

[3] See SEC Office of Investor Education & Advocacy, *Thinking About Investing in the Latest Hot Stock?*, SEC (Jan. 30, 2021), https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert. ("[B]roker-dealers may reserve the ability to reject or limit customer transactions. This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks.").

[4] Charles Schwab, eToro, E*Trade, Freetrade, Interactive Brokers, M1 Finance, Public, Revolut, TD Ameritrade, Trading 212, and Webull all either restricted trading or tightened certain restrictions on

---

129



including GameStop, as a risk management measure.  RHS met the deposit requirements imposed by the clearinghouse on January 28 and has continued to meet those requirements to date.  RHM also raised additional capital, a significant portion of which is being held as regulatory capital by RHS and can be deployed in the event deposit requirements increase significantly in the future.

    a.  **Does Robinhood disclose the number of customers who hold margin accounts – which allows customers to borrow money from Robinhood to buy stocks –to federal regulators? If so, what is the average total margin among Robinhood margin account holders?**

Under current rules, RHF is not required to collect and disclose the number of customers who hold margin accounts.

    b.  **Reports revealed that potential cash flows issues "could have put Robinhood out of compliance with very basic regulatory rules that every brokerage is required to follow." According to one analyst, "[t]his raises the question of if [Robinhood was] negligent in their management of their net capital and other regulatory obligations."**

        i.  **Please describe in detail any findings of noncompliance with laws or regulations governing Robinhood's platform or business practices during or preceding the recent market volatility.**

During the relevant period, RHF and RHS were in compliance with the SEC's net capital requirements, and remain so through the present.  To the best of our knowledge, Robinhood has acted in compliance with all other applicable laws and regulations related to the market volatility during the relevant period.

        ii.  **Please describe in detail any conversations that Robinhood's senior leadership had with staff of financial regulatory agencies regarding the recent market volatility.**

Robinhood has been in regular communications with the SEC, Financial Industry Regulatory Authority ("FINRA"), and other self-regulatory organizations regarding the recent market volatility events.

---

these stocks.  *See* Harry Robertson, *Robinhood, Webull, M1 and these other platforms have resumed trading of GameStop and AMC shares*, MARKETS INSIDER (Jan. 29, 2021, 2:39 PM), https://markets.businessinsider.com/news/stocks/robinhood-webull-m1-reopen-gamestop-stock-trading-2021-1-1030019926.

130



**3.** **Reports indicate that "Robinhood routes more than half of its customer orders to Citadel [Securities], by far its largest market-making partner by volume."**

    **a.** **Please describe in detail the relationship between Robinhood and Citadel Securities.**

      Like other clearing brokers, RHS routes customer trade orders to market makers, including Citadel Execution Services (which is an SEC registered broker-dealer), to execute RHF's customers' orders. RHS receives rebates for directing customer orders to market makers in an arrangement known as "payment for order flow." This payment for order flow practice is regulated by the SEC, and RHS complies with its disclosure obligations under SEC Rule 606. Citadel Execution Services is one of seven market makers to which RHS routes customer orders. No Citadel entity including, but not limited to, Citadel Execution Services, holds any ownership stake directly, or to Robinhood's knowledge indirectly, in Robinhood.[5]

    **b.** **Did Robinhood engage in any discussions with any Citadel businesses or affiliates prior to Robinhood reaching its decision to institute restrictions on trading for GameStop and other stocks? If so, please provide a full description of these discussions.**

      RHS is in regular dialogue with all of the market makers to which it routes customer orders including, among others, Citadel Execution Services. RHS's decision to impose limits on purchases of certain securities was not prompted by nor the result of any such discussions.[6] We have attached for your reference documentation regarding communications related to the decision to impose limits on certain securities.[7]

    **c.** **What user data does Robinhood share with Citadel Securities, and on what terms?**

      Robinhood does not share customer data beyond customer orders with any of RHS's market makers. As stated above, RHS routes customer orders to market makers for order execution.

---

[5] *See* Ex. B (Robinhood Financial LLC, Robinhood Securities, LLC & Robinhood Markets, Inc.'s Mem. Law Opp'n Pl.'s *Ex Parte* Appl. TRO & Order Showing Cause Prelim. Inj., *Cobos v. Robinhood Fin. LLC*, No. 21-cv-00835-VAP-MRW (C.D. Cal. Feb. 8, 2021), ECF Nos. 27-27-3) at 18.

[6] *See* Ex. B at 142 (Decl. of James Swartwout).

