190

1  as "without sanction or permission").  Plaintiff willingly downloaded the

2  Robinhood application himself, opened an account and agreed to the Customer

3  Agreement.  The Customer Agreement grants Robinhood the authority, "at any

4  time" and "without prior notice," to "prohibit or restrict" Plaintiff's "access to the

5  use" of the app or website.  (Bain Decl. Ex. D ¶ 16.)  It further permits Robinhood

6  to "prohibit or restrict" Plaintiff's "ability to trade," "refuse to accept any of"

7  Plaintiff's transactions, or "refuse to execute any of" Plaintiff's transactions.  (*Id.*);

8  *see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009)

9  (affirming dismissal of CFAA claim because, where an employee had permission

10  from his employer to use the computer, he did not access the computer "without

11  authorization").

12       C.   <u>Plaintiff's Unfair Competition Law Claim Fails.</u>

13       Plaintiff cannot show a likelihood of success on the merits of his

14  claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

15  Code § 17200, *et seq.*, because (i) he lacks standing to bring such a claim, and

16  (ii) even if he had standing, his claim is doomed to fail on the merits.

17       i.   *Plaintiff Lacks Standing to Pursue His UCL Claim.*

18       "Standing under the UCL . . . is substantially narrower than standing

19  under Article III of the Constitution." *Wright v. Gen. Motors Acceptance Corp.*,

20  545 F. App'x 686, 688 (9th Cir. 2013) (internal quotation marks omitted).  To have

21  standing to bring a UCL claim, "a plaintiff suing under the UCL must (1) establish

22  . . . *economic injury*, and (2) show that the economic injury was the result of, i.e.,

23  *caused by*, the unfair business practice . . . that is the gravamen of the claim." *Id.*

24  (alterations in original) (citations omitted) (internal quotation marks omitted).

25       Plaintiff has not alleged a cognizable injury.  He alleges that he tried

26  to purchase AMC shares using the Robinhood app on January 28, 2021, and that he

27  tried to "access the 'buy' feature" for BlackBerry shares that same day.  (Cobos

28

1   Decl. ¶ 7.)  What he ignores is that he remained free to purchase these stocks from

2   other broker-dealers.  Robinhood did not prevent—and could not prevent—

3   Plaintiff from buying these stocks; it simply did not provide a means for him to

4   buy those stocks through Robinhood.  Moreover, it is entirely speculative whether

5   Plaintiff would have made or lost money if he had actually bought additional

6   shares.[8]  *See Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir.

7   2018) ("A 'some day' intention[]—without any description of concrete plans . . .

8   —does not support a finding of the 'actual or imminent' injury that Article III

9   requires.") (alteration in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S.

10   555, 564 (1992)).

11         Plaintiff's allegations regarding his BlackBerry options contract fare

12   no better.  If he had exercised his call option on January 28 (as he could have done

13   had he spoken to a live broker), he would have immediately *lost* money as the

14   stock was trading well below the strike price of $24.00.  (*See* Cobos Decl. ¶ 5;

15   Cobos Decl. Ex. 2.)  That option remained out of the money when it expired the

16   following day, and BlackBerry shares have not traded above $24.00 through filing.

17        ii.   *Plaintiff's UCL Claim Cannot Succeed on the Merits.*

18         Plaintiff likewise cannot show a likelihood of success on the merits of

19   his UCL claim.  To state a claim under the UCL, a plaintiff must allege that the

20   defendant engaged in an "unlawful, unfair or fraudulent business act or practice".

21   Cal. Bus. & Prof. Code § 17200.  Plaintiff cannot show any unlawful conduct.

22        *First*, as discussed above in Sections I.A and I.B, Plaintiff's claims

23   under 15 U.S.C. § 78i(a) and 18 U.S.C. § 1030(a) are without merit, and thus

24   cannot support a UCL claim.  *See Bejou v. Bank of Am.*, No. CV F 13-0125 LJO

25

26

27       [8] Plaintiff allegedly tried to purchase these stocks using the Robinhood app at a time on January 28 when they were trading at $7.92 (AMC) and $15.31 (BB). (Cobos Decl. ¶ 6; Cobos Decl. Exs. 1-2.)  The Court can take judicial notice that

28   these stocks closed on Monday, February 8, at $6.18 (AMC) and $13.76 (BB).

OPPOSITION TO PLAINTIFF'S EX PARTE           CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

192

1  SMS, 2013 WL 1759126, at *5 (E.D. Cal. Apr. 24, 2013) ("Reliance on other

2  invalid claims fails to support a viable UCL claim.").

3       *Second*, to the extent Plaintiff alleges separate liability under Section

4  9(d) or 9(i) of the Exchange Act, Plaintiff's claim also fails.  Section 9(d) prohibits

5  a person from manipulating a "short sale of any security".  15 U.S.C. § 78i(d).

6  Plaintiff alleges that Robinhood's stock restriction prevented him from buying

7  additional AMC stock, not shorting.  (Compl. ¶ 25.)  Customers cannot engage in

8  short sales on the Robinhood platform.  (Swartwout Decl. ¶ 4.)  Moreover, Plaintiff

9  does not allege that he suffered *any* loss as a result of a short sale by another

10  market participant, and therefore lacks standing to bring such a claim.

11       Section 9(i) prohibits any person from violating "*such rules or*

12  *regulations as the Commission may adopt*, consistent with the public interest, the

13  protection of investors, and the maintenance of fair and orderly markets".  15

14  U.S.C. § 78i(i) (emphasis added).  Plaintiff fails to cite any specific SEC "rules or

15  regulations" that Robinhood allegedly violated that would give rise to liability.

16  Instead, Plaintiff alleges generally that Robinhood's "suspension of purchasing

17  was contrary to the rules and regulations requiring a fair and orderly market".

18  (Pl.'s Br. at 13.)  Such vague allegations are insufficient to survive a motion to

19  dismiss, much less serve as a basis for obtaining temporary injunctive relief.

20       *Third*, to the extent Plaintiff alleges separate liability under Rule 5310

21  of the Financial Industry Regulation Authority ("FINRA"), Plaintiff's claim fails

22  again.[9]  Robinhood's decision to decline or limit trades does not violate Rule 5310.

23  Rule 5310—the "Best Execution and Interpositioning" rule—applies to the level of

24  care with which a broker-dealer must exercise with an *accepted* trade order.  *See In*

25  *the Matter of Scottrade, Inc.*, Exchange Act Release No. 58012, 93 S.E.C. Docket

26

27      [9] In addition to these grounds for why a UCL claim fails, it is well established

28  that there is no private right of action for a violation of FINRA Rules.  *See Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 414 (2d Cir. 2009).

193

1   1550, 2008 WL 2510611, at *5 (June 24, 2008) ("By *accepting* an order, a broker-

2   dealer impliedly represents that the order will be executed in a manner consistent

3   with the duty of best execution." (emphasis added)).  In other words, the Rule

4   applies to *how* a trade is executed, not to a broker-dealer's decision as to *whether*

5   to execute a particular trade.  As Plaintiff concedes, RHF temporarily did *not*

6   accept any purchase orders for either AMC Entertainment or BlackBerry stock.

7           *Fourth,* Plaintiff cannot show any unfair or fraudulent conduct. As

8   discussed above, Plaintiff's speculative conflict of interest allegation concerning

9   Citadel Securities is refuted by the record evidence.  *See supra* Section II(A)(ii).

10          iii.    *Robinhood's Lawful Acts Cannot Violate the UCL.*

11          By definition, lawful acts cannot violate the UCL.  *See Nivasive, Inc.*

12   *v. Cadwell Indus., Inc.*, No. 12CV3065 JLS (JMA), 2013 WL 12096625, at *5

13   (S.D. Cal. Nov. 4, 2013) ("[T]he UCL may not be used to impose liability for

14   allegedly unfair practices that have been affirmatively declared to be lawful.").

15   Specifically, a UCL claim cannot succeed where the challenged conduct is an

16   essential part of the company's business operations and is consistent with industry

17   practices.  *See Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134, 1149

18   (2003) (holding that a lender's conduct did not violate the UCL because that

19   conduct was "widespread and commonly used as a method to compensate

20   mortgage brokers for services provided to borrowers and the lender").

