Speech

# "Market Structure and the Retail Investor:" Remarks Before the Piper Sandler Global Exchange Conference

Chair Gary Gensler

**Washington D.C.**

**June 8, 2022**

Thank you, Rich (Repetto), for that kind introduction. It is good to be with you again. As is customary, I'd like to note my views are my own, and I'm not speaking on behalf of my fellow Commissioners or the SEC staff.

Rich, at last year's conference, you and I spoke about how technology has transformed and continues to transform our equity markets.[1]

This has led to some good things. For example, retail investors have greater access to markets than any time in the past.

This technological transformation, though, also has led to challenges, including market segmentation, concentration, and potential inefficiencies.

Right now, there isn't a level playing field among different parts of the market: wholesalers, dark pools, and lit exchanges. Further, the markets have become increasingly hidden from view. In 2009, off-exchange trading accounted for a quarter of U.S. equity volume. Last year, during the meme stock events, that share swelled to a peak of 47 percent.[2] What's more, 90-plus percent of retail marketable orders are routed to a small, concentrated group of wholesalers that pay for this retail market order flow.[3]

It's not clear, with such market segmentation and concentration, and with an uneven playing field, that our current national market system is as fair and competitive as possible for investors.

In a recent report about last year's meme stock events, the SEC staff described four areas to consider in the interest of promoting our three-part mission in the equity markets overall. To date, the Commission has released proposals regarding two of those items: shortening the settlement cycle and enhancing short sale disclosures.[4] We also issued a request for comment on digital engagement practices.[5]

Today, I'd like to focus on the other item staff raised: "Trading in dark pools and through wholesalers."[6]

We haven't updated key aspects of our national market system rules, particularly related to order handling and execution, since 2005. Thus, last year I asked staff to take a holistic, cross-market view of how we could update our rules and drive greater efficiencies in our equity markets, particularly for retail investors. Today, I'd like to discuss that work across six areas:

- Minimum Pricing Increment
- National Best Bid and Offer
- Disclosure of Order Execution Quality
- Best Execution
- Order-by-Order Competition
- Payment for Order Flow, Exchange Rebates, and Related Access Fees

## Minimum Pricing Increment

First, I'd like to discuss the minimum increments at which securities are priced — what's called the tick size.

Today, we lack a level playing field amongst the different trading venues. There are many disparities, but one in particular I'd like to focus on is the tick size.

In lit markets, investors see prices in one-penny increments. Wholesalers, though, can fill orders at sub-penny prices and without open competition.

More than half of the share volume in the first five months of this year was in stocks constrained by tick size.[7] In contrast, sub-penny trading, including at a tenth of a penny, accounts for 37 percent of share volume executed off-exchange.[8]

Given this activity, I wonder why lit markets should have that one-penny constraint. It raises real questions about whether this structure is fair and best promotes competition. Why not allow all venues to have an equal opportunity to execute at sub-penny increments?

Therefore, I've asked staff to make recommendations for the Commission's consideration around leveling the playing field with respect to two facets of tick size. These include, first, possibly harmonizing the tick size across different market centers — such that all trading occurs in the minimum increment; second, given the sheer volume of off-exchange sub-penny trading, as well as what is currently allowed in exchanges' retail liquidity programs, possibly shrinking the minimum tick size to better align with off-exchange activity.

## National Best Bid and Offer

Next, I'd like to discuss the National Best Bid and Offer (NBBO).

The NBBO is a quote designed to aggregate information across different exchanges. It provides investors important pre-trade transparency. Those shares are subject to the Order Protection Rule.

I've asked staff to consider three issues related to the NBBO. The question is, what is included or excluded from the NBBO?

First, the NBBO currently includes only what's called round lots, which are quotes for 100 shares or more.

That seems to leave some critical gaps. Staff calculations using trade and quote data found that odd lots increased from around 15 percent of trades in January 2014 to more than 55 percent of trades in March 2022.[9]

Retail investors — the very investors who are more likely to buy or sell at odd lot prices — are unable to see these prices.

In 2020, the Commission adopted a Market Infrastructure Rule, which was recently upheld in court. This rule created a new round lot definition, which, depending upon share price, can be anywhere between 100 shared and 1 share. It also added odd-lot information to core market data.[10]

Under the transition schedule, the implementation of the new round lots could be several years away. Therefore, I've asked staff to consider whether we could accelerate implementation of the new round lot definition.

The Infrastructure Rule also enhanced transparency for quotation information with the remaining odd lots. I also asked staff to consider whether to accelerate implementation of this piece of the Infrastructure Rule as well. Together, I believe accelerating these timelines would allow retail investors to see better prices sooner.

Third, I also have asked staff to consider whether there should be an odd-lot best bid and offer so that investors would know the best price available in the market regardless of share quantity.

