IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>EDWARD CONSTANTINESCU,<br>PERRY "PJ" MATLOCK,<br>JOHN RYBARCZYK,<br>GARY DEEL,<br>STEFAN HRVATIN,<br>TOM COOPERMAN,<br>MITCHELL HENNESSEY,<br>DANIEL KNIGHT. | No. 4:22-CR-00612-S |

**DEFENDANT EDWARD CONSTANTINESCU'S
THIRD MOTION TO COMPEL *BRADY* MATERIAL
AND FOR AN EVIDENTIARY HEARING**

Rather than reliably abiding by its Constitutional obligations, the government continues to prosecute this case by largely ignoring Constantinescu's requests for *Brady* material, necessitating this Court's assistance a third time. The most recent dispute involves the government's refusal to meaningfully respond to Constantinescu's requests for *Brady* material regarding his Houston-based FBI Special Agent brother-in-law's receipt of Constantinescu's trading profits, the government's curious involvement with Constantinescu's wife (the FBI agent's sister), and the government's ongoing concealment of exonerating evidence in the possession of other agencies.

As discussed below, the Houston FBI field office employs Constantinescu's brother-in-law as a special agent ("Special Agent B"). The Houston FBI squad investigating this case knows that Special Agent B accepted $100,000 of Constantinescu's trading profits in September 2021, during the time of Constantinescu's alleged conspiracy to trade of Meme Stocks. He also knew about the home Constantinescu provided for his mother-in-law. Obviously, a Houston FBI agent accepting

money purportedly the result of a multi-million-dollar pump-and-dump scheme being prosecuted by the same field office is plainly exculpatory on several fronts, but the government has not produced the information surrounding their investigation into Special Agent B (nor have they provided what would be equally exculpatory information if the Houston FBI elected to ignore this information and forego an investigation). Either way, the import is obvious. The original investigation in late 2021 yielded the same result as the SEC's investigation: Constantinescu's trading profits were well-earned. Constantinescu seeks production of this information as material to show the Houston field office's bias, to attack the credibility of the investigation that led to these charges against him, and to highlight that the government does not actually believe its previously sworn statements that much of Constantinescu's trading profits are primarily the result of securities fraud.

Second, the government has taken several unusual steps to insert itself into Constantinescu's (since withdrawn) divorce proceedings with his wife, who is Special Agent B's sister. These steps have included the prosecutor meeting with Constantinescu's wife and her lawyer to discuss this case and potential spousal support payments (and failing to disclose the existence of these meetings to defense counsel) and petitioning this Court to change Constantinescu's bail conditions so he could be ordered to pay Special Agent B's sister ten thousand dollars a month and thousands more to her divorce attorney. These inexplicable actions were undertaken notwithstanding the government obtaining warrants to seize every trading dollar ever made by Constantinescu and his most valuable assets, including his houses and cars. Constantinescu thus seeks production of all information regarding these secret conversations with his wife's divorce attorney, along with all information regarding the government's decision to

facilitate Constantinescu being ordered to send thousands of dollars to a third-party, notwithstanding the representations made in its seizure warrant affidavit.

Constantinescu respectfully requests a hearing to ensure that the government is not withholding *Brady* material.

## BACKGROUND PERTINENT TO THE DISPUTE

I.   *History Between the Prosecution Team and Constantinescu*

For several years, Constantinescu has been married to Special Agent B's sister. Special Agent B has been assigned to the Houston field office—the same office that investigated this case and whose agents will almost certainly be testifying witnesses at trial. Throughout the course of the marriage, Special Agent B has made several requests that Constantinescu give him money and invest money on his behalf. On September 29, 2021, Constantinescu gave Special Agent B approximately $100,000 of his trading profits. About a month later, in October 2021, Constantinescu separated from his wife and moved out of their shared residence. Special Agent B, aggressively vocally attacked Constantinescu for his perceived marital transgressions.

