IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| |
|---|
| **UNITED STATES OF AMERICA** <br> v. <br><br> **EDWARD CONSTANTINESCU,** <br> **PERRY "PJ" MATLOCK,** <br> **JOHN RYBARCZYK,** <br> **GARY DEEL,** <br> **STEFAN HRVATIN,** <br> **TOM COOPERMAN,** <br> **MITCHELL HENNESSEY,** <br> **DANIEL KNIGHT.** |

No. 4:22-CR-00612-S

**DEFENDANT EDWARD CONSTANTINESCU'S
REPLY IN FURTHER SUPPORT OF HIS SECOND MOTION TO COMPEL
*BRADY* MATERIAL AND TO IMPOSE SANCTIONS, INCLUDING A CONTINUANCE,
AND REQUEST FOR A HEARING[1]**

The government is correct that "[t]he USAO's obligation to produce *Brady* and *Giglio* material that is in the sole possession of the SEC turns on whether the USAO and the SEC were engaged in a joint investigation." *See United States v. Martoma*, 990 F. Supp. 2d 458, 460 (S.D.N.Y. 2014); Opp. pg. 2 [ECF 327]. Still, it is startling that the U.S. Attorney's Office continues to conceal *Brady* material after engaging in joint fact-gathering and investigative cooperation with the SEC continuously from the commencement of its investigation to the present. Materials produced in discovery reflect that the government's investigative team included the SEC to a degree far beyond the characterization in its opposition. The government's characterization of the investigation as "parallel" not "joint" is just wordplay.

More to the point, the government's opposition is trying to keep both the goat and cabbage happy. But the government cannot go to trial on its theory that the defendants' actions

---

[1] Defendants Perry "PJ" Matlock, Gary Deel, Stefan Hrvatin, and Tom Cooperman join the motion.

1

caused the price and volume "volatility" of NAKD, SNDL, EXPR, and other meme stocks during 2021 while hiding from the SEC's contradictory findings. *See* Opp. pg. 5 [ECF 327]. The Superseding Indictment accuses the defendants of orchestrating "pump and dumps" by "artificially driv[ing] up" these stocks' prices. Superseding Indictment at ¶¶ 1, 12, 16. The SEC's records supporting its contrary findings are obviously exculpatory and impeachment material.

Nor, as the government argues, is Constantinescu's request for exculpatory material in the SEC's investigative files, including the Meme Stock Materials, "ill-defined." Opp. pg. 6. He seeks SEC records, documents, and communications related to a list of stock tickers belatedly provided by the government that form the foundation of a conspiracy charge against him. Mem. pg. 2, Ex. B. The government's attempt to ignore its constitutional obligations should be rejected; it must be ordered to review and produce the SEC's records immediately.

I. **The government conducted a joint investigation, as proven by sustained joint fact-finding efforts, continuous investigative cooperation, and SEC public statements.**

The starting inquiry for this Court is whether the SEC conducted a joint investigation with the Department of Justice (including the U.S. Attorney's Office and the FBI) (collectively, "DOJ") while engaging in fact-finding that led to the charges at hand. "One main factor to consider is whether there has been cooperation between the investigative agencies," examples of which include "coordination in conducting witness interviews and otherwise investigating the facts of the case," as well as "whether the other agency . . . shared documents with the prosecution." *United States v. Bases*, 549 F. Supp. 3d 822, 825 (N.D. Ill. 2021). While the government claims that "[a]t most" the SEC attended a "minority of" government witness interviews and "exchanged some documents" with the DOJ, (Opp. pg. 3), materials produced in discovery reflect a very different story:

1. DOJ formally opened its investigation in May 2022; that month, DOJ met with the SEC to discuss its investigation, during which time the SEC identified two primary suspects. Ex. P (July 12, 2022 Meeting with the Securities and Exchange Commission Report). Less than a month after meeting with the SEC, DOJ case agents memorialized that they anticipated "swift" prosecution of at least one individual the SEC discussed in its May 2022 meeting with DOJ. *See* Ex. Q (June 13, 2022 Request for Manual Access Restriction Report).

2. A few days after meeting with the SEC, the DOJ requested that the SEC share material from its case files with the DOJ. *See* Ex. P. The SEC provided the DOJ with evidence used to support the government's case, including Twitter records, brokerage records, recordings made by purported whistleblowers, and a purported chat log of messages on Discord for Atlas Trading from 2020 through 2021. *See* Ex. R (July 25, 2022 Information Provided By the Securities and Exchange Commission Report). At least some of these materials were incorporated into the government's indictment.

