UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | Case No. 4:22-cr-612 |
| CONSTANTINESCU, *et al.* | § § | The Honorable Andrew S. Hanen |
| Defendants. | § § | |

**United States' Response in Opposition to Defendant Constantinescu's Motion to Compel**

The United States, by and through its undersigned counsel, responds to Defendant's Third Motion to Compel (ECF No. 322). The Court should deny the Motion for the below-stated reasons.

**I.    The Court should deny the Motion because the information Defendant seeks is not *Brady* material.**

The topics and materials referenced in the Motion cannot be "exculpatory" or "exonerate[]" Defendant (Mot. at 1, 2), because they have nothing to do with the Defendant's conduct alleged in this case. Putting aside Defendant's now-routine hyperbole and purported license to stretch facts to that end, he does not identify material exculpatory or impeachment information that implicates *Brady* or *Giglio*.

*First*, the circumstances surrounding Special Agent B's apparent receipt of a money from Defendant are unrelated to whether Defendant committed securities fraud, as alleged in the Superseding Indictment, and do not bear on the credibility of any testifying witness in this case. *Second*, communications between a prosecutor and an attorney representing Defendant's wife similarly have nothing to do with Defendant's guilt or innocence of the charged crimes. The divorce attorney of Defendant's wife reached out to a prosecutor for information about this case. In response, the United States sought only to ensure that Defendant did not use his conditions of

pre-trial release in this case to shirk any financial obligations in divorce proceedings, and to ease any administrative burden on this Court.

In his third purported *Brady* motion, Defendant is now flailing without deference to either the facts or the law. With neither on his side, he resorts to pounding the table. The Court should put an end to it.

1. *Special Agent B had no role in the investigation and was prevented from being aware of it until after charges were brought.*

Defendant's specious claims of bias in this investigation are belied by basic facts. Special Agent B had no role in either the investigation or charging of this case.

As background, Special Agent B does not physically work in the FBI's Houston Field Office, but is assigned to an office in Bryan–College Station. In that capacity, Special Agent B works primarily on national security issues. As explained below, Special Agent B had zero role in the investigation of this case.

As reflected in the FBI's case-opening document, this case originated with the Fraud Section in Washington, DC, and "was referred to FBI Houston by DOJ Fraud Section . . . ." (*See* Ex. 1 at 3.) Thus, the case origination itself could not be further removed from Special Agent B. Defendant had this information but chose instead to make specious insinuations in his Motion without any basis in fact.

When the lead case agent opened the case on May 18, 2022, the case agent had neither met, and to this date has not even spoken to, Special Agent B nor had any knowledge of Special Agent B's relationship to Defendant. On June 13, 2022, the case agent requested that this investigation's case file be placed on "prohibited status," as reflected in the serial dated June 13, 2022, attached as Exhibit 2. Designating the case as "prohibited status" meant that Special Agent B did not have any ability to see if this case even existed, let alone the substance of the file.

To be clear, the case agent had no reason to suspect Special Agent B of any wrongdoing and had no understanding of Special Agent B's relationship with his sister or Defendant, whether positive or otherwise. By placing this case in prohibited status, the case agent sought to protect against even the possibility of Special Agent B inadvertently learning of this investigation. In this way, the lead case agent took this reasonable step to ensure the covert nature of the investigation by walling off anyone with potential ties to Defendant. After this case was charged by indictment on December 7, 2012 (*see* ECF No. 1), Special Agent B was informed about this case by his supervisor on or about the morning of the Defendants' arrests. Special Agent B was so informed on or about December 13, 2022 as a professional courtesy given his relationship to Defendant's wife. Prior to the Defendants' arrests, the case team has no reason to believe that Special Agent B knew of the investigation at all and, as noted above, took affirmative steps to preclude such knowledge.