[7] *See id.*

131



d.  **How much revenue does Robinhood earn from its contractual relationship with Citadel Securities?**

Consistent with its regulatory obligations under SEC Rule 606, RHS discloses on a quarterly basis its payment for order flow arrangements with market makers.  RHS's Rule 606 disclosures are publicly available on Robinhood's website.[8]

In comparison, other major online brokers also route a significant portion of their customers' orders to Citadel Execution Services for order execution.

### TD Ameritrade Clearing, Inc. - December 2020

#### S&P 500 Stocks

| Venue - Non-directed Order Flow | Non-Directed Orders (%) | Market Orders (%) | Marketable Limit Orders (%) | Non-Marketable Limit Orders (%) | Other Orders (%) |
|---|---|---|---|---|---|
| Citadel Execution Services | 38.22 | 44.28 | 42.56 | 20.03 | 52.03 |
| Virtu Americas, LLC | 20.73 | 23.16 | 21.19 | 5.74 | 34.24 |
| G1 Execution Services | 16.15 | 30.03 | 29.42 | 12.92 | 8.74 |
| UBS Securities, LLC | 14.20 | 1.03 | 3.89 | 36.93 | 1.12 |
| Two Sigma Securities, LLC | 8.93 | 0.96 | 2.42 | 22.91 | 0.85 |

#### Non-S&P 500 Stocks

| Venue - Non-directed Order Flow | Non-Directed Orders (%) | Market Orders (%) | Marketable Limit Orders (%) | Non-Marketable Limit Orders (%) | Other Orders (%) |
|---|---|---|---|---|---|
| Citadel Execution Services | 38.30 | 44.21 | 42.48 | 19.06 | 53.05 |
| Virtu Americas, LLC | 21.60 | 23.28 | 21.96 | 7.79 | 34.78 |
| G1 Execution Services | 15.08 | 29.80 | 29.03 | 6.80 | 7.20 |
| UBS Securities, LLC | 13.74 | 1.09 | 3.53 | 37.45 | 0.81 |
| Two Sigma Securities, LLC | 9.24 | 1.09 | 2.49 | 24.85 | 0.61 |

#### Options

| Venue - Non-directed Order Flow | Non-Directed Orders (%) | Market Orders (%) | Marketable Limit Orders (%) | Non-Marketable Limit Orders (%) | Other Orders (%) |
|---|---|---|---|---|---|
| Citadel Execution Services | 44.67 | 44.81 | 44.76 | 44.49 | 45.15 |
| Global Execution Brokers LP | 35.08 | 44.50 | 44.05 | 34.85 | 26.33 |
| Dash Financial | 9.47 | 4.55 | 4.91 | 8.90 | 16.24 |
| Wolverine Execution Services | 6.43 | 3.45 | 3.58 | 8.82 | 1.52 |

---

[8] *See* Robinhood Securities LLC - Held NMS Stocks and Options Order Routing Public Report, 4th Quarter, 2020 (Jan. 25, 2021, 11:07), https://cdn.robinhood.com/assets/robinhood/legal/RHS%20SEC%20Rule %20606a%20and%20607%20 Disclosure%20Report%20Q4%202020.pdf (reflecting Q4 2020 Rule 606 Report).

132



**Charles Schwab - December 2020**

S&P 500 Stocks

| Venue - Non-directed Order Flow | Non-Directed Orders (%) | Market Orders (%) | Marketable Limit Orders (%) | Non-Marketable Limit Orders (%) | Other Orders (%) |
|---|---|---|---|---|---|
| Citadel Execution Services | 31.08 | 32.02 | 30.36 | 27.32 | 40.32 |
| Virtu Americas, LLC | 26.73 | 26.75 | 24.17 | 24.83 | 36.12 |
| G1 Execution Services, LLC | 22.66 | 23.09 | 25.32 | 23.82 | 13.02 |
| UBS Securities, LLC | 13.99 | 13.05 | 14.46 | 16.87 | 8.66 |
| Two Sigma Securities, LLC | 4.68 | 5.03 | 5.38 | 4.70 | 1.57 |
| Cboe EDGX Exchange, Inc. | 0.54 | 0.07 | 0.28 | 1.50 | 0.21 |
| Nasdaq Execution Services, LLC | 0.31 | 0.00 | 0.03 | 0.96 | 0.11 |