21          But that is all that is challenged here:  lawful acts undertaken by

22   Robinhood that are consistent with industry practice to ensure compliance with

23   clearinghouse requirements and SEC regulations.  (*See* Swartwout Decl. ¶¶ 25-29;

24   Verma Decl. ¶¶ 12-16.)  These acts were explicitly permitted by the Customer

25   Agreement (Bain Decl. ¶¶ 8-21), and the SEC confirmed in its January 30, 2021

26   Bulletin the right of broker-dealers to take such actions.  *See* SEC Statement.

27   Indeed, other broker-dealers also set purchase restrictions on the "meme" stocks.

28

194

1        D.   Plaintiff's Negligence Claim Fails.

2                Plaintiff does not appear to rely on his negligence claim to support his

3 Application, nor could he.  *See* Pl.'s Br. at 11-17 (arguing only the first three

4 causes of action).  Plaintiff cannot show (1) the existence of a duty of care; (2) a

5 breach of that duty; (3) proximate cause; or (4) damages, as are all required to

6 prove a successful claim for negligence under California law.  *Peredia v. HR*

7 *Mobile Servs., Inc.*, 25 Cal. App. 5th 680, 687 (2018).

8                Most fundamentally, Robinhood's duties to Plaintiff sound in

9 contract, not tort.  *See Sheen v. Wells Fargo Bank, N.A.*, 38 Cal. App. 5th 346, 357

10 (2019) ("[T]he duties of care between parties who negotiate contracts are not

11 governed by the law of tort.").  Here, the Customer Agreement permits Robinhood

12 to restrict the ability to purchase certain securities.  (*See* Bain Decl. Ex. D ¶¶ 5.F,

13 16.)  A tort claim for conduct expressly permitted by contract is barred.  *See, e.g.*,

14 *Mackell v. Wells Fargo Home Mortg.*, No. 16-CV-04202-BLF, 2017 WL 373077,

15 at *8 (N.D. Cal. Jan. 26, 2017).  Moreover, every customer agrees that "My

16 Account is self-directed" (Bain Decl. Ex. D ¶ 5.A), meaning that the customer is

17 fully responsible for his or her own investment decisions and is not relying on any

18 advice or recommendations from Robinhood.  To the extent that a broker-dealer

19 owes any duty beyond its contractual relationship with its customer, it owes those

20 duties only for each individual transaction it accepts and processes for the

21 customer.  *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d

22 Cir. 2002) ("On a transaction-by-transaction basis, the broker owes duties of

23 diligence and competence in executing the client's trade orders, and is obliged to

24 give honest and complete information when recommending a purchase or sale.

25 The client may enjoy the broker's advice and recommendations with respect to a

26 given trade, but has no legal claim on the broker's ongoing attention.").  There is

27 no duty to accept all trades for all customers at all times.

28

OPPOSITION TO PLAINTIFF'S EX PARTE           CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

195

1    FINRA Rule 5310 does not save Plaintiff's negligence claim.  As

2 noted above, the duty of best execution under FINRA Rule 5310 concerns only

3 *how* an accepted trade is executed, not *whether* a broker will accept a trade.  *See*

4 *id.*; *see also In the Matter of Scottrade*, 2008 WL 2510611, at *5 ("By *accepting*

5 an order, a broker-dealer impliedly represents that the order will be executed in a

6 manner consistent with the duty of best execution.") (emphasis added).  Robinhood

7 did not accept any trades at issue.  FINRA Rule 5310 is irrelevant.

8 **II.   PLAINTIFF CANNOT CLEARLY SHOW IRREPARABLE HARM.**

9    Plaintiff must demonstrate by a clear showing that he will suffer

10 irreparable injury, and that the injury is likely and imminent, not remote or

11 speculative.  *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th

12 Cir. 1988); *Brewer*, 680 F.3d at 1072.  Plaintiff fails to make a clear showing that

13 he will suffer irreparable harm.  Indeed, he has failed to demonstrate any harm at

14 all—past, present or future—and any alleged harm can be remedied by damages.

15    A.   Plaintiff Has Not Demonstrated Past, Present or Imminent Harm.

16    Allegations of past harm cannot support an injunction; Plaintiff must

17 instead articulate a threat of ongoing injury that is "likely" or "imminent".  *See*

18 *Baldrige*, 844 F.2d at 675.  Prior to the market open on February 5, 2021,

19 Robinhood lifted all of the temporary restrictions that it had previously put in place

20 (Swartwout Decl. ¶ 32), mooting Plaintiff's assertion of imminent harm.  At this

21 point, whether—and to what extent—Robinhood may again decide it is necessary

22 to implement restrictions on any securities is entirely speculative, as is the question

23 of whether any such limitations would relate to any securities that have anything to

24 do with Plaintiff.

25    Moreover, Plaintiff's theory of imminent harm appears to be that

26 restrictions (if Robinhood reinstates them in the future) might lead to "depressed"

27 prices in certain securities. (Pl.'s Br. at 12, 15, 17.)  This could only conceivably

28

196

1  harm Plaintiff with respect to securities he already held before the purchase

2  restrictions went into effect.  For the reasons discussed below, Plaintiff's

3  speculative, conclusory assertions of harm that he *might* suffer in the future are

4  insufficient to warrant a grant of injunctive relief.  *See Herb Reed Enterprises, LLC*

5  *v. Florida Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (a party seeking

6  injunctive relief may not rely on "unsupported and conclusory statements

7  regarding harm [the plaintiff] might suffer" in the future).

8        *First*, Plaintiff's theory is predicated on assuming that—if Robinhood

9  had not placed temporary restrictions on AMC (now lifted)—he *would have*

10  purchased AMC shares, those shares *would have* risen in value and then he *would*

11  *have* sold those shares for a profit.  Yet Plaintiff cannot show that he would have

12  purchased AMC shares at a low price, held them for the right amount of time and

13  then sold them at a higher price for a profit.  Any attempt to do so would simply be

14  with the benefit of hindsight.  Plaintiff could have *lost* money buying additional

15  AMC shares instead of *making* money.  The same will be true for any future

16  restrictions Robinhood may put in place.  Pure speculation about lost profits on

17  stock-market trading does not entitle Plaintiff to sweeping injunctive relief.  *See id.*

18        *Second*, Plaintiff cannot show that he was foreclosed (or is now

19  foreclosed) from carrying trades on the open market.  Nothing obligated Plaintiff to

20  trade on Robinhood's platform.  Robinhood was not an exclusive broker for any of

21  these stocks.  Plaintiff admits that "[o]ther retail customers at other brokerage firms

22  at the same time are and were permitted to purchase *or* sell the same stocks".

23  (Pl.'s Br. at 11.)  This alone defeats Plaintiff's Application.

24        *Third*, Plaintiff's theory of harm assumes that Robinhood's temporary

25  purchase restrictions moved the market price of those securities.  There is no

26  evidence that RHF, a single broker-dealer in the market for securities, has the

27  ability to move markets when investors could still purchase and sell shares through

28

OPPOSITION TO PLAINTIFF'S EX PARTE                    CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

26

197

1  other broker-dealers.  This thread of loosely-tied, speculative assertions is

2  misguided, strains logic and certainly does not entitle Plaintiff to injunctive relief.

3  *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098-99 (9th Cir. 2007)

4  ("[C]onclusory allegations are insufficient to establish irreparable harm.").

5          B.   <u>Any Alleged Harm Can Be Remedied with Damages.</u>

6          Even if Plaintiff had shown that he has suffered or will suffer harm—

7  which he has not—the only appropriate remedy would be damages.  "A plaintiff is

8  not entitled to an injunction if money damages would fairly compensate him for

9  any wrong he may have suffered."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343

10  U.S. 579, 595 (1952) (Frankfurter, J., concurring).  Any injury that Plaintiff might

11  suffer from the inability to trade securities on Robinhood's platform is ***monetary***

12  injury, which "is not normally considered irreparable".  *See Los Angeles Mem'l*

13  *Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)

14  (holding it is "well established" that injuries in the form of lost revenue are not

15  normally irreparable); *Bofi Fed. Bank v. Erhart*, 2016 WL 4680291, at *8 (S.D.