## Disclosure of Order Execution Quality

Next, I'd like to turn to how we might enhance retail investors' ability to compare execution quality by their brokers.

Today, retail investors cannot compare execution across brokers, such as how much price improvement they provide to their clients. That's because only "market centers," such as dark pools, wholesalers, and exchanges, are required to provide these disclosures on monthly Rule 605 reports. Moreover, this rule hasn't been substantively updated since 2000.[11]

Thus, I've asked staff to make recommendations for the Commission's consideration around how we might update Rule 605 so that investors receive more useful disclosure about order execution quality. This could include mandating that broker-dealers, along with market centers, file monthly Rule 605 reports.

Further, I've asked staff to make recommendations considering whether to require that all reporters provide summary statistics of execution quality, such as the price improvement as a percentage of the spread.

## Best Execution

Fourth, I'd like to turn to best execution.

Right now, while the Financial Industry Regulatory Authority (FINRA) and the Municipal Securities Rulemaking Board (MSRB) have rules on best execution, the SEC does not.[12] These FINRA and MSRB rules require broker-dealers to exercise reasonable diligence to execute customer orders in the best market so that their customers receive the most favorable prices under prevailing market conditions.

I think investors might benefit if the SEC considered proposing its own best execution rule. In addition, broker-dealers and investors might benefit from more detail around the procedural standards brokers must meet when handling and executing customer orders.

Therefore, I've asked staff to consider recommending that the SEC propose its own best execution rule — for equities and other securities.

## Order-by-Order Competition

Next, I'd like to talk about how to best promote as much competition as possible for retail investors on an order-by-order basis.

Competition promotes efficiencies where economic rents, or excess profits above market competition, might otherwise accrue.

As I mentioned, the vast majority of retail marketable orders are flowing to wholesalers that pay for this order flow.[13] What's more, this segmentation means that institutional investors, such as pension funds, don't get to interact directly with that order flow. This segmentation—which isolates retail orders—may not benefit the retail public as much as orders being exposed to order-by-order competition.

Some suggest that this segmentation, with such isolation, allows retail investors to receive slightly better prices compared to the NBBO. Price improvement without competition, though, isn't necessarily the best price improvement. Wholesalers may be saving more than they're passing along to investors in terms of price improvement.[14]

Further, as I previously discussed, the current NBBO has gaps and may not represent a level playing field. As a result, it may not be a precise measuring rod for assessing whether retail investors are receiving fully competitive prices.

Thus, I've asked staff to make recommendations for the Commission's consideration around how to enhance order-by-order competition. This may be through open and transparent auctions or other means, unless investors get midpoint or better prices.

The listed options exchanges have operated auctions for retail orders for many years. I've asked staff, in considering any recommendations for stock auctions, to draw upon lessons from the options market, focusing on assuring full competition among all market participants to provide the best prices for retail investors.

## Payment for Order Flow, Exchange Rebates, and Related Access Fees

Last, let me turn to the topics of payment for order flow, exchange rebates, and related access fees.

Payment for order flow can raise real issues around conflicts of interest. As described in the Commission's settled enforcement action against Robinhood in 2020, payment for order flow can distort routing decisions. Certain principal trading firms seeking to attract Robinhood's order flow told them that there was a tradeoff between payment for order flow and price improvement for customers.[15]

As the staff wrote in the GameStop report, payment for order flow may incentivize broker-dealers to use digital engagement practices, such as gamification, to increase customer trading.[16]

The European Union is actively considering banning payment for order flow,[17] potentially joining regulators in the United Kingdom, Canada, and Australia.

Exchange rebates also may present conflicts.

Exchanges give rebates to traders. High-volume traders benefit more from these arrangements, and retail investors don't directly benefit from those rebates. Just as payment for order flow presents a conflict of interest in the routing of marketable retail orders, exchange rebates may present a similar conflict in the routing of customer limit orders.

Therefore, I've asked staff to make recommendations around how we can mitigate conflicts with respect to payment for order flow and rebates.

One thing I've asked them to consider is whether exchange fees — what somebody pays to access a quotation on an exchange — and rebates should be more transparent, so that investors can understand these amounts at the time of trade execution.

Finally, I've asked staff to consider how the access fees might change in light of a potentially lower minimum tick size. Currently, access fees for protected quotes that are priced at $1 or more are capped at three-tenths of a penny per share.[18] If we reduce the minimum pricing increment, it may also be appropriate to reduce these access fee caps proportionately.

## Conclusion

In conclusion, I think we, at the SEC, need to look for opportunities to freshen up our rules to ensure America remains the gold standard of the world's capital markets.

We can't take our leadership in capital markets for granted. New financial technologies and business models continue to change the face of finance for investors and issuers. More retail investors than ever are accessing our markets. Other countries are developing deep, competitive capital markets as well, seeking to surpass our own.