According to the FBI's opening report in this case, around May 18, 2022, the FBI Houston field office opened an investigation into several individuals, including Constantinescu, for possible wire and securities fraud violations: curiously, several weeks before the SEC joined the investigation and several weeks before Special Agent B was firewalled from the case. The opening report reflects information obtained from a *suspicious activity report* regarding trading *between January 2021 and October 2021*, but does not indicate how the report or the individuals' trading activity piqued the government's attention. On June 13, 2022, the same case agent who wrote the case opening report requested that the investigation's case file be removed from the FBI's centralized case management system because Constantinescu—now characterized in the report as

3

the "main subject" of the investigation—was the brother-in-law of Special Agent B. The report does not articulate how or when the government learned that Constantinescu's newly estranged wife's brother was an agent in the Houston field office.

The June 2022 report relayed further that Special Agent B's exposure to the criminal violations under investigation had not been determined, but that the Houston field office would remain responsible for the investigation moving forward. Notwithstanding that the case had been opened for less than a month, the case agent wrote in the report that the case agents "anticipate[d] swift prosecution in this case."

On December 14, 2022, Constantinescu was indicted with several other defendants. Bank records that the government collected during the course of its investigation reflect plainly that on September 29, 2021, a cashier's check in the amount of $100,000 was overnighted from one of Constantinescu's bank accounts ("Account 1") to Special Agent B. Notwithstanding the date of the payment and Special Agent B's name appearing in the bank records in connection with a $100,000 payment, it does not appear that the government has produced any material reflecting preindictment investigation into Special Agent B. Nor has the government made an appropriate representation that it has looked for such materials and none exist.

On February 13, 2023, and apparently notwithstanding the marital communications privilege, a Houston FBI agent investigating this case (the "Financial Case Agent") interviewed Constantinescu's wife and prepared a report of the same. The report does not reflect any inquiry into whether Special Agent B received money from Constantinescu or the $100,000 cashier's check reflected in the bank records. Curiously, the report attempts to sanitize Special Agent B's relationship and position within the Houston field office, characterizing Special Agent B as "a family member" who "worked in law enforcement" in Houston. According to Constantinescu's

wife, Financial Case Agent's report omits exculpatory statements that Constantinescu's wife made to Financial Case Agent during the interview; namely, that Constantinescu was always trying to help people and would not have been engaged in fraud.

Later that month, Constantinescu sent Special Agent B the following message:



A few days later (approximately 8 months after the Houston field office identified that Special Agent B's exposure to criminal violations was unclear), Financial Case Agent spoke with Special Agent B over the phone and memorialized the conversation in a report. The report does not memorialize why the phone call took place, what information or documents Special Agent B was provided with prior to the phone call, or whether he was told that bank records reflected that he received a $100,000 cashier's check from Constantinescu.

During the phone call, Special Agent B admitted that he had provided Constantinescu a small sum of money to invest on Special Agent B's behalf, but claimed the investment occurred in 2018. Special Agent B also claimed that his sister (who has not been employed during the course of her marriage to Constantinescu) had volunteered $100,000 to Special Agent B, which he claimed to have disclosed on an employee financial disclosure form. The report reflects that

approximately two months elapsed between the Financial Case Agent preparing the report and the report actually being entered in the FBI's case file system. Constantinescu has not been able to locate Special Agent B's financial disclosure forms in the government's productions.

Meanwhile, approximately two days after Special Agent B was notified that the $100,000 he received came from Constantinescu's trading profits and was needed to pay his lawyers, Special Agent B's sister participated in an *ex parte* divorce proceeding hearing. During the hearing, the sister's attorney elicited testimony suggesting to the court that there was *no reason* Constantinescu would be unable to pay a $10,000 per month temporary spousal support and all of the divorce attorney's legal fees. No mention was made of the Indictment, Constantinescu's bail conditions, or the fact that the government has obtained warrants purporting to seize all of Constantinescu's money and valuable property. This request, by itself, would not normally be imputed to the government; however, last month, the sister's divorce attorney and sister revealed to defense counsel that he had been in contact with the Assistant U.S. Attorney assigned to this case, which apparently included contact *prior to her filing for divorce*. According to the divorce attorney, the AUSA discussed the Indictment as well as spousal support payments. It does not appear from the government's productions that it has disclosed the substance of these case—and asset—related conversations or the existence of these communications.