3. It appears that the DOJ collected its own set of trading records after first learning of their existence from the SEC. For example, on June 14, 2022, two FBI agents exchanged emails when a brokerage firm responded that it had no records in response to the government's grand jury subpoena. Ex. S (June 14, 2022 email from J. Hale to A. Rodriguez). One of the case agents relayed to the other: "Sorry. We could've gotten more info from the SEC (where thay [sic] spreadsheet came from) on the full names of the brokerage." *See id*.

4. Through the course of the DOJ's investigation, DOJ remained in communication with the SEC regarding how the investigation should progress, including what records should be collected and the identities of the DOJ's primary suspects of the investigation. For example, in September 2022, one of the prosecutors emailed an FBI case agent with the prosecutor's analysis of bank records and relayed: "SEC will also be sending today hopefully *leads for additional accounts for the main subjects*." Ex. T (Sept. 6, 2022 email from S. Armstrong to J. Hale) (emphasis added).

5. The DOJ obtained search warrants based on information provided to DOJ from the SEC. (*See* 22-MJ-2314 to 2324 (Sept. 28, 2022 warrants to Discord, Affidavit of J. Hale at ¶¶ 26, 35); 22-MJ-1999 to 2006 (Aug. 26, 2022 warrants to Twitter, Affidavit of J. Hale at ¶¶ 25, 35)).

6. A former SEC staff attorney who now represents witnesses purporting to be SEC "whistleblowers" emailed the SEC and DOJ jointly in the same email communication in October 2022, prior to the indictment being returned or

the investigation being made public. *See* Ex. U (Oct. 25, 2022 email from lawyer to SEC and DOJ attorneys).

7. Throughout the course of the investigation, it appears that DOJ relied on the SEC to provide and identify certain pertinent records to build the criminal case. For example, shortly before the government indicted the defendants, on November 21, 2022, DOJ emailed the SEC asking if the SEC had blue sheets for a particular time period. *See* Ex. V (Nov. 2022 email chain between J. Hale and A. Palid). The SEC responded: "We should have those bluesheets as well. I'll double-check what we sent you tomorrow and update with those bluesheets if we haven't already sent them." *Id*. A few days later, DOJ emailed SEC again, asking: "Additionally, for SURF we only have the options. Could we get the regular equities for the same time period or at least for May 19th-20th, 2021?" *Id*.

8. The SEC and DOJ jointly conducted (at least) over a dozen witness interviews throughout the investigation and post-indictment, including with individuals who purported to be SEC "whistleblowers," two co-defendants, and others. These interviews have been conducted as recently as a couple weeks ago. *See* Exs. W-1 (Report of June 10, 2022 interview with Witness-1); W-2 (Report of July 15, 2022 interview with Witness-2); W-3 (Report of July 21, 2022 interview with Witness-3); W-4 (Report of Oct. 27, 2022 interview with Attorney-1); W-5 (Report of Jan. 20, 2023 interview with Witness-4); W-6 (Report of Jan. 27, 2023 interview with Witness-4); W-7 (Report of Feb. 2, 2023 interview with Witness-4); W-8 (Report of Feb. 16, 2023 interview with Daniel Knight); W-9 (Report of Mar. 20, 2023 interview with Witness-3); W-10 (Report of Mar. 27, 2023 interview with Daniel Knight); W-11 (Report of Apr. 4, 2023 interview with Witness-4); W-12 (Report of Apr. 25, 2023 interview with Francis Sabo); W-13 (Report of June 12, 2023 interview with Witness-2); W-14 (Report of June 15, 2023 interview with Witness-2); W-15 and W-16 (undated notes of interviews with Francis Sabo).

9. Even after indicting this case, DOJ has continued to work cooperatively with the SEC to understand its evidence. For example, on February 1, 2023, DOJ emailed SEC information from bluesheets and asked the SEC: "Can you tell me which broker this is[?]" *See* Ex. X (Feb. 1, 2023 email from J. Hale to A. Palid).

10. Handwritten notes suggest that in March 2023, DOJ had a meeting with the SEC in which they discussed, among other things, the "discovery process." *See* Ex. Y (handwritten notes from Mar. 20, 2023 meeting with DOJ and the SEC).

11. Additional materials produced in discovery reflect further the SEC's coordinated cooperation with DOJ. *See* Exs. Z-1 (Apr. 3, 2023 email from

  A. Palid to DOJ); Z-2 (June 28, 2022 email from A. Palid to DOJ); Z-3
(May 27, 2023 email from A. Palid to DOJ); and Z-4 (Nov. 4, 2022 email
from Attorney-1 to SEC and DOJ).