Given Special Agent B's complete lack of involvement in the investigation of this case, there is no factual foundation to argue that the Houston Field Office has "bias" towards Defendant. (*See* Mot. at 2.) It therefore follows that there is no similar basis to "attack the credibility of the investigation that led to these charges against [Defendants]." (*Id.*) Putting aside the lack of factual foundation, Defendant's attempts to string together impeachment material for an office writ large fails as a matter of law. *See, e.g.*, *United States v. Freeman*, 164 F.3d 243, 248 (5th Cir. 1999) (explaining that *Brady* and *Giglio* apply to "any evidence that would tend to show a prosecution **witness's** bias, [or] could be used to impeach **him**" (emphasis added)). By ignoring both the facts and the law, Defendant has now lodged his third meritless fishing expedition for purported *Brady* information, which the Court should not entertain. *See United States v. Edwards*, 442 F.3d 258, 268 n.10 (5th Cir. 2006) ("Due to the speculative and conclusory nature of the [defendants']

3

allegations with respect to both the suppression and materiality *Brady* prongs, such a hearing would serve as nothing more than a fishing expedition.").

As to the facts surrounding the transfer of funds to Special Agent B, an agent on this case interviewed Special Agent B after Defendant texted Special Agent B the February 21, 2023 message referenced in the Motion. (*See* Mot. at 5.) The United States produced both the cited text message and the report of interview to Defendant as part of its discovery obligations in this case. Defendant is therefore seeking to pervert the United States' *compliance* with its discovery obligations to manufacture discovery "violations" out of whole cloth.

The nature and circumstances of that transfer have no relevance to this case, given Special Agent B's lack of involvement in the case. Even assuming that this money is from "trading profits" as Defendant Constantin suspiciously claimed more than three months after his indictment and approximately two weeks after the return of the Superseding Indictment (ECF No. 134, Feb. 8, 2023), there is no reason to believe this information is *Brady* material. The transfer has nothing to do with the underlying facts of the case and whether Defendant committed the charged offenses.

As to the merits of the transaction, Defendant ties himself in knots trying to besmirch the integrity of the case team but does not flesh out the only possible logical conclusions of his argument, none of which resolve in his favor. If the transfer did not involve tainted funds, then there is zero relevance to the transfer at all, and it does not undermine the United States' efforts to seize Defendant Constantinescu's other assets in this case. If Defendant will concede that the transfer involved tainted funds, the only conceivable relevance would be impeachment material as to Special Agent B. Of note, this argument would also require accepting other foundational predicates, namely that Special Agent B had knowledge of the tainted source of the funds or otherwise acted in a manner that would undermine his credibility. On both points, the United States

does not accept these premises. Nonetheless, even assuming such is the case for present argument, that hypothetical relevance falls flat given that Special Agent B is not a witness in this case and will not be called as such by the United States. *See, e.g.*, *Freeman*, 164 F.3d at 248 ("The district court determined that so long as neither [person] testified, the issue of their potential bias or misconduct was not relevant."); *United States v. Mesa*, 660 F.2d 1070, 1076–77 (5th Cir. 1981) (holding failure to disclose government witness was under investigation did not require reversal because impeachment value of such evidence insufficient to result in acquittal).

2. *The points concerning Defendant's wife are irrelevant to this case.*

Defendant's wife's attorney in their divorce proceeding reached out, on his own, to a prosecutor to obtain information about this case and its potential impact on the divorce proceedings, as demonstrated in the example email attached as Exhibit 3. The prosecutor and divorce attorney spoke by phone several times and exchanged several emails, such as Exhibit 3. As demonstrated in Exhibit 3, the main thrust of the attorney's inquiries turned on his efforts to understand the veracity of Defendant's purported representations to the divorce court that Defendant's pre-trial conditions in this case prevented him from paying court-ordered spousal support.[1] (*See* Ex. 3 at 2.) None of the prosecutors ever spoke with Defendant's wife, and only a single prosecutor spoke with her attorney over the phone. There were no "meetings" or "secret conversations." (*See* Mot. at 2.) The United States filed the referenced motion regarding Defendant's pre-trial release conditions to ensure that Defendant could not use this case to avoid his financial obligations in that proceeding, and to avoid the administrative burden of this Court

---

[1] Defendant's apparent claims of being unable to pay spousal support due to his pre-trial conditions in this case are curious given that bank records clearly show he violates those conditions when he pleases. As his bank statements show, Defendant transferred approximately $28,000 on or about January 23, 2023 to an individual the United States understands to be Defendant's current girlfriend, in clear violation of his pre-trial conditions. (*See* DOJ-PROD-0000354575.) It appears Defendant uses his pre-trial conditions as a shield when convenient but disregards them when inconvenient.