Non-S&P 500 Stocks

| Venue - Non-directed Order Flow | Non-Directed Orders (%) | Market Orders (%) | Marketable Limit Orders (%) | Non-Marketable Limit Orders (%) | Other Orders (%) |
|---|---|---|---|---|---|
| Citadel Execution Services | 30.46 | 30.44 | 30.58 | 27.54 | 40.55 |
| Virtu Americas, LLC | 26.21 | 24.42 | 24.59 | 25.19 | 39.43 |
| G1 Execution Services, LLC | 23.12 | 25.22 | 24.61 | 23.38 | 11.07 |
| UBS Securities, LLC | 14.56 | 14.36 | 14.64 | 16.90 | 7.43 |
| Two Sigma Securities, LLC | 4.78 | 5.53 | 5.37 | 4.61 | 1.30 |
| Cboe EDGX Exchange, Inc. | 0.54 | 0.03 | 0.17 | 1.45 | 0.14 |
| Nasdaq Execution Services, LLC | 0.33 | 0.00 | 0.03 | 0.93 | 0.08 |

Options

| Venue - Non-directed Order Flow | Non-Directed Orders (%) | Market Orders (%) | Marketable Limit Orders (%) | Non-Marketable Limit Orders (%) | Other Orders (%) |
|---|---|---|---|---|---|
| Citadel Execution Services | 34.56 | 33.14 | 33.47 | 33.16 | 38.25 |
| Global Execution Brokers LP | 30.25 | 29.99 | 29.70 | 29.49 | 31.94 |
| Wolverine Execution Services, LLC | 18.53 | 18.96 | 19.44 | 20.65 | 14.24 |
| Dash Financial Technologies, LLC | 8.70 | 12.34 | 11.05 | 9.53 | 4.30 |
| Morgan Stanley & Co., LLC | 7.95 | 5.57 | 6.34 | 7.17 | 11.28 |

At this time, RHS does not expect the data reflected in its Rule 606 disclosures for Q4 2020 to materially change by the end of the current quarter.  RHS can make its Rule 606 disclosures for Q1 2021 available to your office following their release at the end of the quarter.

e.   **Does Robinhood have similar contracts with other large hedge funds, private equity funds, or other large financial services firms? If so, please provide a full description of these relationships.**

Robinhood does not have any contracts with hedge funds or private equity funds regarding customer order execution.  RHS currently has payment for order flow arrangements with seven other market makers: G1X Execution Services, LLC, Global Execution Brokers, LP, Morgan Stanley & Co.,

133



LLC, Two Sigma Securities, LLC, Virtu Americas, LLC, and Wolverine Securities, LLC, and Wolverine Execution Services LLC.[9]

    **4.    Please describe Robinhood's requirements for addressing customers' complaints and grievances, in particular Robinhood's use of forced arbitration requirements.**

        **a.    Please explain in detail the terms of the arbitration processes that Robinhood customers are mandated to participate in when seeking relief.**

When customers sign up for accounts, they must acknowledge their agreement to the terms set forth in the operative customer agreement. The disclosures in RHF's customer agreements regarding arbitration are consistent with RHF's and RHS's regulatory obligations under FINRA Rule 2268, which governs requirements when pre-dispute arbitration agreements are used. In particular, the customer agreements include the language set forth in FINRA Rule 2268(a).[10] Further, as required by FINRA Rule 2268(b)(1), the operative customer agreement sets forth, before the customer indicates acceptance, that it contains a pre-dispute arbitration clause and refers to where that clause is located.[11]

---

[9] *See id.*

[10] *See* Ex. A ¶ 38. The language set forth in FINRA Rule 2268, which is identical to the customer agreements, is as follows:

This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows: (1) All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed. (2) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited. (3) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings. (4) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date. (5) The panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry. (6) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court. (7) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.

[11] *See* Ex. A at 1 ("I also understand that by clicking 'submit application' I have acknowledged that this agreement contains a predispute arbitration clause in Section 38 herein.").

134



b.   **How many consumer complaints has Robinhood fielded from customers that were required to use the arbitration process to address their concerns?**

As stated above at 4(a), under the operative customer agreement and consistent with FINRA regulations, all RHF customers agree to adhere to the terms of the pre-dispute arbitration clause.  As of February 11, there are 24 arbitrations pending.  RHF is open to reviewing its use of arbitration and will continue to be guided by what is in its customers' best interests with respect to resolving customer complaints.

c.   **How many of these customers went through the arbitration process?**

One of the cases initiated in 2020 pursuant to the FINRA arbitration process under FINRA Rule 2268 resulted in a final determination by a FINRA arbitrator.

d.   **What was the outcome of these cases?**

A FINRA panel issued a $0 award for the one case initiated in 2020 that resulted in a final determination.

e.   **In cases where Robinhood lost in arbitration, was the settlement, or any part of it, made public?**

As noted above, a FINRA panel issued a $0 award for the one case initiated in 2020 that resulted in a final determination.  All cases that have been finally determined by a FINRA arbitrator are publicly available on FINRA's website.[12]

\* \* \*

_____

[12] *See* https://www.finra.org/arbitration-mediation/arbitration-awards-online.