16  Cal. Sept. 7, 2016) ("[E]ven if the Court considered a precipitous decline in stock

17  price as irreparable harm, [Plaintiff] has not demonstrated a likelihood of suffering

18  this harm again in the absence of a preliminary injunction."); *Sierra Military*

19  *Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 582 (2003) (same).

20  **III.**    **THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS.**

21          In considering whether to grant or deny injunctive relief, a district

22  court "must balance the competing claims of injury and must consider the effect on

23  each party of the granting or withholding of the requested relief."  *N. Cheyenne*

24  *Tribe v. Norton*, 503 F.3d 836, 843-44 (9th Cir. 2007) (quoting *Amoco Prod. Co. v.*

25  *Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

26          The balance of equities tips decidedly in favor of denying the

27  requested relief.  Granting Plaintiff's requested relief would risk serious harm to

28

198

1   Robinhood's business, its customers, and the broader stock market.  It would

2   deprive RHF and RHS of the use of an important tool essential to the continued

3   operation of any broker-dealer.  RHS instructed RHF to impose certain temporary

4   purchase restrictions to mitigate risk in connection with its clearinghouse deposit

5   requirements.  This ensured continuity of operations on the Robinhood platform,

6   providing access to millions of customers to trading in thousands of securities.

7   (Swartwout Decl. ¶ 28; Verma Decl. ¶ 26.)  While the recent capital infusion and

8   use of purchase restrictions has helped RHS manage its clearinghouse deposit

9   requirements, enjoining Robinhood from exercising its discretion to limit trading in

10   volatile securities would impose an unlimited capital requirement on the business.

11   (Verma Decl. ¶ 27-28.)  No broker-dealer could possibly have the capital to

12   support limitless trades, especially in volatile securities.  Enjoining Robinhood's

13   ability to restrict trading in certain stocks that jeopardizes the continued operation

14   of the entire platform would risk serious harm to Robinhood's business and loss of

15   goodwill with its broker-dealers' customers—causing Robinhood irreparable harm.

16   *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir.

17   2001) (holding "threatened loss of prospective customers or goodwill certainly

18   supports a finding of the possibility of irreparable harm").

19            Indeed, granting the requested relief could force Robinhood into an

20   impossible Catch-22 scenario.  On the one hand, RHS could comply with this

21   Court's order and become the only broker-dealer in the United States that is

22   exposed to the risk of limitless collateral deposit requirements.  On the other hand,

23   RHS could act consistently with its Customer Agreement and SEC guidance by

24   exercising discretion to limit trades to ensure that it can meet all collateral deposit

25   requirements and net capital regulations (*e.g.*, Swartwout Decl. ¶¶ 26-29), but, in

26   doing so, violate the Court's order.

27

28

199

1     Simply put, RHS's discretion to instruct RHF to apply trading

2 restrictions is one tool that RHS uses to satisfy its obligations to the entire

3 Robinhood customer base, its clearinghouses and the SEC.  Removing that tool

4 would directly, and irreparably, interfere with those efforts.  *See John Labatt Ltd.*

5 *v. Onex Corp.*, 890 F. Supp. 235, 249 (S.D.N.Y. 1995) (finding that the balance of

6 hardships tipped in favor of defendants who were entitled to conduct their business

7 pursuant to Canadian law and regulations, and noting that granting the relief sought

8 "would superimpose another—potentially inconsistent—regulatory scheme on the

9 transaction").  By contrast, denial of the injunction would impose little, if any,

10 hardship on Plaintiff.  The temporary restrictions have already been lifted, and

11 even when they were in place Plaintiff was free to execute trades elsewhere.

12 (Swartwout Decl. ¶ 32.)

13 **IV. A TEMPORARY RESTRAINING ORDER IS NOT IN THE PUBLIC**

14   **INTEREST.**

15     The sweeping relief that Plaintiff seeks would do far more harm than

16 good to the public, and the fourth *Winter* factor fails.  *Winter*, 555 U.S. at 20.

17     As described above, preserving Robinhood's discretion to impose

18 trading restrictions on volatile stocks benefits the public by ensuring stability for

19 the millions of Robinhood customers and, by extension, the entire market.  The

20 requested injunction would tie RHF's and RHS's hands from complying with other

21 broker-dealer requirements that help to protect the public interest, such as

22 restricting transactions in situations involving suspected insider trading or money

23 laundering.  Should the Court order the requested relief, RHS could find itself in

24 the position of having to choose between, on the one hand, violating clearinghouse

25 obligations and undermining the regulatory regime designed to protect the public

26 or, on the other, violating this Court's order.  That is not in the public interest.  *See*

27 *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 94

28

200

1    (9th Cir. 2009) (finding that a preliminary injunction conflicted with the public

2    interest where the injunction was inconsistent with gaming regulations).

3            The SEC and FINRA already inspect and regulate broker-dealers.

4    The SEC has stated—*following media attention on Robinhood's actions*—that

5    "broker-dealers may reserve the ability to reject or limit customer transactions."

6    *See* SEC Statement.  These agencies are best positioned to assess whether that

7    discretion should be narrowed in the future.

8    **V.    PLAINTIFF WOULD HAVE TO POST A BOND SUFFICIENT TO**

9    **COVER ALL POTENTIAL HARM TO ROBINHOOD.**

10            Plaintiff argues that he should be required to post only a nominal bond

11   of $1,000 given the supposed absence of any harm to Robinhood.  (Pl.'s Br. at 19.)

12   Plaintiff is wrong on the facts and the law.  Under Federal Rule of Civil Procedure

13   65(c), a "court may issue a preliminary injunction or a temporary restraining order

14   *only* if the movant gives security in an amount that the court considers proper to

15   pay the costs and damages sustained by any party found to have been wrongfully

16   enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added); *see Moroccanoil,*

17   *Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017) (requiring a

18   bond in the amount of $250,000, taking into account the costs the defendant would

19   incur).  Plaintiff would have to post a bond of *at least* $3 billion, the incremental

20   amount originally required by the clearinghouse before the trading restrictions

21   were implemented.  (Swartwout Decl. ¶ 25; Verma Decl. ¶ 12.)  Plaintiff obviously

22   cannot bond such an amount.  The magnitude of such a bond confirms why the

23   balance of hardships tilts so decidedly against an injunction.

24                          <u>CONCLUSION</u>

25            For the foregoing reasons, Defendants respectfully submit that the

26   Application must be denied.

27

28

OPPOSITION TO PLAINTIFF'S EX PARTE                          CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO
                          30

201

1   Dated:  February 8, 2021

2

3

4                                          By:  _/s/ Naeun Rim_____

5                                          Naeun Rim
                                           Grace W. Kang
6                                          BIRD, MARELLA, BOXER, WOLPERT,
7                                          NESSIM, DROOKS, LINCENBERG &
                                           RHOW, P.C.
8                                          1875 Century Park East, 23rd Floor
9                                          Los Angeles, California 90067
                                           Tel: (310) 201-2100
10                                         Fax: (310) 201-2110
11                                         E-mail: nrim@birdmarella.com
                                           E-mail: gkang@birdmarella.com
12
13                                         Antony L. Ryan (*pro hac vice pending*)
14                                         Kevin J. Orsini (*pro hac vice pending*)
                                           CRAVATH, SWAINE & MOORE LLP
15                                         825 Eighth Avenue
16                                         New York, NY 10019
                                           Tel: (212) 474-1000
17                                         Fax: (212) 474-3700
                                           E-mail: aryan@cravath.com
18                                         E-mail: korsini@cravath.com
19
20                                         *Attorneys for Defendants Robinhood*
                                           *Financial LLC, Robinhood Securities, LLC*
21                                         *and Robinhood Markets, Inc.*
22
23
24
25
26
27
28
     OPPOSITION TO PLAINTIFF'S EX PARTE                  CASE NO. 21-cv-00843-VAP-MRW
     APPLICATION FOR A TRO
                                      31