It's not clear, given the current market segmentation, concentration, and lack of a level playing field, that our current national market system is as fair and competitive as possible for investors.

I think we can do better here for retail investors. Thank you.

---

[1] *See* Gary Gensler, "Prepared Remarks at the Global Exchange and FinTech Conference" (June 9, 2021), *available at* https://www.sec.gov/news/speech/gensler-global-exchange-fintech-2021-06-09.

[2] *See* Nicholas Megaw, "SEC chair Gary Gensler to set out overhaul of US equity market" (June 6, 2022), *available at* https://www.ft.com/content/0b70572f-2968-4a96-a0e8-d2f76dc62d95.

[3] Publicly available data from Rule 606 reports for large retail brokers in first quarter 2022.

[4] *See* U.S. Securities and Exchange Commission, "Shortening the Securities Transaction Cycle" (Feb. 9, 2022), *available at* https://www.sec.gov/rules/proposed/2022/34-94196.pdf. *See* U.S. Securities and Exchange Commission, "Short Position and Short Activity Reporting by Institutional Investment Managers" (Feb. 25, 2022), *available at* https://www.sec.gov/rules/proposed/2022/34-94313.pdf

[5] *See* U.S. Securities and Exchange Commission, "SEC Requests Information and Comment on Broker-Dealer and Investment Adviser Digital Engagement Practices, Related Tools and Methods, and Regulatory Considerations and Potential Approaches; Information and Comments on Investment Adviser Use of Technology" (Aug. 27, 2021), *available at* https://www.sec.gov/news/press-release/2021-167.

[6] *See* "Staff Report on Equity and Options Market Structure Conditions in Early 2021" (Oct. 14, 2021), p. 44, *available at* https://www.sec.gov/files/staff-report-equity-options-market-struction-conditions-early-2021.pdf.

[7] Staff in the Division of Economic and Risk Analysis calculated the total trading volume of stocks that had a time-weighed quoted spread of 1.1 cents or less from January–May 2022 and divided their share volume by the total share volume to get 56% of total trading volume. Statistics were calculated by Commission staff based upon public NYSE Trade and Quote (TAQ) data.

[8] Excluding sub-penny midpoint trades. Statistics were calculated by Commission staff from public NYSE TAQ data. Off-exchange midpoint trades are off-exchange trades that occur at the midpoint of the NBBO, i.e. a trade price of 10.01 when the NBB is 10.00 and the NBO is 10.02. These percentages are based on off-exchange trades with trade prices greater than or equal to $1 occurring during the regular trading session between the hours of 9:30AM and 4:00PM between December 2021 and the end of February 2022 (i.e. opening and closing trades are not included). Filters are also applied to exclude trades if they have an irregular sale condition.

[9] *See* NYSE TAQ data.

[10] *See* "SEC Adopts Rules to Modernize Key Market Infrastructure Responsible for Collecting, Consolidating, and Disseminating Equity Market Data" (Dec. 9, 2020), *available at* https://www.sec.gov/news/press-release/2020-311. $250.00 or less per share: round lot = 100 shares; $250.01 to $1,000.00 per share: round lot = 40 shares; $1,000.01 to $10,000.00 per share: round lot = 10 shares; and $10,000.01 or more per share: round lot = 1 share.

[11] *See* Financial Industry Regulatory Authority, "SEC Rule 605," *available at* https://www.finra.org/rules-guidance/guidance/sec-rule-605.

[12] *See*, e.g., Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 270 (3d Cir.), *cert. denied*, 525 U.S. 811 (1998). A broker-dealer's duty of best execution to its customers predates the federal securities laws and is derived from an implied representation that a broker-dealer makes to its customers. The duty is established from "common law agency obligations of undivided loyalty and reasonable care that an agent owes to [its] principal." This obligation requires that a "broker-dealer seek to obtain for its customer orders the most favorable terms reasonably available under the circumstances."

[13] Publicly available data from Rule 606 reports for large retail brokers in first quarter 2022.

[14] Publicly available data from Rule 605 reports for years 2020-2021.

[15] *See*Securities Act Release No. 10906, "In the Matter of Robinhood Financial, LLC" (Dec. 17, 2020),*available at*https://www.sec.gov/litigation/admin/2020/33-10906.pdf.

[16] *See* "Staff Report," p. 44.

[17] *See* Proposal for a Regulation of the European Parliament and of the Council amending Regulation (EU) No 600/2014 as regards enhancing market data transparency, removing obstacles to the emergence of a consolidated tape, optimising the trading obligations and prohibiting receiving payments for forwarding client orders (Nov. 25, 2021), *available at* https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:52021PC0727.

[18] Rule 610(c) also imposes an access fee cap for protected quotes that are priced less than $1. For these, the access fee cannot be more than 0.3% of the quotation price.