Shortly after the *ex parte* divorce proceeding, on March 7, 2023, the government obtained several seizure warrants and attempted to seize nearly all of Constantinescu's assets prior to actually proving its case, a request that this Court stayed. Financial Case Agent—the same agent who previously interviewed Special Agent B and his sister—was the affiant on the affidavit submitted in support of the seizure warrants. One of the assets sought to be seized was funds contained in Account 1, from which Special Agent B had previously received $100,000 of

Constantinescu's trading profits. Financial Case Agent swore to the following in support of the government's seizure requests:

    i. From around January 2020 through April 2022, Constantinescu and his codefendants profited "at least" $114 million from the allegedly illegal scheme, during which time Constantinescu himself profited in excess of $79 million in "identified fraudulent funds";

    ii. Constantinescu's business operations were purportedly "permeated by fraud";

    iii. Between January 2020 through February 2022, Constantinescu transferred over $24 million from an investment account to Account 1.  The source of funds in the investment account "were determined to be made up of profits earned through excessive securities trading activities while participating in the fraud scheme";

    iv. Constantinescu sent "a large amount" of "illicit funds" to Account 1, and in 2021, the FBI identified over $75 million of purported "identified fraud proceeds"; and

    i. From March 29, 2020 through June 30, 2022, approximately 98% of money that was transferred to Account 1 was from Constantinescu's investment account that the agent identified as being sourced by profits earned through the fraud scheme.

Financial Crimes Agent's affidavit listed several asset purchases and analysis of certain transfers over $10,000 from Account 1, but conveniently omitted reference to the fact that Special Agent B accepted $100,000 from Account 1 in September 2021.

More recently, after being advised that Constantinescu needed money to pay his lawyers, and swearing that much of the money in Constantinescu's bank accounts were the result of "fraud," on May 15, 2023, the government filed a motion to modify conditions of release asking this Court for an order "expressly permitting" Constantinescu to pay $10,000 per month spousal support obligation sought by Special Agent B's sister, which was granted. [ECF 270, 274 sealed].  In other words, it appears that the government petitioned this Court to facilitate Constantinescu's transfer

7

of thousands of dollars each month to a third party notwithstanding its sworn statements in the seizure warrant affidavit.[1]

### II. *Supplemental Discovery Requests and the Government's Response*

While the government has an independent duty to seek out and timely produce *Brady* material regardless of a defendant's requests, on March 1, 2023, Constantinescu submitted a letter to the government supplementing its prior discovery requests to demand prompt production of several buckets of *Brady* Material. Those requests included:

 i. Any and all Documents or Information concerning investigative efforts to verify any information provided by any and all witnesses, where such efforts were negative (or inconclusive);

 ii. Any and all Documents or Information concerning discussions with any witness or potential witness that contain or reveal Brady Material;

 iii. Any and all Documents or Information regarding any misconduct or any allegation or suggestion of misconduct of any government agents or attorneys involved in any investigation of Mr. Constantinescu;

 iv. Any and all Documents or Information indicating that any government witness is biased or prejudiced against Mr. Constantinescu or has a motive to falsify or distort his or her testimony;

 v. Any and all Documents or Information suggesting that any government agent is biased or prejudiced against Mr. Constantinescu or has motive to falsify or distort his or her testimony (regardless of whether that government agent will be called as a witness by the government);

 vi. Any and all Documents or Information regarding errors by the government . . . or other information that calls into question . . . the completeness of the government's investigation;