  In other words, the government's opposition brief, again, distorts key facts to the Court. The government should have learned its lesson by now. The same two prosecutors from the DOJ Fraud Section who have appeared in this case were also responsible for a joint investigation with the CFTC in a Chicago prosecution. *See Bases*, 549 F. Supp. 3d at 822. There, as here, the same attorneys attempted to minimize their interactions with the CFTC, claiming that it "was limited to participating in some witness interviews with the DOJ and providing the DOJ with trading data pursuant to an access request." *Id.* at 828. The Court in *Bases* made clear that the "extensive record of cooperation and coordination" between DOJ and the CFTC "belie[d]" the government's characterization and ordered that the government had "an affirmative obligation to review the materials" in CFTC's control. *Id.* at 828-29.

  The government's few dismissive sentences disavowing the existence of the joint investigation do not transform it into a parallel investigation.[2] First, the government suggests that because the SEC was not involved in its *charging* process, this Court should ignore the significant involvement in the *investigation* process. Opp. pg. 4. But "[f]or *Brady* purposes, it is enough [to support the finding of a joint investigation] that the agencies are engaged in joint fact-gathering, even if they are making separate investigatory or charging decisions, because the purpose of *Brady* is to apprise the defendant of exculpatory evidence obtained during the fact-gathering . . . ." *United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012). This is a

---

[2] The government suggests that it has elected not to fully respond to the defense's joint-investigation argument until after reviewing this reply brief. Opp. pg. 4 n.2. Constantinescu's opening brief makes clear that the government conducted a joint investigation with the SEC, and the government is in possession of all the facts reflecting that it conducted a joint (not parallel) investigation with the SEC. The government's decision to not meaningfully address the details surrounding its coordination with the SEC highlights the need for an evidentiary hearing to develop the record more fully. Arguments not included in the government's opposition have been waived.

critical point here, since the SEC identified two now-defendants when it first conversed with DOJ about this investigation, DOJ and the SEC levied charges against the same eight defendants, and they issued their charging documents simultaneously.

Next, the government also notes that the two agencies commenced their investigations at different times, and the DOJ requested its own set of *some* of the SEC's investigative records. Opp. pg. 4. As highlighted above, it appears that the government requested its investigative records—including trading records—based on information provided by the SEC, highlighting cooperation and coordination, not an independent, parallel track. *See* Exs. R, S. Besides, a "joint investigation . . . does not require a coterminous investigation," *Gupta*, 848 F. Supp. 2d at 495, and "simply because the DOJ conducted some parts of the investigation on its own does not erase its joint and coordinated activities with [another agency]," *Bases*, 549 F. Supp. 3d at 825. The government cannot be permitted to piggyback on the SEC's investigation *and* be absolved from reviewing those same files for exculpatory evidence.

The DOJ latched on to the SEC's investigation, accepted key records from the SEC that it then relied on in its charging documents, conducted joint interviews of witnesses, coordinated with the SEC about possible materials to obtain other "leads," coordinated the charging date and press statements, asked the SEC about its evidence, and spoke with the SEC about the discovery process in this case. Several federal courts have evaluated similar investigations and held that they were joint. *See, e.g., Bases*, 549 F. Supp. 3d at 825 (finding joint investigation where DOJ and CFTC shared trading data, jointly interviewed key witnesses, and referenced each other in the press, notwithstanding that some of the witnesses were interviewed independently and DOJ hired its own data analyst); *Martoma*, 990 F. Supp. 2d at 461; *United States v. Gupta*, 848 F. Supp. 2d at 495. The facts of this case support the same conclusion.

If there remains any doubt this was a joint investigation with the SEC, the defense respectfully requests that the Court set the matter for an evidentiary hearing and order the government to produce all emails and messages exchanged between DOJ, FBI, and/or the SEC, along with calendar invites (or, if such material has not been maintained, a document reflecting calls and calendar invites) of all calls, meetings, web-meetings, and other coordination between DOJ and the SEC. In the event DOJ reviewed materials on a "shared screen" during the course of a webcast such as Zoom, WebEx, or Teams, the Court should demand disclosure of that information as well. *Accord United States v. Alexandre*, 22-CR-326 (S.D.N.Y. Nov. 8, 2022) [ECF No. 54 pgs. 6-7] (ordering DOJ to provide further details to evaluate whether the investigation was a joint investigation and collecting cases regarding the same).

**II.   The government must be ordered to review, identify, and produce from the SEC's files *Brady* material, including the underlying materials from the SEC Meme Stock Report.**

The government's brief concedes that it has not reviewed SEC records for *Brady* material, downplaying the serious responsibility that rests on *the government* to review and identify *Brady* material. *See* Opp. pg. 1. The government asserts that Constantinescu "cannot . . . identify the critical *'Brady'* material," which the government concludes is "fatal to the request altogether." Opp. pg. 5.[3] The government is completely wrong, and the *Scott* opinion it cites does not stand for that proposition. Basic tenants of criminal law demand that it is "the *prosecution's* affirmative duty to disclose evidence favorable to a defendant," an obligation tracing from "early 20th-century strictures against misrepresentation." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). Obviously, "the Supreme Court has placed the initial *Brady/Giglio* duty on the government, and the [government] is not free to assign it to the defendant." *United States v. Saffarinia,* 424 F.