5

having to approve a monthly $10,000 spousal support payment. (*See* ECF Nos. 270, 274.) These efforts have nothing to do with the merits of this case.

As to Defendant's claims of his wife's alleged exculpatory statements, the prosecution team has no knowledge of those assertions. The FD-302 report produced in discovery and attached here as Exhibit 4 reflects the sole conversation between Defendant's wife and a member of the prosecution team that occurred prior to the filing of Defendant's Motion. The purpose of that discussion was to ask Defendant's wife if she knew the password to Defendant's phone.[2] As reflected in the FD-302, the wife took the opportunity to provide more information, as she "stated she wanted to talk to the Federal Bureau of Investigation (FBI) in order to have an accurate record about what she knew with respect to her husband, Edward Constantinescu . . . ." (Ex. 4 at 1.) With respect to Defendant Constantinescu's trading, as the report reflects, his wife "certainly noticed Constantin had made a lot of money trading stocks" but "[s]he did not have access to any of the trading accounts or anything to do with the trading." (Ex. 4 at 2.) Subsequent to the filing of the Motion, Defendant's wife voluntarily contacted the case agent again and affirmed the veracity of those statements.[3] The statements the defense alleges were made are not consistent with those statements or with the general tenor of the interview, as reflected in the report. (*See id.*) And even if Defendant's wife did make the statements Defendant alleges, the defense is aware of those

---

[2] The marital communications privilege, which is evidentiary in nature, obviously doesn't apply to this situation despite Defendant's confused reference to it. *See, e.g.*, *United States v. Ramirez*, 145 F.3d 345, 355 (5th Cir. 1988) ("The marital privilege is divided into two distinct privileges by the federal courts. The first privilege bars a spouse from *testifying* adversely to the other. The second privilege bars a spouse from *testifying* as to the confidential marital communications of the other." (emphasis added)); *Jernigan v. State*, 661 S.W.2d 936, 938 (Tex. Crim. App. 1983) (en banc) (holding information subject to the privilege may support an arrest warrant because the privilege concerns "*testimony in a criminal proceeding*" and, thus, nothing about the privilege "prohibits the use of information supplied by a person other than as evidence in a criminal proceeding"); (Mot. at 4).

[3] On this point, the United States incorporates by reference its Motion for Revocation (ECF No. 343) and its exhibits.

6

purported statements, so they cannot support a *Brady* claim. *See, e.g.*, *Clark*, 928 F.2d 733, 738 (6th Cir. 1994) (explaining there is no *Brady* issue "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available to the defendant from another source" (internal quotations and citations omitted); *United States v. Saipov*, 17-cr-722, 2023 WL 3495031, at *5 (S.D.N.Y. May 16, 2023) ("[A]ny evidence known to [defendants] is not *Brady* material.").

## Conclusion

The Court should deny Defendant's Motion because it seeks information that cannot logically be exculpatory or impeachment material and, thus, does not implicate *Brady*, or is otherwise irrelevant to this case.

Dated: July 28, 2023                                         Respectfully submitted,


                                                             GLENN S. LEON
                                                             Chief, Fraud Section
                                                             Criminal Division, Department of Justice

                                    By:      */s/John J. Liolos*
                                             Scott Armstrong, Assistant Chief
                                             John J. Liolos, Trial Attorney
                                             Fraud Section, Criminal Division
                                             United States Department of Justice
                                             1400 New York Ave. NW
                                             Washington, DC 20005
                                             Tel.: (202) 768-2246

        ALAMDAR S. HAMDANI
        United States Attorney
        Southern District of Texas

By:   */s/ Thomas Carter*
      Thomas H. Carter
      Assistant United States Attorney
      State Bar No.: TX24048387
      1000 Louisiana Street, 25th Floor
      Houston, Texas 77002
      Tel.: (713) 567-9470

**CERTIFICATE OF SERVICE**

    I hereby certify that on July 28, 2023, I will cause the foregoing brief to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide copies to counsel for all parties.

    */s/ John J. Liolos*
    John J. Liolos, Trial Attorney
    U.S. Department of Justice
    Criminal Division, Fraud Section