202

1  Antony L. Ryan (*pro hac vice* pending)
       aryan@cravath.com
2  Kevin J. Orsini (*pro hac vice* pending)
       korsini@cravath.com
3  CRAVATH, SWAINE & MOORE LLP
   825 Eighth Avenue
4  New York, New York 10019-7475
   Telephone:  (212) 474-1000
5  Facsimile:  (212) 474-3700

6  Naeun Rim (State Bar No. 263558)
       nrim@birdmarella.com
7  Grace W. Kang (State Bar No. 271260)
       gkang@birdmarella.com
8  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
9  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
10
   *Attorneys for Defendants Robinhood Financial LLC;*
11 *Robinhood Securities, LLC; and Robinhood Markets, Inc.*

12

13              **UNITED STATES DISTRICT COURT**

14             **CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16  LEVI COBOS, an individual on behalf of those similarly situated, | Case No. 21-cv-00843-VAP-MRW |
| 17 | |
| 18  Plaintiff, | [Related Cases 2:21-cv-00835-VAP (MRWx); 2:21-cv-00837-VAP (MRWx)] |
| 19  v. | |
| 20  ROBINHOOD FINANCIAL LLC, a | **DECLARATION OF BRIANNA BAIN** |
| 21  Delaware Corporation; ROBINHOOD SECURITIES, LLC, a Delaware | |
| 22  Corporation; and ROBINHOOD MARKETS, INC., a Delaware | Judge:  Hon. Virginia A. Phillips |
| 23  corporation; and DOES 1 through 1000, inclusive, | Courtroom:  8A |
| 24 | Hearing Date:  February 10, 2021 |
| 25  Defendants. | Hearing Time:  10:00 A.M. |
| 26 | |
| 27 | |
| 28 | |

203

1        I, Brianna Bain, declare as follows:

2        1.    I am the Head of Market Operations at Robinhood Financial LLC

3 ("RHF"). I have been registered at RHF since 2016. In my position, I am

4 responsible for supervising RHF's ability to accept customer orders as well as

5 margin and options operations and supervision. I have personal knowledge of the

6 facts stated in this declaration, except for those matters stated on information and

7 belief, and if called upon to do so, I could and would so testify.

8        2.    I respectfully submit this Declaration in support of Robinhood's

9 Opposition to Plaintiff's Motion for a Temporary Restraining Order.

10        3.    Robinhood Markets, Inc. ("RHM") is a financial services company

11 headquartered in Menlo Park, California. RHM wholly owns RHF, which acts as

12 an introducing broker for its customers by taking their trade orders. RHF is

13 headquartered in Menlo Park, California. RHM also wholly owns Robinhood

14 Securities, LLC ("RHS"), which, as a member of SEC-registered clearinghouses,

15 serves as a clearing broker for RHF. In that capacity, RHS executes customer

16 orders received from RHF by routing them to market-makers and also clears and

17 settles trades for RHF. RHS's headquarters is registered with FINRA and the SEC

18 in Lake Mary, Florida. Throughout this Declaration, I refer to these three entities

19 collectively as "Robinhood."

20        4.    In my capacity as Head of Market Operations at RHF, I supervise a

21 number of our customer-facing functions, including equity and options trading, and

22 margin. Among other responsibilities, I supervise aspects of the customer interface

23 on the RHF platform. I am familiar with how our customer-facing applications are

24 programmed, maintained and updated. I also am involved with reviewing and

25 approving new customer account applicants.

26        5.    I understand that the plaintiff in this case is Levi Cobos. Mr. Cobos is

27 a Robinhood customer. In preparing this declaration, I reviewed Mr. Cobos's

28

204

1  account and application history.  I also confirmed that I approved Mr. Cobos's

2  account when he first applied.

3     **I.**    **Robinhood's Customer Accounts and Agreements.**

4        6.    Prospective customers can open a Robinhood account on the web or

5  by downloading the Robinhood app onto their mobile device.  In both instances,

6  prospective customers provide certain personal information as part of submitting

7  an application.

8        7.    As part of the application process, prospective customers are asked to

9  review and accept a number of agreements, and terms and conditions before their

10  account can be approved and they can begin investing using the Robinhood

11  platform.

12        8.    On October 29, 2020,  Mr. Cobos applied to be a Robinhood

13  customer.  He provided his contact and employment information, verified his

14  identity and described his level of investment experience.  Like other customers

15  who signed up for Robinhood, when he did so, he expressly assented to the

16  following provision:

17           I agree to this Robinhood Financial Brokerage Application
         Agreement (this "Application Agreement").  I also agree
18           to the terms of the RHF-RHS Customer Agreement,
         Robinhood Terms and Conditions, RHF Use and Risk
19           Disclosures, RHF PFO Disclosure, RHF Business
         Continuity Plan Summary, and FINRA Public Disclosure
20           Program, which are incorporated by reference and
         constitute part of this Application Agreement.

21

22        9.    A true and correct screenshot where the above-quoted provision is

23  viewable to prospective customers is attached hereto as **Exhibit A**.

24        10.    The Brokerage Application Agreement incorporated the terms of six

25  other, related agreements:  (i) RHF-RHS Customer Agreement, (ii) Robinhood

26  Terms and Conditions, (iii) RHF Use and Risk Disclosures, (iv) RHF PFO

27  Disclosure, (v) RHF Business Continuity Plan Summary and (vi) FINRA Public

28  Disclosure Program.  Mr. Cobos, like all other prospective customers, was

3

205

1   provided the hyperlinks to each of these agreements to review their terms before

2   joining the Robinhood platform and thereby agreed to the terms and conditions

3   contained in those documents.  A true and correct copy of the Brokerage

4   Application Agreement in effect in October 2020 is attached hereto as **Exhibit B**.

5        11.   Consistent with FINRA Rules, the RHF-RHS Customer Agreement

6   (the "Customer Agreement") includes terms that govern the RHF and RHS

7   contractual relationship with its customers, including the terms on which customer

8   accounts are maintained and trades effectuated, as well as the applicable dispute

9   resolution procedures.  When Mr. Cobos agreed to the Brokerage Application

10  Agreement, he confirmed that he reviewed the Customer Agreement and assented

11  to its terms.  A true and correct copy of the Customer Agreement in effect in

12  October 2020 is attached hereto as **Exhibit C**.  A true and correct copy of the

13  current version of the Customer Agreement is attached hereto as **Exhibit D**.

14       12.   Paragraph 5.F of the Customer Agreement that Mr. Cobos accepted

15  provides that Robinhood "may at any time, in its sole discretion and without prior

16  notice to [the customer], prohibit or restrict [the customer's] ability to trade

17  securities." (Ex. C, ¶ 5.F.)

18       13.   Paragraph 16 of the Customer Agreement that Mr. Cobos accepted

19  provides that "Robinhood may at any time, at its sole discretion and without prior

20  notice to [the customer]:  (i) prohibit or restrict [the customer's] access to the use

21  of the App or the Website or related services and [the customer's] ability to trade,

22  (ii) refuse to accept any of [the customer's] transactions, (iii) refuse to execute any

23  of [the customer's] transactions, or (iv) terminate [the customer's] Account."

24  (Ex. C, ¶ 16.)

25       14.   In the Customer Agreement, Mr. Cobos also agreed that his securities

26  could be sold without notice.  Specifically, the agreement provides that "whenever

27  it is necessary for Robinhood's protection or to satisfy a margin call . . . Robinhood

28  may (but is not required to) sell, assign, deliver all or any part of the securities in

4

206

1   [the customer's] Account, or close any or all transactions in [the customer's]

2   Account."  Furthermore, the customer agrees that "Robinhood may, but is not

3   obligated to, attempt to contact [the customer] before taking any such action."  The

4   customer also agrees that "Robinhood reserves the right to take any such action

5   without prior notice or demand for additional collateral, and free of any right of

6   redemption, and that any prior demand, call or notice will not be considered a

7   waiver of [Robinhood's] right to sell or buy without demand, call or notice."

8   Robinhood "may choose which securities to buy or sell, which transactions to

9   close, and the sequence and timing of liquidation, and may take such actions on

10   whatever exchange or market and in whatever manner (including public auction or

11   private sale) that Robinhood chooses in the exercise of its business judgment."