---

[1] Thereafter, on June 5, 2023, the government filed a motion to unseal the Court's Order so it could be used against Constantinescu in his wife's divorce proceedings. The same day, Constantinescu's wife filed a Notice of Nonsuit in the divorce proceedings, specifically stating that she did not want to pursue her motion to enforce temporary spousal support. The divorce court granted the wife's request the following day but, amazingly, the government refused to withdraw its motion to unseal the Court's order, notwithstanding that the divorce request was moot.

  vii. Any and all Documents or Information suggesting that the government failed to maintain records of statements or evidence that could otherwise have led to Brady Material;

  viii. Any and all Documents or Information regarding all contradictory statements presented by government witnesses, agents, or attorneys to the grand jury in this matter;

  ix. Any and all notes, memoranda, and FBI 302 Reports, to the extent they exist, arising from any attorney proffers and witness interviews the government conducted with . . . any other individual with respect to the allegations in the Indictment and the government's investigation of Mr. Constantinescu; and

  x. Any and all Documents or Information indicating in any way, manner, or degree that Mr. Constantinescu lacked intent to mislead his Twitter followers and/or members of Atlas Trading Discord.

The request for *Brady* Material also specifically requested information related to Special Agent B, including:

  i. Any and all Documents or Information related to [Special Agent B's] dates of employment and various positions/departments at any federal law enforcement agency, including but not limited to his employment records from the FBI Houston field office.

  ii. Any and all Documents or Information indicating the timeline of the FBI's investigation into Mr. Constantinescu.

  iii. Any and all Documents or Information indicating that the government (including the FBI) was aware that [Special Agent B] was Mr. Constantinescu's brother-in-law.

  iv. Any FBI internal communications, notes, memoranda, and reports concerning [Special Agent B's] relationship with Mr. Constantinescu.

In response to the *Brady* Material request, on March 8, 2023, the government dismissively replied that it was aware of its *Brady* obligations and that it had complied with them and was otherwise "declin[ing] to disclose the requested information at this time." (Mar. 8, 2023 email from J. Liolos to M. Ford). *But see United States v. Saffariniai,* 424 F. Supp. 3d 46, 86-87

9

(D.D.C. 2020) (noting that after several years of accepting such representations, the court "no longer accepts conclusory assertions by [DOJ] that it 'understands' its Brady obligations and 'will comply' or 'has complied' with them.").

## ARGUMENT

The manner by which the government has conducted its investigation into Constantinescu's trading activity before rushing to charge him on flawed theories fueled by personal animosity of a fellow agent and sloppy accounting of trading profits is an appropriate area for the defense to attack this case. It is obvious that "[u]nder *Brady* and *Giglio,* the Government must disclose to the defense any evidence that would tend to show a prosecution witness's bias, could be used to impeach him, or is otherwise exculpatory of the defendant." *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999). "Evidence may be material under *Brady* even though it is inadmissible." *United States v. Sipe*, 388 F.3d 471, 485 (5th Cir. 2004). The Supreme Court has recognized that information that may be used to attack the reliability of the investigation or "sully the credibility" of investigating law enforcement officers can be *Brady* material. *See Kyles v. Whitley*, 514 U.S. 419, 445-51 (1995) (evaluating suppressed evidence and noting that such evidence could have been used to "undermine the ostensible integrity of the investigation"). Indeed, "[a] common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation." *Id.* at 446 (quoting *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986)). Indeed, the Fifth Circuit has reversed a trial conviction because withheld *Brady* evidence "carried within it the potential . . . for the . . . discrediting of the police methods employed in assembling the case." *See Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

The context of a case is key to any *Brady* determination. As highlighted above, it appears that the Houston FBI field office includes an estranged family member who received a hundred thousand dollars' worth of trading profits from Meme Stocks the government now says were the result of pump and dumps and the government has taken inconsistent approaches to the profits in a manner that seems to have benefited Special Agent B and his sister. Information reflecting these inconsistencies and biases are incredibly important in a case such as this, where the government's case rests on the slender reed of its self-serving, strained interpretations of memes and tweets, along with fantastical, bloated accounting of trading profits. After all, seven months in and the government still cannot identify a single false tweet by Constantinescu.