---

[3] The notion that a *defendant* must first identify specific items as a prerequisite to entitlement to *Brady* material is directly contradicted by Policy 9-5.001 of the Justice Manual.

Supp. 3d 46, 88 (D.D.C. 2020) (internal alterations omitted); *see also United States v. Baca*, 409 F. Supp. 3d 1169, 1228 (D.N.M. 2019) ("[t]he burden is on the government to produce exculpatory materials; the burden is not on the defendant to first note that such materials exist").

The government also asserts that no obligation exists because the records the defense seeks were not created as the result of joint activity. Opp. pg. 4. It is unclear how the government could make this assertion without conceding that it was so intertwined with the SEC that it can make representations about the timing and details of the SEC's investigative efforts. In any event, the government conflates and misunderstands that given the joint investigation, the SEC is deemed a member of its prosecution team; thus, information in the SEC's possession, custody, and control is deemed within the prosecution team's possession, custody, and control. The government's lawyers are not excused from reviewing records and materials created prior to May 18, 2022. *See* Opp. pg. 4-5. That is especially true where, as here, the SEC issued a report (the October 2021 SEC Meme Stock Report) that contradicts assumptions crucial to one of the allegations in the Superseding Indictment while the SEC was investigating these defendants. *See* Ex. P (noting that the SEC's investigation had been open for approximately one year).[4] Accordingly, the Court should order that the government's review of SEC materials must include those materials that relate to the case the government chose to charge, not merely records that were created after DOJ administratively opened its investigation.

---

[4] To hold otherwise would lead to unacceptable results. This circumstance is no different than if the DEA issued a national report suggesting that a particular type of test to detect the presence of methamphetamine was unreliable shortly before a U.S. Attorney's Office charged a defendant and attempted to rely on DEA evidence involving the same test to prove its case. In this hypothetical, the government could not reasonably disavow an obligation to turn over materials suggesting that the test lacked reliability merely because the report had been prepared prior to the government's prosecution.

**III.     SEC information that contradicts DOJ's allegations and conclusions, including the SEC Meme Stock Materials and the SEC's competing trading profits valuation, is relevant and exculpatory.**

The government argues that Constantinescu "fails to demonstrate how the information he seeks is relevant, let alone material." Opp. pg. 5. The following two sentences should clear up how this information is material. The SEC determined that NAKD, SNDL, EXPR, GNUS, KOSS, and other Meme Stocks experienced price and volume volatility in 2021 because of a convergence of complex factors and that the "motivation" for the uptick in "buy volume" "could not be determined." Mem. pg. 2 (citing the Meme Stock Report). This directly contradicts the Superseding Indictment's allegations that people were defrauded by Constantinescu "artificially driving up" these stocks prices by tweeting. *See* Superseding Indictment ¶¶ 1, 13. Additionally, the Superseding Indictment alleges $114 million of illicit profits, while the SEC has determined a completely different figure (both of which differ from seizure warrant affidavits). *See* Ex. I to Mem. (noting a $100 million scheme).

Accordingly, Constantinescu respectfully requests that the Court: (1) require the government to produce additional information to assist in the appropriate inquiry as to whether this was a joint investigation; (2) hold an evidentiary hearing to address the government's consistent failures to produce *Brady* material; (3) admonish the government to produce exculpatory material to the defense immediately, regardless of whether the defense has "identified" or "requested" it; and (4) order the government to review the SEC's files (including emails, notes, and other material) and produce *Brady* material from those files, including the following:

1. All information underlying SEC's conclusions and analyses in the SEC Meme Stock Report, whether prepared before or after DOJ opened its investigation, including information subpoenaed by SEC from third-parties;

2. All information that contradicts the government's allegations in the indictment or the conclusions of its opinion witnesses; and

3. All information that would otherwise be exculpatory if contained in DOJ's own files, emails, or phones.

Dated: July 19, 2023                                      Respectfully submitted,

_____
Matthew A. Ford
Texas Bar No. 24119390
mford@fordobrien.com
Jamie Hoxie Solano
Admitted *Pro Hac Vice*
jsolano@fordobrien.com

FORD O'BRIEN LANDY, LLP
3700 Ranch Road 620 South, Suite B
Austin, Texas 78738
Telephone: (512)-503-6388
Facsimile: (212) 256-1047

*Attorneys for Defendant*
*Edward Constantinescu*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on July 19, 2023, a true and correct copy of the foregoing document has been electronically served on all counsel of record via the Court's CM/ECF system.

                                          */s/ Matthew A. Ford*
                                          Matthew A. Ford