12   (Ex. C, ¶ 31.)

13       15.   Paragraph 5.A of the Customer Agreement that Mr. Cobos accepted

14   provides that his account is "self-directed" and that "neither Robinhood nor any of

15   its employees, agents, principals, or representatives . . . provide investment advice

16   in connection with this Account."  (Ex. C, ¶ 5.A.)

17       16.   The Robinhood Terms and Conditions (the "Terms and Conditions")

18   govern customers' use of software, products, goods, services, content, tools, and

19   information provided by RHF and RHS.  By submitting his application, Mr. Cobos

20   also agreed to the Terms and Conditions.  A true and correct copy of the version of

21   the Terms and Conditions in effect when Mr. Cobos submitted his application in

22   October 2020 is attached hereto as **Exhibit E**.

23       17.   The first page of the Terms and Conditions defines "[t]he Robinhood

24   website and mobile application" as "the Service."  On the next page, the Terms and

25   Conditions provide, in bold capital letters, that RHF and RHS "will not be liable

26   for any direct, indirect, incidental, special, consequential or exemplary

27   damages . . . resulting from . . . the use of or the inability to use the . . . Service."

28   (Ex. E, at 1-2.)

5

207

1   18.   When Mr. Cobos submitted his application and assented to the various

2   agreements described above, he was advised that those documents might be

3   modified from time to time.  For example, the first page of the Customer

4   Agreement provides in bold capital letters that it may be amended from time to

5   time, with the most up-to-date agreement (if there are any revisions) posted on the

6   Robinhood website.  Mr. Cobos agreed to check for updates to the Customer

7   Agreement, and that by continuing to maintain a brokerage account with

8   Robinhood, to be bound by the Customer Agreement as it might be amended from

9   time to time.  (Ex. C, at 1, ¶ 37.G.)

10   19.   Similarly, the final page of the Terms and Conditions includes a

11   provision titled "Revisions":  "Robinhood may at any time revise these Terms and

12   Conditions by updating this document.  You agree to be bound by subsequent

13   revisions and agree to review these Terms and Conditions periodically for changes.

14   The most updated version of this document will be available for your review under

15   the 'Robinhood Terms and Conditions' link that appears on the Robinhood website

16   and mobile application."  (Ex. E, at 5.)

17   20.   The current versions of the Customer Agreement and Terms and

18   Conditions are readily available on a dedicated page on Robinhood's website,

19   called the Disclosure Library, so that customers are aware of the terms and

20   conditions under which they use Robinhood's trading platform.  A true and correct

21   copy of a screenshot of the relevant page of the Robinhood website is attached

22   hereto as **Exhibit F**.

23   21.   The relevant provisions detailed above form the agreements in effect

24   at the time Mr. Cobos opened his account and have not changed in any of the

25   subsequent versions of those agreements, including the current versions publicly

26   available in Robinhood's Disclosure Library.  (*See* **Exhibits B**, **D** and **E** (true and

27   correct copies of the current versions of the Brokerage Application Agreement, the

28   Customer Agreement and the Terms and Conditions).)

6

208

**II.    Mr. Cobos' Call Option Contract.**

22.    I understand that Mr. Cobos claims to have purchased a call option for BlackBerry, Ltd. ("BlackBerry" or "BB") stock with a strike price of $24.00 and an expiration date of January 29, 2021. (*See* Declaration of Cobos ¶ 5 (Dkt. No. 9-0 ("Cobos Decl.").) I have reviewed his account and option contract and confirmed both the strike price and expiration date.

23.    I also understand that Mr. Cobos claims to have attempted to exercise his BB call option on January 28, 2021, and was unable to do so.  (Cobos Decl. ¶ 7.)

24.    My review of the options contract and publicly available stock prices indicates that from January 28, 2021, through the January 29, 2021, expiration date, Mr. Cobos' call option was never in the money.  At all times on January 28 and January 29, 2021, BB traded below the $24.00 strike price, and was therefore out of the money ("OTM") at the January 29, 2021 expiration date.  Had Mr. Cobos exercised his call option as he claims he tried to do, he would have immediately suffered a loss.

25.    Robinhood had a practice (predating the purchase restrictions for certain securities implemented on January 28, 2021) of not permitting the in-app or online exercise of OTM options.  This practice protects Robinhood customers from a money-losing exercise of OTM options.  As a result, Mr. Cobos was unable to exercise his OTM BB call option on the Robinhood app or online on either January 28 or 29.  He could have sold his options contract during this time.

26.    If an option is in the money as it nears expiration, Robinhood takes proactive steps to ensure that customers do not miss out on available profits.  Thus, Robinhood will typically exercise an ITM option so long as the customer's account has the required buying power (*i.e.*, available cash on hand) to do so.  If a customer lacks the buying power to exercise the option, Robinhood will typically attempt to sell the ITM option in the market shortly before expiration, if it has not received

7

209

1    contrary instructions from the customer.  Robinhood followed this practice with

2    respect to open options contracts for BlackBerry stock that expired on January 29,

3    2021.  As a result, any BlackBerry option contracts that were ITM and set to expire

4    were exercised or sold on behalf of the customer, and any BlackBerry option

5    contracts that were OTM and expired on that date were allowed to expire by their

6    own terms.

7    **III.    Updates to the Robinhood Trading Platform.**

8           27.    Many of Robinhood's customers access the Robinhood platform by

9    downloading the Robinhood mobile app to their smartphone or other mobile

10   device.  In addition to the website, the app is available on the Google Android and

11   Apple iOS operating systems.  Once a customer has downloaded the Robinhood

12   app and Robinhood has approved the  account, he or she can use the mobile app to,

13   among other things, deposit funds, make trades and read investment news.

14          28.    While the customer experiences the features of the Robinhood

15   platform through the app on his or her mobile device or via the web, much of the

16   functionality of the Robinhood platform is supported by Robinhood servers, which

17   customer devices access remotely.  These servers house the software that runs

18   trading functions that the customer experiences through the app or the web-based

19   interface.

20          29.    In the ordinary course of business, Robinhood makes changes from

21   time to time to the software and databases on its servers that run the Robinhood

22   platform.  These changes are effectuated entirely on Robinhood's servers, and not

23   on the customer's mobile device or computer.  These changes do not involve any

24   transmission of any program or code to the customer's mobile device or computer,

25   nor do they alter the customer's mobile device or computer.  In other instances,

26   RHF may update the Robinhood app itself, and customers must download the

27   update.

28

8

210

1    30.    On Thursday, January 28, 2021, in response to unprecedented market

2  volatility and trading volume in certain stocks, Robinhood designated certain

3  volatile stocks "position closing only," meaning that customers could not purchase

4  additional shares in those stocks, but were permitted to sell their positions or

5  exercise ITM options.  Customers were advised of these limited designations

6  through Robinhood's public website.

7    31.    In enacting these temporary measures, Robinhood made changes

8  solely to the software and/or databases on its own servers.  Robinhood did not

9  transmit any program or code to any customer's mobile device or computer.  The

10  changes were performed entirely on Robinhood's servers.  They did not involve

11  updates to the Robinhood app itself.

12    32.    After market close on Thursday, January 28, 2021, Robinhood took

13  steps to ease the restrictions.  Rather than marking the relevant tickers "position

14  closing only," Robinhood set a maximum number of shares or options contracts for

15  each customer on a security-by-security basis, thereby permitting certain limited

16  buying in the impacted securities.  In the following days, Robinhood modified the

17  restrictions a number of times as necessary to respond to developing market

18  conditions.

19    33.    Once again, in enacting and revising these temporary measures,

20  Robinhood made changes solely to the software and/or databases on its own

21  servers.  Robinhood did not transmit any program or code to any customer's

22  mobile device or computer.  The changes were performed entirely on Robinhood's

23  servers.

24    34.    As of February 5, 2021, Robinhood no longer has any maximum share

25  restrictions on a security-by-security basis.