Where, as here, the government must convince a jury the price and volume change of Meme Stocks was caused by Constantinescu "artificially inflating" their prices, such information tending to show the government's bias and information that could impeach the government's credibility is material. *Accord United States v. Stevens*, 2011 WL 4344016, at *20 (W.D. La. Sept. 14, 2011) (noting that the court's *Brady* analysis was appropriately viewed against the backdrop of the case where "credibility was key"). As discussed further below, against the backdrop of this case, the government must be ordered to produce the following items as *Brady* material.

I. *All Information Regarding the Government's Investigation (or Lack Thereof) Into Special Agent B's Receipt of $100,000 of Trading Profits, Including His Financial Disclosure Forms, is Brady Material and Must be Produced.*

All information, including messages, emails, reports, notes, financial analyses, and other materials, regarding Special Agent's B's receipt of $100,000 of Constantinescu's trading profits is material to the defense in several respects. The DOJ either investigated Special Agent B's receipt of this money and failed to disclose information and materials gathered through the course of that

11

investigation or elected not to investigate the $100,000 transfer aside from the cursory phone call referenced herein. Either scenario requires the disclosure of *Brady* material.

If the government investigated Special Agent B's relationship with Constantinescu and the $100,000 money transfer, information surrounding the government's treatment of the $100,000 transfer made during the core of the government's purported charged conspiracy is material to Constantinescu's defense. Depending on the timing of this investigation, such information is especially pertinent to challenge the credibility of Financial Case Agent and his squad members who were aware from the bank records, financial analysis, and phone call with Special Agent B of the $100,000 but nonetheless did not disclose the transfer when making sweeping statements in the seizure warrant affidavits and have not yet disclosed investigative materials to the defense. Further, in the event the investigatory materials reflect that the $100,000 transfer was not the result of trading profits resulting from fraud, such conclusion seems contradictory to the sweeping figures in the indictment and seizure warrant affidavit, although certainly consistent with the SEC's representations to Congress.

Additionally, given the contentious relationship between Special Agent B and Constantinescu, investigative materials will likely include information that could be used to reflect the Houston field office's bias against Constantinescu stemming from a fellow agent's extreme hostility and distaste for Constantinescu. *Accord United States v. Stevens*, 2011 WL 4344016, at *21 (W.D. La. Sept. 14, 2011) ("The undisclosed information also demonstrates that Hakim had a reason to be biased, and the jury was improperly denied the opportunity to consider that bias."). This is particularly true where, as here, the case agents concluded less than a month into the opening of the investigation that Constantinescu was the "primary" subject of the investigation

after learning that his brother-in-law was an agent in the Houston field office and concluding that prosecution of a purported $114 million "cutting edge" securities case would be "swift."

In the event the DOJ and the prosecution team did not conduct an investigation into Special Agent B (or the agencies decided to commence an investigation following the filing of this motion) aside from the phone call referenced herein, a lack of investigation is material to the defense's ability to impeach the credibility of the Houston field office's investigation and must also be produced. If the government elected not to investigate one of their own and instead charge forward against the agent's newly estranged family member, that information is highly relevant to underscore further the lack of credibility of the government's investigation. Additionally, information reflecting that the FBI permitted Special Agent B to keep the money and conduct no further investigation is also helpful for the defense to show that not even the FBI *actually* believes that Constantinescu's trading profits were criminally derived, and certainly not the stuff *actual* securities fraud cases are made of.