26

27

28

9

211

DocuSign Envelope ID: 8B4DBA26-0A5E-4392-BA6C-6AA5F004B505

1    **IV.    Robinhood Did Not Hold Any Short Positions in the Relevant Stocks**

2    **On Its Own Account.**

3        35.    As of January 27, 2021 and through the present, RHF did not hold,

4    and has not held, short positions in GameStop Corp., AMC Entertainment

5    Holdings, Inc. or BlackBerry.  Nor did Robinhood customers hold short positions

6    in any of those securities through Robinhood, as the Robinhood app and website

7    do not permit short selling.

8        I declare under penalty of perjury that the foregoing is true and correct.

9        Executed February 8, 2021, at Menlo Park, California.

10

11                                        *Brianna Bain*

12                                        Brianna Bain

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

212

# EXHIBIT A

213



214

# EXHIBIT B

215

**Robinhood Financial LLC**

**Form CRS Relationship Summary Effective June 30, 2020**

**1. Introduction**

Robinhood Financial LLC ("Robinhood Financial", "we," "our," or "us") is registered with the Securities and Exchange Commission as a broker-dealer. Brokerage and investment advisory services and fees differ; and it is important that you understand these differences. Free and simple tools are available for you to research firms and financial professionals at Investor.gov/CRS, which also provides educational materials about broker-dealers, investment advisers, and investing.

**2. What investment services and advice can you provide me?**

Robinhood Financial offers brokerage services to retail investors. Our services involve effecting securities transactions for investors exclusively online. We buy and sell securities only at your direction and we do not offer recommendations of securities, strategies involving securities or securities accounts to you. We do not monitor your account or individual investments, unless we state otherwise in writing. We do not have any account minimums. We offer access to investment tools and education to help you make investment decisions, but this information is for informational and educational purposes only  Robinhood Financial is an introducing broker dealer  Your funds and securities will be custodied by our affiliate, Robinhood Securities, LLC ("Robinhood Securities" and together with Robinhood Financial, "Robinhood"), which services your account by executing, clearing and settling your trades; preparing and distributing your account statements and trade confirmations; and extending credit to margin accounts  We offer NYSE  and NASDAQ listed stocks, exchange traded funds ("ETFs"), options and American depositary receipts ("ADRs"), as well as certain stocks and ADRs traded in over-the-counter markets. We also offer fractional shares in many of the same stocks, ETFs, and ADRs. We do not offer proprietary products or limit our platform to products that pay us revenue sharing or other compensation

**For more information about our products and services,** please visit our website at https://robinhood.com/us/en/about/.

**Conversation starters:** Given my financial situation, should I choose a brokerage service? Why or why not? How will you choose investments to recommend to me? What is your relevant experience, including your licenses, education and other qualifications? What do these qualifications mean? Responses to these questions can be found at: https://rbnhd.co/crs-rs.

**3. What fees will I pay?**

Robinhood does not charge fees or commissions for executing buy and sell orders  Other fees will apply. The primary fees you should expect to pay us include:

**Robinhood Gold Fees:** Robinhood charges a monthly fee for access to premium features such as bigger instant deposits, professional research from Morningstar, and Level II NASDAQ market data, as disclosed in the Robinhood Fee Schedule

14
EXHIBIT B

216

**Margin Interest:** Robinhood Securities charges a percentage on funds you borrow to purchase securities in a margin account.

**You will pay fees and costs whether you make or lose money on your investments. Fees and costs will reduce any amount of money you make on your investments over time. Please make sure you understand what fees and costs you are paying.**

**For more information about fees and costs,** please refer to the Robinhood Fee Schedule on the Robinhood mobile application ("App") and website. Fees may change without notice and any changes will be reflected in the Robinhood Fee Schedule.

**Conversation starters:** Help me understand how these fees and costs might affect my investments. If I give you $10,000 to invest, how much will go to fees and costs, and how much will be invested for me? Responses to these questions can be found at: https://rbnhd.co/crs-rs.

**What are your legal obligations to me when providing recommendations? How else does your firm make money and what conflicts of interest do you have?**

We **do not** provide recommendations. The way we make money may create some conflicts with your interests. You should understand and ask us about these conflicts because they can affect the services we provide you. Here are some examples to help you understand what this means:

**Cash Management - Cash Sweeps** Each bank that participates in the Robinhood cash management program (called the "Sweep Service") that receives sweeps of your cash awaiting investment in securities into deposit accounts ("Program Bank") pays a fee to Robinhood equal to a certain percentage of the daily deposit balance of your cash deposited at the Program Bank. These fees may vary depending on the Program Bank. This creates an incentive for us to use Program Banks that pay greater compensation to us however, all Program Banks pay the same interest rates to all customers. The interest rates on your funds deposited at a Program Bank will be determined by the amount the Program Banks are willing to pay minus the fees paid to Robinhood. The interest rates paid by a Program Bank may be higher or lower than the interest rates available to depositors making deposits directly with a Program Bank or other depository institution in comparable accounts. Over time, the interest rates provided by Program Banks may be lower than the rate of return available through other investment options or deposit products that are not FDIC insured.

For more information about the Sweep Service, please refer to the Insured Network Deposit Sweep Program Disclosures available in the Robinhood Disclosure Library. Specific information about your deposit accounts may be found on the Robinhood website, App, or by e-mailing help@robinhood.com or visiting https://robinhood.com/contact.

**Examples of other Revenue Robinhood Receives:** • Interest on uninvested cash deposited in interest-bearing bank accounts outside the Sweep Service. • Stock loan income from lending the stocks you purchase on margin. • Interchange fees from purchases made by you with the Sweep Service debit card. • Rebates from market centers to which we route customer orders.

**Conversation starters:** How might your conflicts of interest affect me, and how will you address them? Our response to this question can be found at: https://rbnhd.co/crs-rs.

**For more information about conflicts of interest,** please visit the Robinhood Disclosure Library.

EXHIBIT B

217

**How do your financial professionals make money?** Robinhood Financial professionals do not receive commissions or other compensation related to client assets or clients' investment activities. Robinhood Financial professionals receive salaries and bonuses that are based on their overall job responsibilities and performance.

**4. Do you or your financial professionals have legal or disciplinary history?**

Yes. Visit Investor.gov/CRS for a free and simple search tool to research Robinhood and Robinhood financial professionals.

**Conversation starters:** As a financial professional, do you have any disciplinary history? For what type of conduct? Our responses to these questions are found on our website: https://rbnhd.co/crs-rs.

**5. For more information about our services or financial professionals** or to request an up-to-date version of this Form and our Written Responses, please email help@robinhood.com or visit https://robinhood.com/contact.

**Conversation starters:** Who is my primary contact person? Is he or she a representative of an investment adviser or a broker-dealer? Who can I talk to if I have concerns about how this person is treating me? Our responses to these questions can be found at: https://rbnhd.co/crs-rs.

## Brokerage Application Agreement

By tapping or clicking the "Submit Application" button, I agree to this Robinhood Financial Brokerage Application Agreement (this "Application Agreement"). I also agree to the terms of the RHF-RHS Customer Agreement, Robinhood Terms and Conditions, RHF Use and Risk Disclosures, RHF PFO Disclosure, RHF Business Continuity Plan Summary, and FINRA Public Disclosure Program, which are incorporated by reference and constitute part of this Application Agreement.

In addition, I may, in the future, receive from You supplemental disclosures, terms, and agreements that pertain to certain account types, features, or services. References to this Application Agreement include such supplemental disclosures, terms, and agreements. Capitalized, undefined terms in this Application Agreement have the meaning given in the Robinhood Financial Customer Agreement. I agree to read this Application Agreement and all incorporated disclosures, terms, and agreements carefully and retain copies for My records.

**MY WARRANTIES AND REPRESENTATIONS**

**I represent and warrant that:**

1. This brokerage account is not maintained by a current or former Politically Exposed Person or Public Official (includes U.S. and Foreign Individuals).

2. This brokerage account is not maintained by a Foreign Financial Institution as defined by Title 30 of the Code of Federal Regulations.

3. This brokerage account is not a Foreign Bank organized under foreign law and located outside of the United States as defined by Title 31 of the Code of Federal Regulations.