Constantinescu therefore respectfully requests an order compelling the government, meaning all government agencies, including the DOJ, FBI, and IRS to produce all investigative materials related to or concerning Constantinescu's relationship and monetary gifts to Special Agent B, including Special Agent B's financial disclosure forms, other financial forms in the possession, custody, or control of the government, any statements made by Special Agent B expressing hostility or negative sentiment towards Constantinescu, and all internal agency communications concerning their relationship whether written or oral.

II. *The Prosecution Team's Conversations with Constantinescu's Wife's Divorce Attorney and All Information Regarding the Decision to Facilitate Constantinescu's Payments to his Wife is Brady Material and Must Be Produced.*

It does not appear that the government has produced information relating to the government's conversation(s) with Special Agent B's sister and her divorce lawyer about the indictment and spousal support payments, which obviously relate to Constantinescu's assets. The mere fact that the government engaged in meetings with Special Agent B's sister's attorney while they discussed charges against Constantinescu and how his assets could be transferred to Special Agent B's sister is material to the defense to be used as impeachment to show bias and to challenge the propriety of the government's investigation and prosecution. This is especially troublesome because these conversations appear to have occurred prior to the Financial Crimes Agent's memorialized interview with Special Agent B's sister, but were not disclosed, which obviously colors the statements memorialized in Financial Crime Agent's interview report. *Accord United States v. Triumph Cap. Grp., Inc.,* 544 F.3d 149, 165 (2d Cir. 2008) (granting new trial when government withheld early proffer notes of witness interview).

Constantinescu thus requests that the Court order the government to immediately produce calendar entries, memorandums, notes (even if prepared by the AUSA who entertained these conversations), and any other materials reflecting the existence and substance of conversations and/or meetings with Special Agent B's sister or her divorce attorney. In the event the AUSA did not memorialize these conversations and/or meetings, or in the event that these materials do not accurately reflect what the government told Constantinescu's wife during these secret conversations, the Court should order the AUSA to reduce the requested information into written form and provide that information to the defense immediately.

14

Additionally, according to Constantinescu's wife, the sole report memorializing a meeting with Financial Case Agent omits exculpatory information that she told the agent, which obviously should be produced immediately, along with any other exculpatory information the prosecution team omitted from reports in this case, including Special Agent B's.

Finally, it also appears that the government has not produced information regarding its decision to facilitate the ability of Special Agent B's sister to obtain a court order that would permit Constantinescu to transfer ten thousand dollars each month to Special Agent B's sister. This highly unusual conduct is material to the defense to show that the prosecution team is biased and is also material to show that the government does not actually believe the sworn statements in the seizure warrant affidavit. Accordingly, the government should be ordered to produce all information addressing the decision to facilitate Constantinescu's transfer of money to Special Agent B's sister, including any analyses or discussion that suggests Constantinescu's trading profits were not the result of criminal activity or the government does not care about seizing such monies.

## CONCLUSION

In light of the above and the two other pending motions seeking to compel production of *Brady* material, Constantinescu has lost confidence that the government understands its obligations and respectfully requests a fulsome evidentiary hearing to determine the extent and degree of the government's withholding of *Brady* material raised in all three of his pending motions to compel *Brady* material along with any other relief deemed just and proper.

Dated: July 13, 2023

Respectfully submitted,

/s/ Matthew A. Ford
Matthew A. Ford
Texas Bar No. 24119390
mford@fordobrien.com

Jamie Hoxie Solano
*Court Admission Pending*
jsolano@fordobrien.com

Cara J. Filippelli
Texas Bar No. 24126183
cfilippelli@fordobrien.com
FORD O'BRIEN LANDY, LLP
3700 Ranch Road 620 South, Suite B
Austin, Texas 78738
Telephone: (512)-503-6388
Facsimile: (212) 256-1047

*Attorneys for Defendant
Edward Constantinescu*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2023, a true and correct copy of the foregoing document has been electronically served on all counsel of record via the Court's CM/ECF system.

*/s/* Matthew A. Ford
Matthew A. Ford