218

4. I have carefully reviewed, understand and agree to the terms and provisions of the following: RHF-RHS Financial Customer Agreement, Robinhood Terms and Conditions, RHF Use and Risk Disclosures, RHF PFO Disclosure, RHF Business Continuity Plan Summary, and FINRA Public Disclosure Program.

5. I consent to receive all future brokerage account information electronically.

6. Tapping or clicking the "Submit Application" button is equivalent to My written signature, and I understand that I am entering into legal agreements.

7. I HAVE READ THE RHF-RHS CUSTOMER ACCOUNT AGREEMENT WHICH CONTAINS A PREDISPUTE ARBITRATION CLAUSE (SECTION 28 ON PAGES 20 AND 21) AND AGREE IN ADVANCE TO ARBITRATE ANY CONTROVERSIES WHICH MAY ARISE BETWEEN OR AMONG ME, YOU, AND/OR ROBINHOOD SECURITIES IN ACCORDANCE WITH SUCH SECTION 28.

8. ALL OF THE INFORMATION I HAVE PROVIDED IN THIS APPLICATION IS ACCURATE. You can rely on it and are authorized to verify this information.

9. I AGREE TO NOTIFY YOU PROMPTLY REGARDING ANY CHANGE IN THE INFORMATION PROVIDED ON THIS APPLICATION.

**RULE 14b-1(c)**

I acknowledge that Rule 14b-1(c) of the Securities Exchange Act, unless I object, requires You to disclose to an issuer, upon its request, the names, addresses, and securities positions of Your customers who are beneficial owners of the issuer's securities held by You in nominee name. The issuer would be permitted to use My name and other related information for corporation communication only. If I object, I will send an email to support@robinhood.com with "Rule 14b-1(c) objection" in the subject.

**TAXES**

Under penalties of perjury, I certify that: (1) the number provided with this application is My correct taxpayer identification number (or I am waiting for a number to be issued to Me), and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified Me that I am no longer subject to backup withholding, and (3) I am a U.S. citizen or other U.S. person (defined below).

If I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on My tax return, I will send an email to support@robinhood.com with "Backup Withholding" in the title.

Definition of a U.S. person. For federal tax return purposes, I am considered a U.S. person if I am: An individual who is a U.S. citizen or U.S. resident alien, a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, an estate (other than a foreign estate), or a domestic trust (as defined in Regulations section 301.7701-7).

219

The Internal Revenue Service does not require My consent to any provisions of this document other than the certifications required to avoid backup withholding.

**MY AUTHORIZATION AND MY AGREEMENT**

I authorize You and/or RHS to obtain a consumer report at the time of application to verify My creditworthiness and to obtain a consumer report from time to time for updates, renewals, extensions, and collection activity on any approved brokerage account. Upon My written request, You and/or RHS will disclose to Me whether it obtained a report, and if so, the name and address of the consumer-reporting agency that provided it. In the event that My brokerage account is denied by RHS as a result of the consumer report verification, I authorize RHS to provide to You the reason(s) for such denial.

**MARKET DATA**

Robinhood Financial may choose to make certain market data available to you pursuant to the terms and conditions set forth in this Agreement. By executing this Agreement, I agree to comply with those terms and conditions.

**Definitions**

1. "Market Data" means (a) last sale information and quotation information relating to securities that are admitted to dealings on the New York Stock Exchange ("NYSE"), (b) such bond and other equity last sale and quotation information, and such index and other market information, as United States-registered national securities exchanges and national securities associations (each, an "Authorizing SRO") may make available and as the NYSE may from time to time designate as "Market Data"; and (c) all information that derives from any such information.

2. "Nonprofessional" means any natural person who receives market data solely for his/her personal, non- business use and who is not a "Professional." A "Professional" includes an individual who, if working in the United States, is: (i) registered or qualified with the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), any state securities agency, any securities exchange or association, or any commodities or futures contract market or association; (ii) engaged as an "investment advisor" as that term is defined in Section 202 (a) (11) of the Investment Advisers Act of 1940 (whether or not registered or qualified under that Act), or (iii) employed by a bank or other organization exempt from registration under federal and/or state securities laws to perform functions that would require him or her to be so registered or qualified if he or she were to perform such functions for an organization not so exempt. A person who works outside of the United States will be considered a "Professional" if he or she performs the same functions as someone who would be considered a "Professional" in the United States.

**Provisions Applicable to All customers**

1. *Proprietary Nature of Data.* I understand and acknowledge that each Authorizing SRO and Other Data Disseminator (as defined below) has a proprietary interest in the Market Data that originates on or derives from it or its market(s). I agree not to reproduce, distribute, sell or commercially exploit the Market Data in any manner.

18
EXHIBIT B

220

2. *Enforcement*. I understand and acknowledge that (a) the Authorizing SROs are third-party beneficiaries under this Agreement and (b) the Authorizing SROs or their authorized representative(s) may enforce this Agreement, by legal proceedings or otherwise, against Me or any person that obtains Market Data that is made available pursuant to this Agreement other than as this Agreement contemplates.

3. *Data Not Guaranteed*. I understand that neither You nor any Authorizing SRO, other entity whose information is made available over the Authorizing SROs' facilities (an "Other Data Disseminator"), or information processor that assists any Authorizing SRO or Other Data Disseminator in making Market Data available (collectively, the "Disseminating Parties") guarantees the timeliness, sequence, accuracy, completeness, reliability, or content of Market Data or of other market information or messages disseminated to or by any Disseminating Party. I understand that neither Robinhood Financial nor any Disseminating Party guarantees the timeliness, sequence, accuracy, completeness, reliability or content of market information, or messages disseminated to or by any party. I understand that neither Robinhood Financial nor any Disseminating Party warrants that the service provided by any such entity will be uninterrupted or error-free. I further understand that Market Data by Xignite provides market data to Robinhood Financial customers. NEITHER ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, NOR ANY DISSEMINATING PARTY SHALL BE LIABLE IN ANY WAY FOR (A) ANY INACCURACY, ERROR OR DELAY IN, OR OMISSION OF, (I) ANY MARKET DATA, INFORMATION OR MESSAGE, OR (II) THE TRANSMISSION OR DELIVERY OF ANY SUCH DATA, INFORMATION OR MESSAGE; OR (B) ANY LOSS (AS DEFINED IN THIS AGREEMENT) OR DAMAGE ARISING FROM OR OCCASIONED BY (I) ANY SUCH INACCURACY, ERROR, DELAY OR OMISSION, (II) NON-PERFORMANCE OR III) INTERRUPTION IN ANY SUCH MARKET DATA, INFORMATION, OR MESSAGE, WHETHER DUE TO ANY ACT OR OMISSION BY ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, OR ANY DISSEMINATING PARTY, OR TO ANY "FORCE MAJEURE" (E.G., FLOOD, EXTRAORDINARY WEATHER CONDITIONS, EARTHQUAKE OR OTHER ACT OF GOD, FIRE, WAR, INSURRECTION, RIOT, LABOR DISPUTE, ACCIDENT, ACTION OF GOVERNMENT, OR COMMUNICATIONS OR POWER FAILURE, EQUIPMENT OR SOFTWARE MALFUNCTION) OR ANY OTHER CAUSE BEYOND THE REASONABLE CONTROL OF ROBINHOOD FINANCIAL, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS AND EMPLOYEES, OR ANY DISSEMINATING PARTY.

4. *Permitted Use*. I shall not furnish Market Data to any other person or entity. If I receive Market Data other than as a Nonprofessional, I shall use Market Data only for My individual use.

5. *Dissemination, Discontinuance, or Modification*. I understand and acknowledge that, at any time, the Authorizing SROs may discontinue disseminating any category of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages that may arise therefrom.

6. *Duration; Survival*. This Section of this Application Agreement remains in effect for so long as I have the ability to receive Market Data as contemplated by this Section. In addition, Sections

221

2(B)(1)-(3) and the first two sentences of Section 2(B)(7), survive any termination of this Application Agreement.

7. *Miscellaneous.* The laws of the State of New York shall govern this Section 2 and it shall be interpreted in accordance with those laws. This subsection is subject to the Securities Exchange Act of 1934, the rules promulgated under that act, and the joint-industry plans entered into pursuant to that act.

**Provisions Applicable to Nonprofessionals**

1. *Permitted Receipt.* I understand that I may not receive Market Data from You as a Nonprofessional, and You may not provide Market Data to Me as a Nonprofessional, unless You first properly determine that I qualify as a Nonprofessional as defined above and I in fact qualify as a Nonprofessional. I agree that, as a prerequisite to Robinhood Financial qualifying Me as a Nonprofessional, I will provide to You truthful and accurate information about Me, such as: my occupation, employer, employment position and functions; my use of Market Data; my registration status with any securities agency, exchange, association, or regulatory body, or any commodities or future contract market, association, or regulatory body, whether in the United States or elsewhere; and any compensation of any kind I may receive from any individual or entity for my trading activities, asset management, or investment advice. Except as otherwise declared to You in writing, by tapping or clicking the "Submit Application" button, I certify that I meet the definition of Nonprofessional as set forth in this Application Agreement.

2. *Permitted Use.* If I am a Nonprofessional, I agree to receive Market Data solely for my personal, non-business use.

3. *Notification.* I shall notify You promptly in writing of any change in my circumstances that may cause Me to cease to qualify as a Nonprofessional.

**Extended Hours Trading Disclosure**

You should consider the following points before engaging in extended hours trading. "Extended hours trading" means trading outside of "regular trading hours." "Regular trading hours" generally means the time between 9:30 a.m. and 4:00 p.m. Eastern Standard Time.

*Risk of Lower Liquidity.* Liquidity refers to the ability of market participants to buy and sell securities. Generally, the more orders that are available in a market, the greater the liquidity. Liquidity is important because with greater liquidity it is easier for investors to buy or sell securities, and as a result, investors are more likely to pay or receive a competitive price for securities purchased or sold. There may be lower liquidity in extended hours trading as compared to regular trading hours. As a result, Your order may only be partially executed, or not at all.

*Risk of Higher Volatility.* Volatility refers to the changes in price that securities undergo when trading. Generally, the higher the volatility of a security, the greater its price swings. There may be greater volatility in extended hours trading than in regular trading hours. As a result, Your order may only be partially executed, or not at all, or You may receive an inferior price when engaging in extended hours trading than You would during regular trading hours.

222

*Risk of Changing Prices.* The prices of securities traded in extended hours trading may not reflect the prices either at the end of regular trading hours, or upon the opening the next morning. As a result, You may receive an inferior price when engaging in extended hours trading than You would during regular trading hours.

*Risk of Unlinked Markets.* Depending on the extended hours trading system or the time of day, the prices displayed on a particular extended hours trading system may not reflect the prices in other concurrently operating extended hours trading systems dealing in the same securities. Accordingly, You may receive an inferior price in one extended hours trading system than You would in another extended hours trading system.

*Risk of News Announcements.* Normally, issuers make news announcements that may affect the price of their securities after regular trading hours. Similarly, important financial information is frequently announced outside of regular trading hours. In extended hours trading, these announcements may occur during trading, and if combined with lower liquidity and higher volatility, may cause an exaggerated and unsustainable effect on the price of a security.

*Risk of Wider Spreads.* The spread refers to the difference in price between for what price You can buy a security and at what price You can sell it. Lower liquidity and higher volatility in extended hours trading may result in wider than normal spreads for a particular security.

Extended Hours Trading Order Types and Expiration Settings.You may place only unconditional limit orders and typical Robinhood Financial Market Orders.

1. *Limit Orders.* GFD Limit Orders placed during the Day session will expire at the close of the afterHours session for that day, if not executed. "GFD" may also be substituted with an exact time for additional clarification, ex: "This order will automatically expire at 6pm ET if not executed or canceled by You.". GTC Limit Order placed during any session will stand through all sessions until executed or canceled. Any Limit order placed while all sessions are closed will be queued for the opening of the next session.
2. *Market Orders.* All Robinhood Financial Market Orders are technically limit orders with a 5% collar, although during the extended hours trading, these types of orders will be available for only a select list of securities as determined by Robinhood Financial and based on extended hours trading spreads. Orders in securities that do not fit into this category will be effected only as traditional Limit Orders, in which case You will not be shown an option to place a Market Order. Any Market Order placed while all sessions are closed will be queued for the opening of the next session.

BY TAPPING OR CLICKING ON THE "SUBMIT APPLICATION" BUTTON, I: (1) ACKNOWLEDGE THAT I HAVE RECEIVED THE FORM CRS RELATIONSHIP SUMMARY, AND (2) AGREE TO THIS APPLICATION AGREEMENT.

Robinhood Instant Agreement

This Robinhood Instant Agreement (the "Instant Agreement") sets forth the terms and conditions for a Robinhood Financial LLC ("Robinhood Financial") customer ("I"), to open the type of margin account described herein as "Robinhood Instant."

223

Robinhood Instant is a service offering margin accounts that allow customers to trade using unsettled funds up to the amount in their Robinhood Instant account. Robinhood Instant requires a minimum deposit of $2,000 or 100 percent of the purchase price—whichever is less—in the account before purchasing a security.

By tapping or clicking the "SUBMIT APPLICATION" button below, I: (1) acknowledge that I have carefully read and agree to this Instant Agreement and all incorporated disclosures, terms, and agreements, and retained copies for my records; (2) authorize Robinhood Financial to accept instructions to allow for trading no more than the amount held in my Robinhood Instant account; (3) agree to open, or convert my Robinhood Financial account into, a Robinhood Instant account under all of the aforementioned terms and conditions; and (4) also agree to the terms of the RHF Margin Agreement.

I understand that I have the option to borrow funds in my Robinhood Instant account, provided I meet the necessary requirements and receive the approval of Robinhood Financial. I acknowledge that I have read and that it is important that I fully understand the risks involved in trading securities on margin as described in the Margin Disclosure Statement.

Robinhood Financial will monitor trading activities in Robinhood Instant accounts and alert those customers at risk of qualifying as "pattern day traders." A pattern day trader, as defined under FINRA Rule 4210(f)(8)(B), is any customer who executes four or more day trades within five business days, provided the number of day trades is more than six percent of the total trades in the account during that period. All Robinhood Instant accounts designated as a pattern day trading accounts will be required to maintain $25,000 equity at all times in order to continue day trading. I acknowledge it is important that I fully understand the risks involved in day trading securities, as described in the Day Trading Risk Disclosure.

I understand that this Instant Agreement is not a recommendation to make a specific investment or use any specific investment strategy. Robinhood Financial provides no investment, legal or tax advice. Robinhood Instant is not necessarily suitable for everyone. I agree to examine my investment objectives, financial resources and risk tolerance to determine whether Robinhood Instant meets my investment needs.

By using a Robinhood Instant account, I acknowledge that I remain subject to all other terms and conditions provided in the RHF-RHS Customer Account Agreement, RHS Customer Margin and Short Account Agreement, Margin Disclosure Statement, and Day Trading Risk Disclosure, which are incorporated by reference and constitute part of this Instant Agreement. In addition, I acknowledge that, in the future, I may receive supplemental disclosures, terms, and agreements that pertain to certain account types, features, or services.

BY TAPPING OR CLICKING ON THE "SUBMIT APPLICATION" OR "ACCEPT" BUTTON BELOW, I: (1) ACKNOWLEDGE THAT I HAVE READ THIS INSTANT AGREEMENT AND ALL INCORPORATED DISCLOSURES, TERMS, AND AGREEMENTS CAREFULLY, AND RETAINED COPIES FOR MY RECORDS; (2) AUTHORIZE ROBINHOOD FINANCIAL TO ACCEPT INSTRUCTIONS TO ALLOW FOR TRADING NO MORE THAN THE AMOUNT HELD IN MY ROBINHOOD INSTANT ACCOUNT; AND (3) AGREE TO OPEN, OR CONVERT MY ROBINHOOD FINANCIAL ACCOUNT INTO, A ROBINHOOD INSTANT ACCOUNT UNDER ALL OF THE AFOREMENTIONED TERMS AND CONDITIONS.

22
EXHIBIT B